# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **GIH-SPE II, LLC,** | Case No. 09-11205 (PJW) |
| Debtor. | |

## AFFIDAVIT OF RICHARD BOSWORTH IN SUPPORT OF THE MOTION OF CANPARTNERS REALTY HOLDING COMPANY IV LLC FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | |
| | ) | ss: |
| COUNTY OF LOS ANGELES | ) | |

RICHARD BOSWORTH, being duly sworn states as follows:

1.     I make this affidavit (the "Affidavit") under the penalty of perjury.  All facts set forth herein are based on my personal knowledge and the information contained in the records of Canpartners Realty Holding Company IV LLC ("Canyon" or the "Lender"), which I have reviewed and which this Affidavit accurately reflects.  If I were called upon to testify, I could and would testify competently to the facts in this declaration.

2.     I am a Senior Director of Canyon Capital Realty Advisors LLC ("CCRA"), a member of Canpartners Realty Holding Company IV LLC ("Canyon").  I submit this Affidavit in support of the motion of Canyon for an order granting relief from the automatic stay (the "Motion").[1]

3.     As a Senior Director of CCRA, I am a custodian of the books and records of Canyon and can confirm that the records and other documents pertaining to the Loan funded

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

by Canyon constitute writings made in the regular and ordinary course of business of Canyon at or near the time of the events or acts of which they are a record.

## I.  The Loan Agreement

4.    On July 10, 2007, the Debtor and Canyon entered into a loan agreement (the "Loan Agreement," a true and correct copy of which is attached hereto as Exhibit 1), pursuant to which the Debtor obtained a loan from Canyon in the principal amount of $56,000,000 (the "Loan").  The Debtor used the proceeds of the Loan to obtain certain real property, improvements, and related personal property in Clark County, Nevada, commonly known as the Greek Isles Hotel & Casino (the "Property," a true and correct copy of the legal description of which is attached hereto as Exhibit 2).[2]  To evidence the making of the Loan, and as part of the same transaction, the Debtor executed and delivered to Canyon a Promissory Note, dated as of July 10, 2007, in the original principal amount of $56,000,000 (the "Note, a true and correct copy of which is attached hereto as Exhibit 3).

5.    To secure payment of the Loan and as part of the same transaction, the Debtor delivered the following documents, among other things, to Canyon:

(a)    a Deed of Trust and Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of July 10, 2007, executed and delivered by Borrower to Nevada Title Company, as trustee, for the benefit of Lender (the "Deed of Trust," a true and correct copy of which is attached hereto as Exhibit 4), encumbering the Property, which was recorded on July 11, 2007 in the Official

---

[2] The "Property" is a parcel of real property containing a hotel and casino and other improvements, located at 305 Convention Center Drive, Las Vegas, NV 89109, together with all leases, licenses, deposits, rents, issues and profits therefrom (all as more particularly described in the applicable loan and security documents).  The Property is situated on land parcel # 162-09-805-015 and #162-09-805-016.

Records of Clark County, Nevada (the "Official Records") as Instrument No 0001159, Book 20070711;

(b)      an Absolute Assignment of Leases, Rents and Income, dated as of July 10, 2007, executed and delivered by Borrower in favor of Lender (the "Assignment of Leases," a true and correct copy of which is attached hereto as Exhibit 5), which was recorded on July 11, 2007 in the Official Records as Instrument No 0001160, Book 20070711;

(c)      a UCC-1 Financing Statement (the "Fixture Filing UCC-1," a true and correct copy of which is attached hereto as Exhibit 6), naming Borrower as Debtor and Lender as Secured Party, which was recorded on July 11, 2007 in the Official Records as Instrument No 0001161, Book 20070711;

(d)      a UCC-1 Financing Statement (the "Personal Property UCC-1, a true and correct copy of which is attached hereto as Exhibit 7), naming Borrower as Debtor and Lender as Secured Party, which was filed on July 20, 2007 with the Delaware Secretary of State as File No. 2007 2753803; and

(e)      a UCC-1 Financing Statement (the "Accounts UCC-1," a true and correct copy of which is attached hereto as Exhibit 8), naming Borrower as Debtor and Lender as Secured Party, which was filed on July 20, 2007 with the Delaware Secretary of State as File No. 2007 2753829 (collectively and together with the Loan Agreement, the Note, and all other documents that govern, evidence, secure, relate to, or arise out of the Loan, the "Loan Documents").

LA1 1590219v.2

6.     As additional security for the repayment of the Loan, interest thereon, and all other charges as provided for in the Loan Agreement, and as part of the same transaction, the following Loan Documents, among other things, were further delivered to Canyon:

(a)     an Accommodation Pledge Agreement (Membership Interests in Borrower), dated as of July 10, 2007 (the "Accommodation Pledge Agreement," a true and correct copy of which is attached hereto as Exhibit 9), executed by GIH-SPE I, LLC, a Delaware limited liability company ("Managing Member"), and ECALV II LLC, a Delaware limited liability company ("Non-Managing Member"; and together with Managing Member, "Members"), in favor of Lender, pursuant to which Members granted to Lender a first priority security interest in all of Members' right, title and interest as the members of Borrower;

(b)     a UCC-1 Financing Statement (the "Managing Member Pledge UCC-1," a true and correct copy of which is attached hereto as Exhibit 10), naming Managing Member as Debtor and Lender as Secured Party which was filed on July 20, 2007 with the Delaware Secretary of State as File No. 2007 2753837; and

(c)     a UCC-1 Financing Statement (the "Non-Managing Member Pledge UCC-1," a true and correct copy of which is attached hereto as Exhibit 11), naming Non-Managing Member as Debtor and Lender as Secured Party which was filed on July 20, 2007 with the Delaware Secretary of State as File No. 2007 2753852.

7.      As evidenced by the Loan Documents, Canyon holds a perfected and unavoidable security interest in the Property, including all rents, revenues, income, issues, and profits therefrom.

8.      Immediately following the Debtor's acquisition of the Property and the funding of the Loan, the Debtor leased the Property to Convention Center Drive Hotel and Casino LLC, a Nevada limited liability company ("Hotel Lessee"), pursuant to that certain Amended and Restated Turn-Key Lease Agreement, dated as of July 10, 2007 (the "Hotel Lease," a true and correct copy of which is attached hereto as Exhibit 12).  At the same time, the Debtor granted to ECALV I LLC, a Delaware limited liability company ("Optionee"), an option to purchase the Property pursuant to that certain Option to Purchase Property, dated as of July 10, 2007 (the "Option Agreement," a true and correct copy of which is attached hereto as Exhibit 13).

9.      The entire principal balance of the Loan, any and all accrued and unpaid interest thereon, and all other obligations thereunder, became due and payable on July 10, 2008, the maturity date (the "Maturity Date") under the Loan Agreement.  The Debtor failed to repay the outstanding principal balance by the Maturity Date and, as a result, the Debtor has been in default since July 10, 2008.

## II.      Loan Default and Foreclosure Sale

10.      By letter dated July 10, 2008 (the "Default Letter," a true and correct copy of which is attached hereto as Exhibit 14), Canyon notified the Debtor that the Maturity Date had lapsed, and that the Debtor failed to repay the Loan on the Maturity Date as required under the Loan Documents, which failure constituted an immediate Event of Default under Section 10.1(a) of the Loan Agreement.

11.     On or about July 10, 2008, Canyon and the Hotel Lessee, among other parties, entered into a forbearance agreement which was to expire on October 10, 2008 (the "Forbearance Agreement," a true and correct copy of which is attached hereto as Exhibit 15). By letter dated October 10, 2008, Canyon notified the other parties thereto that the Forbearance Period had expired.

12.     On or about December 12, 2008, Canyon caused a notice of default to be recorded in the County Records of Clark County, Nevada, as Instrument No. 0003439, Book 20081212 (the "Notice of Default," a true and correct copy of which is attached hereto as Exhibit 16).

13.     On or about January 12, 2009, Canyon filed an action commencing case number A579835 in the District Court of Clark County in Las Vegas, Nevada (the "Las Vegas Court") seeking, among other relief, the appointment of a receiver (the "Receiver"), and on February 9, 2009 the Las Vegas Court appointed the Receiver to take possession of the Property (the "Receivership Order"). Since obtaining possession and control of the Property on or about March 13, 2009, the Receiver has been responsible for the operation, management, maintenance and preservation of the Property under the terms of the Receivership Order.

14.     On or about March 10, 2009, the Debtor and Canyon, among other parties, entered into a settlement agreement (the "Settlement Agreement," a true and correct copy of which is attached hereto as Exhibit 17), pursuant to which the Debtor reaffirmed the Loan Agreement, Note, and the Loan Documents, executed a broad release of any claims against Canyon, and acknowledged that it had no defense against or claim arising from the Loan Documents.

15.     On or about March 12, 2009, Canyon recorded a Notice of Sale (the "Notice of Sale," a true and correct copy of which is attached hereto as <u>Exhibit 18</u>) in the official records of Clark County, Nevada, which scheduled a foreclosure sale of the Deed of Trust for April 7, 2009 (the "<u>Foreclosure Sale</u>").

## III.     Actions Taken Since the Involuntary Petitions

16.     On or about April 6, 2009 (the "<u>Petition Date</u>"), the day immediately prior to the scheduled foreclosure sale, the Involuntary Petition was filed against the Debtor. As a result of the Involuntary Petition, the Foreclosure Sale has been stayed.

17.     On May 7, 2009, Canyon served requests for the production of documents and notices of deposition (the "<u>Discovery Requests</u>") on all Petitioning Creditors on May 7, 2009 (Docket Nos. 9-31). Pursuant to Bankruptcy Rule 7034(b)(2)(A), the Petitioning Creditors were required to produce the requested documents by 4:00pm (EST) on June 8, 2009. Following discussions, on June 15, 2009, the Petitioning Creditors and Canyon agreed to a revised schedule for complying with the Discovery Requests. Under this revised schedule, the Petitioning Creditors agreed to the first production of documents on or before June 22, 2009 and continuing through July 10, 2009.

18.     On May 15, 2009, the Court approved a joint stipulation between Canyon and the Debtors, with the consent of the Receiver, to allow the Receiver to remain in possession of the Property notwithstanding any turnover obligation under section 543(b) (Docket No. 37).

## IV.     Outstanding Debt Owed

19.     The debt owed by the Debtor to Canyon as of June 17, 2009 was no less than $67,361,115.93, consisting of $55,843,991.23 in outstanding principal, $6,413,026.81 in unpaid contract interest, $3,312,793.81 in accrued default interest from the Maturity Date

through June 17, 2009, $1,120,000.00 in unpaid fees, $439,976.20 in protective advances (other than for attorneys' fees and expenses), $206,580.80 in attorneys' fees and expenses, $24,747.08 in accrual on protective advances, plus interest that continues to accrue at the rate of $37,699.92 per day and additional fees and expenses due under the Loan Documents.

20.     The Property has been operating at a net operating loss even before debt service to Canyon.  Since December 17, 2008, no interest payments have been made to Canyon at the applicable nondefault contract rate of interest.[3]

## V.     Fair Market Value of Property

21.     On or about January 9, 2008, Canyon received an appraisal of the fair market value of the Property dated December 31, 2007 (the "December 2007 Appraisal," a true and correct copy of which is attached hereto as Exhibit 19).  This 2007 Appraisal had been prepared at the request and authorization of Harold Rothstein, a majority owner of the Debtor and, at that time, an authorized person for the managing member of the Debtor.  According to the 2007 Appraisal, the Property was value at $120,000,000.

22.     On May 20, 2009, Canyon, by and through its counsel, retained Timothy R. Morse & Associates to perform a current appraisal for the fair market value of the Property, dated June 5, 2009, for purposes of this Motion (the "June 2009 Appraisal").  According to the June 2009 Appraisal, the Property is now valued at $44,080,000.00.

23.     To minimize any continued losses from the Property, Canyon seeks relief from the automatic stay to complete the Foreclosure Sale of the Property.

---

[3] Nothing contained herein is intended or should be construed as (i) an admission by Canyon that it is not entitled to default interest or (ii) a waiver of any claim of default interest.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Dated: 6/18/09

Richard Bosworth

Sworn to and subscribed
before me this
_____ day of June, 2009.

_____
Notary Public

LA1 1590219v.2

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____     _____
Signature of Document Signer No. 1                                    Signature of Document Signer No. 2 (if any)

State of California

County of ___Los Angeles___

Subscribed and sworn to (or affirmed) before me on this

___18___ day of ___June___, 20_09_, by
Date                    Month                          Year

(1)___Richard Bosworth___,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) ☒

(and

(2)_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _____
Signature of Notary Public

**ALIA ALJUNIED**
Commission # 1702887
Notary Public - California
Los Angeles County
My Comm. Expires Nov 4, 2010

Place Notary Seal Above

—————————— *OPTIONAL* ——————————

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document:_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT 1

LOAN AGREEMENT

Dated as of July _10_, 2007

between

GIH-SPE II, LLC,
a Delaware limited liability company

and

CANPARTNERS REALTY HOLDING COMPANY IV LLC,
a Delaware limited liability company

$56,000,000 Loan

Greek Isles Hotel and Casino
City of Las Vegas, County of Clark, State of Nevada

# LOAN AGREEMENT

This LOAN AGREEMENT is made as of this _10_ day of July 2007, by and between GIH-SPE II, LLC, a Delaware limited liability company (the "Borrower"), and CANPARTNERS REALTY HOLDING COMPANY IV LLC, a Delaware limited liability company (together with its successors and assigns, the "Lender"), with respect to the following matters:

## RECITALS

Borrower has requested a loan from Lender in the maximum principal amount of Fifty Six Million and 00/100 Dollars ($56,000,000) (the "Loan"), upon the terms and conditions hereinafter set forth, which will be secured by, inter alia, the Deed of Trust (as hereinafter defined) encumbering all of Borrower's interest in the Property (as hereinafter defined).

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

ARTICLE 1
DEFINITIONS

1.1     Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"Accommodation Pledge Agreement" means that certain Accommodation Pledge Agreement (Membership Interests in Borrower), executed by Borrower's Members in favor of Lender, and the related Consent executed by Borrower.

"Accounts Pledge Agreement (Borrower)" means that certain Pledge Agreement (Accounts – Borrower) executed by Borrower in favor of Lender, granting to Lender a duly perfected Lien on all of Borrower's right, title and interest in and to the Reserves and the Managed Account.

"Accounts Pledge Agreement (Hotel Lease Tenant)" means that certain Pledge Agreement (Accounts – Lessee) executed by Hotel Lease Tenant in favor of Lender, granting to Lender a duly perfected Lien on all of Borrower's right, title and interest in and to the Managed Account.

"Affiliate" means, as to any Person, (a) any other Person which, directly or indirectly through one or more intermediaries, controls, or is under common control with, or is controlled by, (i) such Person or (ii) any general partner or member, director or officer of such Person; (b) any other Person five percent (5%) or more of the equity interest of which is held beneficially or of record by (i) such Person or (ii) any general partner or member, director or officer of such Person, or (c) any general partner, limited partner, director or officer or member of (i) such Person or (ii) any partner, limited partner, director or officer, of such Person. As used in this Agreement,

"control" (and its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract, family relationship or otherwise). As of the date hereof, neither Seller, Mezzanine Lender, nor Non-Managing Member, nor Hotel Lease Tenant, nor Option Holder nor the current Manager shall be deemed to be "Affiliates" of Borrower, Managing Member, DI Development or Guarantor.

"Agreement" means this loan agreement, as it may from time to time be supplemented, modified, amended, restated or extended pursuant to Section 11.2 hereof.

"Approved Budget" shall have the meaning set forth in Section 8.1 hereof.

"Assignment of Leases" means that certain Absolute Assignment of Leases, Rents and Income, executed by Borrower in favor of Lender, in recordable form.

"Assignment of Licenses and Contracts" means that certain Assignment of Permits, Licenses, Approvals, Agreements and Documents, executed by Borrower in favor of Lender.

"Assignment of Management Agreement" means that certain Subordination and Recognition Agreement (re: Management Agreement) executed by Borrower, Manager and Lender.

"Borrower" shall have the meaning set forth in the preamble to this Agreement.

"Borrower's Members" means Managing Member and Non-Managing Member, and any other Person which may become a member of Borrower with Lender's approval and in accordance with the provisions and to the extent permitted herein.

"Borrower's Required Equity" means an amount equal to Four Million Seven Hundred Sixty-Five Thousand Three Hundred Nine and 00/100 Dollars ($4,765,319).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Las Vegas, Nevada, Los Angeles, California or New York, New York are authorized or required by Law to close.

"Casino" means those portions of the Property containing the showroom, gaming and liquor servicing areas of the Property, including, without limitation, the areas of the Property containing and immediately adjacent to the slot machines, video machines, all gaming devices, table games, poker room, keno area, baccarat areas, and any other areas which are subject to the supervision by the Nevada Gaming Authorities, together with all surveillance areas, counting rooms, cashier cages and other areas ancillary to casino gaming.

"Casino Lease" means that certain Space Lease, dated as of September 2, 2005, by and between Seller, as landlord, and Casino Tenant, as tenant, as assigned by Seller to

and assumed by Hotel Lease Tenant, pursuant to which Casino Tenant is leasing from Hotel Lease Tenant the Casino.

"Casino Lease Non-Disturbance Agreement" means that certain Non-Disturbance and Attornment Agreement, of even date herewith, executed by Hotel Lease Tenant, Casino Tenant and Lender.

"Casino Tenant" means United Coin Machine Co., a Nevada corporation.

"Closing" means the initial funding of the Loan.

"Closing Date" means the earlier of the date that initial funding of the Loan occurs or the Deed of Trust is recorded in the Official Records of Clark County, Nevada.

"Closing Instruction Letter" means joint escrow instructions signed by Borrower, Lender and Title Company, with respect to disbursement of Loan proceeds, the funds provided by Borrower, title matters and other escrow matters as Lender shall elect in its discretion.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all of the property, real or personal, which is now or may hereafter become subject to a Lien in favor of Lender as security for the Loan, including, but not limited to, the Property.

"Commitment Fee" means the sum of One Million One Hundred Twenty Thousand and 00/100 Dollars ($1,120,000).

"Commitment Letter" shall have the meaning set forth in Section 2.1(d) hereof.

"Contingent Obligations" means, as applied to any Person, any direct or indirect liability or obligation of that Person, the payment or satisfaction of which is contingent upon the occurrence of some future event or condition other than the passage of time, as determined in accordance with GAAP.

"Contracts" means the instruments, agreements, contracts, licenses and franchise agreements of Borrower for the Property, and all documents related to the Collateral, all of which documents are listed on Schedule 4.21 attached to this Agreement.

"Controlling Member" means GIH-SPE I, LLC, a Delaware limited liability company.

"Credit Card Agreement" shall mean any merchant's agreement or other agreement providing for payment or credit on account of clearing or negotiation of revenues incurred by credit card, debit card, and similar methods.

"Credit Card Company" shall mean the companies with which Borrower, Hotel Lease Tenant or Manager at any time shall be a party to any Credit Card Agreement.

"Credit Card Payment Direction Letter" has the meaning set forth in Subsection 8.4.

"Deed of Trust" means that certain Deed of Trust and Security Agreement, Assignment of Leases and Rents and Fixture Filing of even date herewith executed by Borrower, as trustor, for the benefit of Lender, as beneficiary, encumbering the Property.

"Default Interest" shall have the meaning set forth in the Note.

"Default Rate" shall have the meaning set forth in the Note.

"DI Development" means DI Development Group, LLC, a Delaware limited liability company.

"Disclosed Brokers" means, collectively, Michael Shillan, James A. von Kreuter, SOP USA, Inc. and Bigwal, LLC.

"Dollars" or "$" means United States Dollars.

"Environmental Laws" means all federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, licenses, authorizations and permits of, and agreements with, any Governmental Agency, in each case relating to environmental, health and safety matters, including, without limitation, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 1801 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 741 et seq.; the Clean Water Act, 33 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C., Sections 651, the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 80, et seq., the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j; Nevada Revised Statutes Chapter 459; and all comparable state and local laws, all as the same may be hereafter amended including all similar or related laws of the State of Nevada and all environmental regulations, remediation or pollution control laws of the State of Nevada all as the same may be amended from time to time.

"Environmental Reports" means environmental reports and audits prepared by environmental engineers and/or consultants reasonably satisfactory to Lender in accordance with standards acceptable to Lender.

"EO13224" shall have the meaning set forth in Section 4.31 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, and any regulations issued pursuant thereto, as amended or replaced and as in effect from time to time.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Financial Statements" shall have the meaning set forth in Section 4.5 hereof.

"Fiscal Quarter" means a fiscal quarter of Borrower.

"Fiscal Year" means a fiscal year of Borrower.

"Forecasted Income and Expense Statement" shall have the meaning set forth in Section 4.5 hereof.

"GAAP" or "generally accepted accounting principles" means generally accepted accounting principles consistently applied, set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and of comparable stature and authority within the accounting profession), or in such other statements by such other entity as may be in general use by significant segments of the U.S. accounting profession which are applicable to the circumstances as of the date of determination.

"Gaming Assets" means all of Borrower's gaming assets consisting of all gaming equipment which directly or indirectly comprise, are used in, or relate to Borrower's casino business (operated by Casino Tenant under the Casino Lease), including without limitation, the furniture, fixtures, gaming devices, and all warranties applicable thereto, equipment, appliances, tools, trade names, goodwill, telephone numbers, credit files, computer records, financial statements, gaming tax returns, customer lists, all related accounting files, and all computer hardware and software, used directly or indirectly in the operation of the Casino.

"Gaming Related Activities" shall have the meaning set forth in Section 4.32 hereof.

"Gross Revenues" means all rents, revenues and other types of income accrued in accordance with GAAP, and all other consideration from any source whatsoever received by or for the benefit of Borrower or Hotel Lease Tenant, including without limitation, the rent that is payable by Hotel Lease Tenant to Borrower pursuant to the Hotel Lease, including, without limitation, any proceeds from rental and business interruption insurance; provided, however, that "Gross Revenues" shall exclude any revenues from the Property derived from gaming activities on the Property (but "Gross Revenues" shall include the rent that is payable by Casino Tenant to Hotel Lease Tenant pursuant to the Casino Lease).

"Governmental Agency" means (a) any international, foreign, federal, state, county or municipal government, or political subdivision thereof, (b) any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or (c) any court, administrative tribunal or public utility and includes, without limitation, the Nevada Gaming Authorities.

"Greek Isles License Agreement" means that certain Service Mark and Domain Name License Agreement, of even date herewith, by and between Mark IV Realty Group, Inc., an Illinois corporation, as licensor, and Borrower, as licensee.

"Guarantor" means Harold A. Rothstein.

"Guaranty" means that certain Guaranty of even date herewith executed by Guarantor for the benefit of Lender.

"Hazardous Materials" means all those substances which are regulated by, or which may form the basis of liability under, any Environmental Law, including all substances identified under any Environmental Law as a pollutant, contaminant, hazardous waste, hazardous constituent, special waste, hazardous substance, hazardous material, or toxic substance, or petroleum or petroleum derived substance or waste, including all "Hazardous Materials" as such term is defined in the Indemnity Agreement and including mold when such mold is present in such conditions or under such circumstances as to impair a structure (or any portion thereof) or limit the use of any structure (or portion thereof) for its intended purposes.

"Hazardous Materials Remediation Reserve" shall have the meaning set forth in Section 8.2(c) hereof.

"Holder" shall have the meaning set forth in Section 11.7(b) hereof.

"Hotel" means all of the portions of the Property which are not part of the Casino.

"Hotel Lease" means that certain Amended and Restated Turn-Key Lease Agreement, of even date herewith, by and between Borrower, as landlord, and Hotel Lease Tenant, as tenant, pursuant to which Hotel Lease Tenant is leasing from Borrower the Property.

"Hotel Lease Subordination Agreement" means that certain Lease Subordination Agreement, of even date herewith, by Hotel Lease Tenant in favor of Lender, pursuant to which Hotel Lease Tenant subordinates the Hotel Lease and all rights therein to the liens created in favor of Lender under the Loan Documents.

"Hotel Lease Tenant" means Convention Center Drive Hotel & Casino, LLC, a Nevada limited liability company.

"Improvements" means all improvements and amenities related to or constructed upon the Property, whether now existing or hereafter constructed.

"Indemnitees" shall have the meaning set forth in Section 11.10 hereof.

"Indemnity Agreement" means that certain Environmental Indemnity Agreement of even date herewith, executed by Borrower and the Guarantor in favor of Lender.

"Intangible Assets" means assets that are considered intangible assets under GAAP, consistently applied, including, without limitation, goodwill, patents, trademarks, trade names, copyrights and other intangible property, including, without limitation, all names and/or logos used or proposed to be used by Borrower.

"Intercreditor Agreement" means the Intercreditor Agreement, of even date herewith, by and between Lender and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Reserve" shall have the meaning set forth in Section 8.2(b) hereof.

"Land" shall have the meaning set forth in the Deed of Trust, as more particularly described on Exhibit A attached hereto.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and published administrative or judicial precedents.

"Leases" means, collectively, all leases, subleases, guaranties, licenses and other agreements affecting the use, enjoyment or occupancy, now or hereafter in existence with respect to the Property.

"Lender" shall have the meaning set forth in the preamble to this Agreement.

"Licenses, Permits and Approvals" means all government permits, exemptions, variances, licenses, dedications, subdivision maps and related rights, entitlements and other governmental approvals relating to the use, ownership, construction, development or operation of the Property, any applications for the foregoing which are pending or have been denied, all rights, benefits and interests under all zoning laws and ordinances, variances, licenses, permits, approvals, dedications, subdivision maps and entitlements promulgated, issued, approved or granted by any Governmental Agency having jurisdiction over the Property and/or Borrower, including, without limitation, the State of Nevada, the County of Clark, Nevada, or otherwise in connection with the Property; any and all development rights and other intangible rights, titles, interests, privileges and appurtenances owned by Borrower and in any way related to or used in connection with the Property and its development, construction or operation; all licenses, consents, easements, rights of way and approvals required from private parties to make use of utilities and to insure vehicular and pedestrian ingress and egress to the Property; and all disposition, redevelopment and development agreements, site approvals, environmental impact reports, traffic and other mitigation and impact studies and reports, maps and all other documents, agreements and/or instruments, private or public, affecting the Property. Although the term "Licenses, Permits and Approvals" includes privileged licenses such as gaming and liquor licenses, nothing contained herein shall imply that Borrower is assigning any such privileged licenses to the extent such licenses are not assignable under applicable Law.

LA1 93-4469

"Lien" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, lien or charge of any kind, whether voluntarily incurred or arising by operation of Law or otherwise, affecting the Property and/or other Collateral, including, without limitation, any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and/or the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction.

"Liquor Expenses" shall mean all costs and expenses incurred in connection with the sale of alcoholic beverages for which a Liquor License is required in order to offer such beverages for sale.

"Liquor License" shall have the meaning set forth in Section 6.30 hereof.

"Liquor Revenues" shall mean all Gross Revenues derived from the sale of alcoholic beverages for which a Liquor License is required in order to offer such beverages for sale.

"Loan" shall have the meaning set forth in the recitals to this Agreement.

"Loan Documents" means, collectively, this Agreement, the Note, the Deed of Trust, and the other documents listed in Schedule 1.1(A) hereof attached hereto and made a part hereof, together with any other documents, agreements or instruments now or hereinafter evidencing, securing or relating to the Loan, in each case as the same may from time to time be supplemented, modified, amended, restated or extended.

"Managed Account" shall have the meaning set forth in Section 8.5 hereof.

"Managed Account Bank" means City National Bank.

"Management Agreement" means that certain Hotel Management Agreement, of even date herewith, between Hotel Lease Tenant and Manager, concerning the management of the Hotel by Manager.

"Manager" means Mark IV Hospitality, Inc., an Illinois corporation, or such other hotel management company or operator approved by Lender in accordance with this Agreement.

"Managing Member" means GIH-SPE I, LLC, a Delaware limited liability company.

"Maturity Date" shall have the meaning set forth in the Note.

"Maximum Rate" shall have the meaning set forth in the Note.

"Mezzanine Lender" means the John Marks Family Trust, u/t/a dated June 19, 2007.

LA1 934469

"Mezzanine Loan" means the loan made pursuant to the Mezzanine Loan Agreement.

"Mezzanine Loan Agreement" means the Loan Agreement, dated as of the date hereof, by and between Managing Member and Mezzanine Lender.

"Mezzanine Loan Documents" means all documents and instruments executed by Borrower's Members or others for the purpose of evidencing, securing, guaranteeing and/or perfecting the Mezzanine Loan.

"Multiemployer Plan" means an employee benefit plan of the type described in Section 4001(a)(3) of ERISA.

"Nevada Gaming Authorities" means the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, or any other governmental agency of the State of Nevada or its political subdivisions that succeed to the functions of such agencies.

"Non-Member Manager" means ECALV II LLC, a Delaware limited liability company.

"Note" means the Promissory Note executed and delivered by Borrower to Lender, in the principal amount of $56,000,000 and any promissory note that may be issued in substitution, renewal, extension, replacement or exchange therefor.

"O&M Plans" means plans to operate and maintain the Property in compliance with Environmental Laws and in such a manner as to minimize the risks posed by such Hazardous Materials (including mold and asbestos) as may exist at the Property at any time, including without limitation, (a) that certain Asbestos Operations and Maintenance Plan for the Greek Isles Hotel and Casino, dated as of June 18, 2007, prepared by TRC Solutions, Inc., and (b) that certain Water Intrusion and Mold Operations and Maintenance Plan for the Greek Isles Hotel and Casino, dated as of June 21, 2007, prepared by TRC Solutions, Inc.

"Obligations" means all present and/or future obligations of every kind or nature of Borrower or any Party at any time and/or from time to time owed to Lender under any one or more of the Loan Documents, whether due or to become due, matured or unmatured, liquidated or unliquidated, or contingent or noncontingent, including obligations of performance as well as obligations of payment, and including interest that accrues after the commencement of any bankruptcy or insolvency proceeding by or against Borrower or Guarantor.

"OFAC" shall have the meaning set forth in Section 4.31 hereof.

"Operating Budget" shall mean an operating budget for the Property for the current and next calendar years, in form, substance and level of detail satisfactory to Lender.

"Opinion of Counsel" means a written legal opinion of the counsel to Borrower, Borrower's Members and Guarantor, in form and substance satisfactory to Lender and Lender's counsel, together with copies of any factual certificates relied on in rendering such opinions.

"Option Agreement" means that certain Option to Purchase Property and Covenants, Conditions and Restrictions, of even date herewith, between Option Holder and Borrower.

"Option Holder" means ECALV I LLC, a Delaware limited liability company.

"Option Subordination Agreement" means that certain Option Subordination Agreement, of even date herewith, by Option Holder in favor of Lender, pursuant to which Option Holder subordinates the Option Agreement and all rights therein to the liens created in favor of Lender under the Loan Documents.

"Party" means each of Borrower, Guarantor and Borrower's Members.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereof established under ERISA.

"Permitted Encumbrances" means, with respect to the Property, (a) all liens, security interests, pledges, mortgages and other encumbrances in favor of Lender arising under this Agreement and the other Loan Documents; and (b) all other liens, restrictions and other title limitations approved by Lender or Lender's counsel in writing as permitted exceptions to the title of the Property.

"Permitted Intercreditor Transfer" means (a) the encumbrance, pledging, and hypothecation of and granting of a security interest in the ownership interests in Managing Member to Mezzanine Lender in connection with the Mezzanine Loan, or (b) any conveyance, assignment, sale or other disposition of the ownership interests in Managing Member effectuated in connection with a foreclosure on such pledge and hypothecation referred to in clause (a) (or sale in lieu thereof) or other exercise of remedies by Mezzanine Lender carried out pursuant to and in strict accordance with the Intercreditor Agreement.

"Person" means any individual or entity, whether a trustee, corporation, limited liability company, general partnership, limited partnership, joint stock company, trust, unincorporated organization, bank, business association, firm, joint venture, Governmental Agency or otherwise.

"Plan" means any employee benefit plan subject to ERISA and maintained by Borrower or to which Borrower is required to contribute on behalf of its employees.

"Policies" shall have the meaning set forth in the Deed of Trust.

"Prohibited Person" shall have the meaning set forth in Section 4.31 hereof.

"Property" shall have the meaning set forth in the Deed of Trust.

"Registrar" shall have the meaning set forth in Section 11.7(b) hereof.

"Rent Payment Direction Letter" means a letter from Borrower or Hotel Lease Tenant to a tenant or subtenant of the Property (including Hotel Lease Tenant and Casino Tenant), directing such tenant or subtenant to pay all rents under its respective Lease to the Managed Account Bank for deposit into the Managed Account, which letter is in form and substance satisfactory to Lender.

"Reserve Bank" means City National Bank.

"Reserve" means any one of the Reserves.

"Reserves" means, collectively, the Tax and Insurance Reserve and the Interest Reserve.

"Reserves Account Control Agreement (Borrower)" means that certain Reserves Account Control Agreement (Borrower) of even date herewith among Borrower, Lender and Managed Account Bank.

"Reserves Account Control Agreement (Lessee)" means that certain Reserves Account Control Agreement (Lessee) of even date herewith among Hotel Lease Tenant, Lender and Managed Account Bank.

"Seller" means Convention Center Drive LLC, a Nevada limited liability company.

"Sources and Uses Statement" means that certain Sources and Uses Statement attached hereto as Exhibit B signed by Borrower and approved by Lender detailing the immediate and prospective sources of funds and uses of all proceeds of the Loan and the Reserves.

"Survey" means an ALTA survey of the Property satisfactory to Lender certified to Lender and the Title Company, prepared by a licensed surveyor satisfactory to Lender, together with a surveyor's certificate satisfactory to Lender.

"Tax and Insurance Reserve" shall have the meaning set forth in Section 8.2(a) hereof.

"Title Company" means Commonwealth Title Insurance Company.

"Title Policy" means a ALTA mortgagee's policy of title insurance insuring the lien of the Deed of Trust, subject only to the Permitted Encumbrances and with endorsements required by Lender, all in form and substance acceptable to Lender and its counsel, issued by the Title Company in favor of Lender in the amount of the Loan.

"To the best knowledge of" means, when modifying a representation, warranty or other statement of Borrower, that the fact or situation described therein, with the exercise of reasonable due diligence and inquiry under the circumstances (in accordance with the standard of what a reasonable Person in similar circumstances would have done) should have been known by Borrower.

"Transfer Application" shall have the meaning set forth in Section 6.30 hereof.

"UCC Financing Statements" means, collectively, appropriate financing statements sufficient when filed in the office of the appropriate governmental agency or agencies to perfect a Lien in favor of Lender in and to the Property described in the Deed of Trust and a Lien in favor of Lender in and to the membership interests in Borrower and in and to the Reserves and Managed Account.

"UCC Policy" means a UCC lender's policy with endorsements required by Lender, all in form and substance acceptable to Lender and its counsel, issued by Title Company in favor of Lender in the amount of the Loan and insuring the pledge of the membership interests in Borrower in favor of Lender evidenced by the Accommodation Pledge Agreement.

"Underwriting Fee" shall mean the sum of $15,000 which shall be paid out of Borrower's own funds and not from the proceeds of the Loan.

"USAH" means the Uniform System of Accounts for the Lodging Industry that is published by the Hotel Association of New York City, Inc. and approved by the American Hotel & Motel Association (currently, the 9th Revised Edition, 1996).

1.2     Use of Defined Terms. Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any one or more of the members of the relevant class.

1.3     Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with sound property accounting practices in effect from time to time, and applied on a consistent basis, except, as otherwise specifically prescribed herein.

1.4     Exhibits and Schedules. All exhibits and schedules to this Agreement, either as originally existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

ARTICLE 2
LOAN

2.1     General Provisions Regarding Loan and Borrowing Procedures.

(a)     Subject to the terms and conditions set forth in this Agreement, Lender shall make the Loan to Borrower.

(b) The Loan shall be evidenced by the Note and secured by, among other things, the Deed of Trust.

(c) Upon the satisfaction of the conditions precedent to the Loan, as set forth in Article 3 hereof, Lender shall disburse the Loan proceeds, which shall be used only for the purposes set forth in Section 2.9 hereof, less any unpaid portion of the Commitment Fee, the estimated fees and disbursements (subject to adjustment upon final accounting) of Lender's counsel, as provided in Section 3.1 hereof, which estimated fees and disbursements shall be paid by Lender to Lender's counsel directly and shall be considered a part of the Loan and evidenced by the Note and the other Loan Documents and secured by, among other things the Deed of Trust. Upon final accounting, Borrower shall pay directly to Lender's counsel the amount, if any, by which the actual fees and disbursements of Lender's counsel exceed the estimated fees and disbursements previously paid or Lender shall cause Lender's counsel to pay to Borrower any amount by which the estimated fees and disbursements previously paid, exceed the actual fees and disbursements of Lender's counsel. Borrower shall separately pay all other costs and expenses associated with the Loan including, but not limited to, the costs and expenses required to be paid by Borrower pursuant to Section 11.3 hereof.

(d) DI Development (an Affiliate of Borrower), Canyon Capital Realty Advisors LLC, and others have entered into a commitment letter dated as of June 5, 2007 (the "Commitment Letter"). Concurrently with Closing and disbursement of Loan proceeds, and as a condition thereto, Borrower shall instruct the escrow agent to disburse the Commitment Fee to Lender. Borrower reaffirms that the Commitment Fee has been earned and due and payable in full upon Closing.

2.2 Principal and Interest.

(a) Interest shall be payable on the outstanding daily unpaid principal amount of the Loan hereunder as provided in the Note. Borrower agrees to pay interest from the date the proceeds of the Loan are disbursed by Lender into escrow or otherwise regardless of when the funds are actually released by escrow or received or utilized by Borrower. Interest accruing under the Note shall compound monthly and be calculated pursuant to Section 2.4 hereof.

(b) Portions of the principal indebtedness evidenced by the Note shall be payable at such times and in such amounts as provided in the Note with all outstanding principal indebtedness, interest, charges and fees under the Note being due and payable on the Maturity Date, as the same may be accelerated pursuant to the terms of this Agreement or extended pursuant to Section 2.4 of the Note.

2.3    <u>Late Payments</u>. Should any installment of principal or interest or any fee or cost or other amount payable under any Loan Document to Lender not be paid when due, it shall thereafter bear Default Interest as provided in the Note; provided, however, to the extent that funds are available for such payments in the Interest Reserve at the time when due, no late charge or Default Interest shall accrue by reason of the failure to pay when due.

2.4    <u>Computation of Interest and Fees</u>. All computations of interest and fees shall be calculated on the basis of a three hundred sixty (360) day year and the actual number of days elapsed, unless use of a three hundred sixty (360) day year would result in collection of interest in excess of the Maximum Rate, in which case interest shall be calculated based on the Maximum Rate.

2.5    <u>Manner and Treatment of Payments</u>. Each payment hereunder or under the Note or under any other Loan Document shall be made to Lender at the place and time(s) provided herein or in the Note. All payments shall be made in lawful money of the United States of America.

2.6    <u>Funding Sources</u>. Nothing in this Agreement or in the Note shall be deemed to obligate Lender to obtain the funds for the Loan in any particular place or manner or to constitute a representation by Lender that it has obtained or will obtain the funds for the Loan in any particular place or manner.

2.7    <u>Failure to Charge Not Subsequent Waiver</u>. Any decision by Lender not to require payment of any interest (including, without limitation, Default Interest), fee, cost or other amount payable under any Loan Document on any occasion shall in no way limit or be deemed a waiver of Lender's right to require full payment of any other interest (including, without limitation, Default Interest), fee, cost or other amount payable under any Loan Document on any other or subsequent occasion.

2.8    <u>No Revolving Facility</u>. This Loan is a not a revolving loan. Any loan proceeds repaid hereunder are not available for re-borrowing.

2.9    <u>Purpose of Loan</u>. The purpose of the Loan is (i) to acquire the Property, (ii) to finance the Reserves, and (iii) to pay for closing costs and certain other costs and expenses of the Property and the Loan approved by Lender. No proceeds of the Loan disbursed at the Closing shall be disbursed to Borrower or an Affiliate of Borrower.

ARTICLE 3
CONDITIONS PRECEDENT TO LOAN

3.1    <u>Loan</u>. The obligation of Lender to make the Loan is subject to the following conditions precedent, each of which shall be satisfied prior to the disbursement of the proceeds of the Loan (unless Lender, in its sole and absolute discretion, shall agree in writing otherwise):

        (a)    Lender shall have received all of the following, each of which shall be originals unless otherwise specified, each properly executed by Borrower, each dated as of the date hereof and each in form and substance satisfactory to Lender and its legal counsel:

(1)     this Agreement, executed by Borrower;

(2)     the Note, executed by Borrower, payable to the order of Lender;

(3)     the Deed of Trust, executed by Borrower, in recordable form;

(4)     the Assignment of Leases, executed by Borrower;

(5)     the Assignment of Licenses and Contracts, executed by Borrower;

(6)     a copy of the fully executed Management Agreement;

(7)     the Assignment of Management Agreement, executed by Borrower and Manager;

(8)     the Reserves Account Control Agreement (Borrower), executed by Borrower, Lender and Managed Account Bank;

(9)     the Reserves Account Control Agreement (Lessee), executed by Hotel Lease Tenant, Lender and Reserve Bank;

(10)    the Accommodation Pledge Agreement, executed by Borrower's Members and the related Consent, executed by Borrower;

(11)    the Indemnity Agreement executed by Borrower and the Guarantor;

(12)    the Guaranty executed by the Guarantor;

(13)    the Accounts Pledge Agreement (Borrower) executed by Borrower;

(14)    the Accounts Pledge Agreement (Lessee) executed by Hotel Lease Tenant;

(15)    the Hotel Lease Subordination Agreement executed by Borrower, Hotel Lease Tenant and Lender;

(16)    the Option Subordination Agreement executed by Borrower, Option Holder and Lender;

(17)    the Casino Lease Non-Disturbance Agreement executed by Hotel Lease Tenant, Casino Tenant and Lender;

(18) the UCC Financing Statements;

(19) the other Loan Documents executed by the parties thereto, in recordable form as applicable;

(20) the pro forma Title Policy, evidencing Title Company's irrevocable commitment to issue the Title Policy with all required endorsements;

(21) the pro forma UCC Policy, evidencing Title Company's irrevocable commitment to issue the UCC Policy with all required endorsements;

(22) the Survey;

(23) the Hotel Lease and the Casino Lease;

(24) an Opinion of Counsel;

(25) the Sources and Uses Statement signed by Borrower;

(26) the Operating Budget;

(27) establishment of the Reserves at the Reserve Bank with deposits in the amounts required under this Agreement;

(28) the establishment of the Managed Account at the Managed Account Bank;

(29) the Closing Instruction Letter;

(30) an updated rent roll of the Property together with complete copies of all Leases; and

(31) all such other documents, instruments, certificates, opinions, assurances, consents or approvals as Lender or its counsel may request or require.

(b) The representations and warranties of Borrower contained in Article 4 shall be true and correct in all material respects;

(c) Borrower, Borrower's Members and Guarantor shall be in compliance with all the terms and provisions of this Agreement and the Loan Documents and no Event of Default shall have occurred in any of the Loan Documents and there shall be no event in existence which, with the giving of notice or the passage of time, or both, would constitute a default;

(d) Lender shall have received the Underwriting Fee from Borrower's own funds and not from the proceeds of the Loan;

(e)    Lender shall have received the Commitment Fee from the proceeds of the Loan;

(f)    The estimated fees and disbursements (subject to adjustment upon final accounting) of outside legal counsel to Lender, shall have been paid to such counsel and any and all other fees and expenses required to be paid by Borrower pursuant to this Agreement shall have been paid;

(g)    Lender shall be satisfied in its sole discretion as to the current fair market value of the Property; and

(h)    The Deed of Trust and the Assignment of Leases shall have been duly recorded in the Official Records of Clark County, State of Nevada.

3.2    _Property Information._ Notwithstanding anything to the contrary contained in Section 3.1, the obligation of Lender to make the Loan and to disburse the proceeds thereof is subject to the further condition that Lender shall have received such additional information relating to the Property and other Collateral as Lender may reasonably request or require.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender, as of the date hereof that:

4.1    _Existence and Qualification; Power; Compliance With Laws._ Each of Borrower and each of Borrower's Members is a limited liability company duly formed and validly existing and in good standing under the Laws of the State of Delaware. Borrower is qualified to do business in and otherwise in good standing under the laws of the State of Nevada. Borrower and each Borrower's Member have all requisite power and authority to conduct its business, to own and lease its properties and to execute, deliver and perform all of their respective obligations under the Loan Documents. Borrower has not failed to comply with any Laws. Borrower has received no written notification from any Governmental Agency of any violation by Borrower of any Law. Neither Borrower nor any of Borrower's Members is in breach or default under any order, writ, judgment, injunction, decree, determination or award naming Borrower or any of Borrower's Members, or under any material contract, in any respect that is materially adverse to the interests of Lender or that would be likely to cause an Event of Default hereunder. Borrower has not failed to obtain any Licenses, Permits and Approvals when and as required and has not failed to accomplish all filings, registrations and qualifications with, or obtained exemptions related to the foregoing, from any Governmental Agency that are necessary for the transaction of such entity's existing business in connection with the Property and the performance of its obligations under the Loan Documents. Borrower was formed for the sole purpose of owning the Property, does not engage in any business unrelated to the Property, does not have any assets other than the Property or any indebtedness other than as may be expressly permitted under the Loan Documents, has its own books, records and accounts separate and apart from any other Person, and holds itself out as being a legal entity, separate and apart from any other Person. Borrower is controlled (as defined in the definition of "Affiliate") by Controlling Member. The

LA1 934469

organizational chart set forth as Schedule 4.1 accurately sets forth the ownership structures of Borrower and its Affiliates shown thereon.

4.2    Authority; Compliance With Other Agreements and Instruments and Government Regulations. The execution, delivery and performance by each Party of the Loan Documents to which it is a party have been duly authorized by all necessary action, and do not and will not:

(a)    require any consent or approval not heretofore obtained of any Person;

(b)    violate or conflict with any provision of Borrower's or Borrower's Member's formation documents;

(c)    result in or require the creation or imposition of any Lien or rights of others (other than as provided under the Loan Documents) upon or with respect to the Collateral;

(d)    violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect, having applicability to any Party and by which such Party is bound;

(e)    result in a breach of or constitute a default under, or cause or permit the acceleration of any obligation owed under, or adversely affect the rights of Borrower under, any contract to which Borrower or any of Borrower's Members is a party; or

(f)    violate any zoning or land use requirements.

4.3    No Governmental Approvals Required. No License, Permit or Approval from, or filing, registration or qualification with, or exemption from any of the foregoing, from any Governmental Agency is or will be required to authorize or permit under applicable Law the execution, delivery and performance by Borrower of its Obligations.

4.4    Environmental and Industrial Hygiene Compliance. Except as disclosed in Schedule 4.4 attached hereto, there is no violation of any Environmental Laws, no notice of any violation of any Environmental Law with respect to the Property has been received by Borrower or any of Borrower's Members from any Governmental Agency, and any investigation of the Property has not indicated the generation, manufacture, storage or disposal of Hazardous Materials on, under or about the Property and there are no Hazardous Materials on, under or about the Property which pose a material public or worker health or safety risk.

4.5    Financial Statements; Income and Expense and Capital Expenditure Statements.

(a)    Borrower has furnished to Lender a copy of the financial statements of the Property for the Fiscal Years 2005 and 2006 and the current Fiscal Year through February 28, 2007 (collectively, the "Financial Statements"). The Financial Statements fairly and accurately present the financial condition of such Property as at such date and for such periods and have been prepared (except as noted therein) in accordance with GAAP.

(b)    ·Borrower has furnished to Lender forecasted monthly income and expense statements and the capital expenditures statements for the Property for the period through December 31, 2007 and annual income and expense statements for the Property for the years 2005 and 2006 (the "<u>Forecasted Income and Expense Statements</u>").

(c)    All financial statements and information prepared by Borrower, its Affiliates or Manager and provided to Lender regarding the Property, Borrower, Guarantor and Manager are true, accurate and complete copies of the originals of such financial statements and information, and all financial statements, information and all other documents prepared by third parties and provided by Borrower to Lender related to the transactions contemplated hereunder and under the other Loan Documents are, to the best knowledge of Borrower, true, accurate and complete copies of the originals of such financial statements, information and other documents.

4.6    <u>No Other Liabilities; No Material Adverse Changes</u>. There are no liabilities or Contingent Obligations not reflected or disclosed in the Financial Statements or in the notes thereto. Since the date(s) of the Financial Statements, neither of Borrower nor any of Borrower's Members has suffered any one or more changes in its condition (financial or otherwise) or its assets, properties, liabilities or prospects, which alone or in the aggregate would be materially adverse to any of such Persons.

4.7    <u>Title to and Location of Property</u>. Borrower has good and indefeasible title to the Property, free and clear of all Liens, other than the Permitted Encumbrances. Borrower's Members have, or will have, on the closing of the Loan, good and indefeasible title to one hundred percent (100%) of the membership interests in Borrower, free and clear of all Liens. All timeshare interests at the Property have been fully and irrevocably terminated, and the Property is no longer encumbered by any timeshare interests or encumbrances.

4.8    <u>Litigation</u>. Except as disclosed in <u>Schedule 4.8</u> attached hereto or under <u>Section 4.18</u>, there are no actions, suits or proceedings served or, to the best knowledge of Borrower, threatened against or affecting Borrower, any of Borrower's Members, Guarantor or the Property in any court of law or before any Governmental Agency.

4.9    <u>Binding Obligations</u>. Each of the Loan Documents, when executed and delivered by the Parties thereto, will constitute the legal, valid and binding obligations of the Parties thereto, enforceable against such Parties in accordance with their respective terms, subject, as to enforcement, only to bankruptcy, insolvency, reorganization, moratorium or similar laws then in effect affecting the enforceability of the rights of creditors generally and the exercise of judicial discretion in accordance with general principles of equity.

4.10    <u>ERISA</u>.

(a)    Except as disclosed in <u>Schedule 4.10</u> there are no Plans;

(b)    With respect to each Plan, if any, described in <u>Schedule 4.10</u>:

(i)     such Plan complies in all material respects with ERISA and any
        other applicable Law;

(ii)    such Plan has not incurred any material "accumulated funding
        deficiency," as that term is defined in Section 302 of ERISA;

(iii)   no "reportable event" (as defined in Section 4043 of ERISA) has
        occurred that could result in the termination or disqualification of
        such Plan; and

(iv)    Borrower has not engaged in any "prohibited transaction" (as
        defined in Section 4973 of the Code).

(c)     Borrower is not and has not been a party to and does not have any
        employees who are covered by any Multiemployer Plan; and

(d)     Borrower is in compliance with each covenant contained in Section 7.3
        hereof.

4.11    Regulations G, T, U and X; Investment Company Act.  Borrower is not engaged
principally, or as one of its important activities, in the business of extending credit for the
purpose of "purchasing" or "carrying" any "margin stock" or "margin security" within the
meanings of Regulations G, T, U or X, respectively, of the Board of Governors of the Federal
Reserve System.  If requested by Lender, Borrower will furnish Lender with a statement or
statements in conformity with the requirements of Federal Reserve Forms G-3 and/or U-1
referred to in Regulations G or U of said Board of Governors.  No part of the proceeds of the
Loan will be used to purchase or carry any such "margin security" or "margin stock" or to extend
credit to others for the purpose of purchasing or carrying any such "margin security" or "margin
stock" in violation of Regulations G, T, U or X of said Board of Governors.  Borrower is not or
is not required to be registered under the Investment Company Act of 1940.

4.12    Disclosure.  All reports, documents, information and forms of evidence delivered
to Lender by Borrower and prepared by Borrower or its Affiliates concerning Borrower or
Borrower's Members or the Property or other Collateral, and to the best knowledge of Borrower,
all such reports, documents, information and forms of evidence delivered to Lender and prepared
by parties other than Borrower or its Affiliates, are accurate, correct and sufficiently complete to
give Lender true and accurate knowledge of their subject matters and do not contain any untrue
statement of a material fact or omits a material fact necessary to make them not misleading.
There is no fact known to Borrower or its Affiliates which Borrower has not disclosed to Lender
in writing which materially and adversely affects the business, operations, properties, profits or
condition (financial or otherwise) of Borrower, any of Borrower's Members or the Property or
other Collateral, or the ability of Borrower or any of Borrower's Members to perform its
respective Obligations.

4.13    Tax Matters.  Borrower and Borrower's Members have duly filed, or caused to be
filed, on a timely basis all appropriate foreign, federal, state and local tax returns and reports for
income taxes, sales taxes, withholding taxes, employment taxes, property taxes, business taxes
and all other tax returns of every kind whatsoever required to be filed in connection with the

ownership, operations and business of Borrower and Borrower's Members, as applicable, and all such tax returns and reports accurately reflect all taxes owing for the periods indicated. Each of Borrower and Borrower's Members has paid in full all taxes, interest, penalties, assessments or deficiencies shown to be due on such tax returns and reports, or claimed to be due by any such taxing authority, except for any such taxes as are being contested in good faith and by appropriate proceedings. The charges, accruals and reserves on each of Borrower's Financial Statements in respect of taxes are adequate.

4.14 <u>Fiscal Year</u>. Borrower operates on a fiscal year ending on December 31.

4.15 <u>Insolvency and Related Matters</u>. Borrower and each of Borrower's Members is each able to pay its debts as they mature, and has not (a) made any assignment for the benefit of creditors; (b) admitted in writing its inability to pay its debts as they mature; (c) applied for or consented to the appointment of a receiver, trustee or similar official for its affairs; or (d) been the subject of any bankruptcy, insolvency, reorganization or liquidation proceeding, or any other proceeding for relief under any bankruptcy law or any law for the relief of debtors or benefit of creditors. After giving effect to the execution and delivery of the Loan Documents and the making of any disbursements under this Agreement and the Note, none of Borrower or any of Borrower's Members will be "insolvent" within the meaning of such term as defined in the applicable laws of the State of Nevada, or as defined in Section 101 of the Bankruptcy Code, or be unable to pay its debts generally as such debts become due, or have insufficient capital for its purposes.

4.16 <u>Intangible Assets</u>. Borrower owns, or possesses the unrestricted right to use, all trademarks, trade names, copyrights, patents, patent rights, licenses and other Intangible Assets that are used in the conduct of its business as now operated, and no such Intangible Asset conflicts with the valid trademark, trade name, copyright, patent, patent right or Intangible Asset of any other Person to the extent that such conflict would have a material adverse effect on the business, operations or condition (financial or otherwise) of Borrower.

4.17 <u>Use</u>. No written notice has been received by Borrower, or to the best knowledge of Borrower, by any other Person, from any Governmental Agency alleging any violation by the Property of any applicable Laws, including Environmental Laws.

4.18 <u>Pending Property Litigation</u>. Except as disclosed on <u>Schedule 4.18</u> attached hereto, there are no actions, suits or proceedings pending or, to the best knowledge of Borrower, threatened in any court or before any Governmental Agency or arbitration board or tribunal (a) relating to (i) the zoning of the Property or any part thereof, (ii) any Licenses, Permits or Approvals issued with respect to the Property or any part thereof, (iii) the condemnation of the Property or any part thereof, (iv) the condemnation or relocation of any roadways abutting the Property, (v) the denial or limitation of access to the Property or any part thereof from any point of access to the Property, (vi) Borrower or Borrower's Members, or (vii) any of Borrower's Member's membership interests in Borrower; (b) asserting that (i) any such zoning and/or Licenses, Permits and Approvals do not permit the operation of the Property or any part thereof as presently being conducted, (ii) any improvements cannot be built or located on the Property or operated with their intended use or (iii) the operation of the Property or any part thereof is in violation of any Law; or (c) might affect the validity or priority of this Agreement or any other

Loan Document. Neither Borrower nor any of Borrower's Members is aware of any facts or circumstances which may give rise to any actions, suits or proceedings described in the preceding sentence.

4.19    Forfeiture.  Neither Borrower nor any of Borrower's Members nor any of their respective principals or directors (if applicable), is or has been charged or are under investigation for, possible violations of the Racketeering, Influenced and Corrupt Organizations Act, the Continuing Criminal Enterprises Act, the Controlled Substance Act of 1978, the Money Laundering Act of 1986, the AntiDrug Abuse Act of 1986, or similar law providing for the possible forfeiture of any of their respective assets or properties.

4.20    Payment of Fees.  Neither Borrower nor any of Borrower's Members or any Affiliate of any of them, is receiving or is being paid a fee or royalty during the term of the Loan or is receiving any proceeds of the Loan, except as expressly set forth in Schedule 4.20 attached hereto.

4.21    No Other Agreements Except Contracts.  Other than the Contracts identified on Schedule 4.21 hereto, no instruments, agreements, contracts or documents materially affect or relate to the Property or other Collateral, and no other instruments, agreements, or documents materially affect or relate to all or any portion of Borrower's Member's membership interest in Borrower.  Borrower has delivered to Lender true, accurate and complete copies of the Contracts.  There exist no amendments or modifications to any of the Contracts.  Borrower has obtained all required consents from any Person for the pledge of each of Borrower's Member's membership interests in Borrower to Lender in accordance with the terms of the Accommodation Pledge Agreement.

4.22    No Other Loans.  There are no currently outstanding loans made by any Person to Borrower, nor any liens on any of the Property or other Collateral, other than the Loan and the liens arising under the Loan Documents and such other loans, and the liens relating thereto, that may be made by Lender or any of its Affiliates to Borrower.  There are no loans to Non-Managing Member nor any liens on all or any portion of the membership interests in Non-Managing Member.  Other than pursuant to the Mezzanine Loan Documents, there are no loans to Managing Member nor any liens on all or any portion of the membership interests in Managing Member.

4.23    No Breach of Acts Under Contracts or Licenses, Permits or Approvals.  There exists no default, violation or other breach under any of the Contracts or Licenses, Permits and Approvals.

4.24    Licenses, Permits and Approvals.  All Licenses, Permits and Approvals of any Governmental Agency or any other entity which are necessary for the operation of the Improvements have been obtained by Borrower and are final and unappealable and will not be appealable with the passage of time.  All such Licenses, Permits and Approvals are current and in full force and effect and there is no pending threat of modification or cancellation of any of the same.  The Property does not depend on any variance, special exception or other special municipal approval for its continued legality.

4.25    Parking. Except as set forth in Section 6.25, the Property has sufficient parking spaces to comply with all applicable Laws.

4.26    Entitlements.   All discretionary approvals required for the subdivision, development, and operation of all of the Improvements on the Property have been obtained. Borrower has not breached any conditions to any such discretionary approvals and all of such discretionary approvals are in full force and effect for a period at least as long as the term of this Loan.

4.27    Zoning. The Property is duly and validly zoned for use as a hotel and casino and for commercial uses, as the case may be.  Such zoning is unconditional and no attacks or challenges are pending or to the best knowledge of Borrower, threatened with respect thereto. Neither such zoning nor any other right to construct or use any Property is in any way dependent upon or related to any real property other than the Property.

4.28    Use. The Property may be operated as a hotel and casino and no written notice has been received by Borrower, Managing Member or Guarantor from any Governmental Agency alleging any violation by the Property of any applicable Laws, including Environmental Laws. Neither the zoning of, nor any other right to carry on the present use of the Property is to any extent dependent upon or related to (a) any other real property or (b) any facilities located on any other real property, except those provided pursuant to perpetual, non-terminable and insurable easements inuring to the benefit of the Property.

4.29    Governmental Approval of Operation of Improvements.  Borrower has obtained all necessary approvals from governmental or quasi-governmental authorities having jurisdiction over the Property for the operation of the Improvements as a hotel and casino.

4.30    Leases. There are no leases or occupancy agreements affecting the Property other than the Leases described on Schedule 4.30. The Leases described on Schedule 4.30 are in full force and effect and there is no default, breach or violation existing thereunder by any party thereto and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation by any party thereunder. Borrower has provided to Lender a true, accurate and complete copy of the such Leases.

4.31    Patriot Act. Neither Borrower nor any of its officers, directors, shareholders, partners, members or Affiliates (including the indirect holders of equity interests in Borrower) is or will be an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http://www.treas.gov/ofac/t11sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) – (iv) above are herein referred to as a "Prohibited Person").

23

4.32 _Specific Leases._ Each of the Hotel Lease and the Casino Lease is in full force and effect and there is no default, breach or violation existing thereunder by any party thereto and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation by any party thereunder. Borrower has provided to Lender a true, accurate and complete copy of the Hotel Lease and the Casino Lease. The Casino Space Lease provides for a fixed rental sum determined in advance. Borrower shall not seek to set casino gaming policy at the property, operate casino games at the property, or receive a percentage of casino revenue (collectively, "Gaming Related Activities"), without prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion. Without any limitation on any of the foregoing, in the event that Lender provides its consent to Borrower's Gaming Related Activities, Borrower agrees to have Lender revise all transactional documents to meet the requirements of Nevada gaming regulations.

4.33 _Gaming License._ Borrower represents and warrants that (a) the existing gaming license for the Casino is held by Casino Tenant, and is in full force and effect, and all license fees required to be paid in connection therewith are fully paid as of the date hereof; and (b) Borrower and its principals have not been deemed as unsuitable landlords by the Nevada Gaming Authorities for owning a casino. Borrower has provided to Lender a true, accurate and complete copy of Casino Tenant's gaming license.

4.34 _Liquor License._ Borrower represents and warrants that the existing Liquor License for the Property is held by Hotel Lease Tenant, and is in full force and effect, and all license fees required to be paid in connection therewith are fully paid as of the date hereof. Borrower has provided to Lender a true, accurate and complete copy of the existing Liquor License for the Property.

4.35 _Management Agreement._ The Management Agreement is in full force and effect. Borrower has not given nor received any notice of a default, breach or violation under the Management Agreement, and (a) there exists no default, breach or violation thereunder by any party thereto and (b) no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation by any party thereunder.

4.36 _Borrower's Equity._ Prior to the date hereof, Borrower has invested an amount not less than Borrower's Required Equity in cash equity into the acquisition of the Property.

ARTICLE 5
[RESERVED]

ARTICLE 6
AFFIRMATIVE COVENANTS

As long as the Loan remains unpaid, or any other Obligation remains unpaid or unperformed, unless Lender otherwise consents in writing:

6.1 _Payment of Taxes and Other Potential Liens._ Borrower shall pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon Borrower,

upon Borrower's property or any part thereof (including, but not limited to, the Property) and, upon Borrower's income or profits or any part thereof, except that Borrower shall not be required to pay or cause to be paid any tax, assessment, charge or levy that is not yet past due, or is being contested in good faith by appropriate proceedings, so long as Borrower has established and maintains adequate reserves for the payment of the same and by reason of such nonpayment and contest no material item or portion of property of Borrower, or any portion of the Property, is in jeopardy of being seized, levied upon or forfeited.

6.2   _Preservation of Existence._   Borrower and Managing Member shall preserve and maintain its existence as a single purpose entity, preserve and maintain its respective licenses, rights, franchises and privileges in the jurisdiction of its formation and all authorizations, consents, approvals, orders, licenses, permits, or exemptions from, or registrations with, any Governmental Agency that are necessary for the transaction of its business, and qualify and remain qualified to transact business in each jurisdiction in which such qualification is necessary in view of its business or the ownership or leasing of its properties. Borrower will at all times have at least one independent manager whose vote is required for each of the following: (a) Borrower engaging in any business activity other than the operation of the Property; (b) causing the dissolution or liquidation of Borrower, in whole or in part (except as otherwise permitted by the Loan Documents); (c) consolidating or merging with or into any other entity or convey or transferring Borrower's property and assets substantially as an entirety to any entity; (d) instituting proceedings for Borrower to be adjudicated bankrupt or insolvent, or consenting to or otherwise acquiesce in the institution of bankruptcy proceedings or any related proceedings against Borrower, or taking any action in furtherance of any such action; or (e) amending any provision of the organizational documents of Borrower relating to the foregoing matters.

6.3   _Maintenance of Properties; Compliance with Agreements._   Borrower shall maintain, preserve and protect all of Borrower's properties and equipment in good order and condition, subject to ordinary wear and tear; not permit any waste of Borrower's properties; and comply at all times in all material respects with all material contracts so as to prevent any loss or forfeiture thereunder.

6.4   _Compliance With Laws._   Borrower and each of Borrower's Members shall each observe corporate formalities in the conduct of its business; comply with the requirements of all applicable Laws and orders of any Governmental Agency, noncompliance with which could materially adversely affect the business, operations or condition (financial or otherwise) of it or the ability of it to perform its Obligations.

6.5   _Inspection Rights._   Borrower shall, at any time during regular business hours, upon not less than one (1) Business Day telephonic notice to Borrower, and as often as requested, permit Lender, or any participant or co-lender in the Loan, or any employee, agent or representative of Lender or said participant or co-lender to examine, audit and make copies and abstracts from the records and books of account of, and to visit and inspect the Property and Improvements of Borrower and to discuss the affairs, finances and accounts of Borrower with any of its officers and key employees, and, upon request, furnish promptly to Lender or said participant or co-lender true copies of all financial information and such other information in Borrower's possession and control as Lender may require from time to time. Lender and said participant or co-lender shall have free and full access to the Property and Improvements for the

purposes of determining compliance with the terms of the Loan Documents including, without limitation, compliance thereof with Environmental Laws. Borrower shall provide adequate facilities for inspection by Lender, said participant or co-lender and other authorized representatives of Lender, and full access to the Property and Improvements shall be afforded to Lender and such persons as may be designated, from time to time, by Lender; provided, that, in the exercise of such inspection rights, neither Lender nor said participant or co-lender shall unreasonably interfere with Borrower's operation of the Property or violate any regulations of the Nevada Gaming Authorities, with respect to the Casino areas of the Property, including, without limitation, neither Lender nor said participant or co-lender shall have access to certain gaming areas of the Property to which access is restricted by Nevada Gaming Authorities, including, without limitation, the surveillance room, casino cage, count room, coin vault and table pit areas.

6.6     Keeping of Records and Books of Account. Borrower shall keep adequate records and books of account reflecting all financial transactions in conformity with GAAP and the USAH, as the case may be, consistently applied, and in material conformity with all applicable requirements of any Governmental Agency having regulatory jurisdiction over Borrower; maintain books and records and bank accounts separate from its Affiliates, and file its own tax returns.

6.7     Maintenance of Insurance. Borrower shall, at its own expense, insure its property and businesses against such losses, casualties and contingencies (including builders' all-risk extended coverage insurance, public liability, property damage and liability for defamation, libel, slander and invasion of privacy), and in such amounts as is customary in the case of Persons engaged in similar businesses as Borrower, or, if provided for in any other Loan Document, as provided in such Loan Document(s).

6.8     Operation of Property. Borrower shall take all actions necessary to cause the Property to be operated as a first class hotel and casino in a manner similar to its operations as of the date hereof (including casino gaming facilities and all licenses and approvals required in connection therewith) in accordance with the Approved Budget. At no time shall Borrower or its principals be deemed as unsuitable landlords by the Nevada Gaming Authorities for owning a casino.

6.9     Single Purpose Entity Requirements. Supplementing the foregoing provisions of this Article 6, for as long as the Loan remains unpaid, or any other Obligation remains unpaid or unperformed, or any portion of the Loan remains outstanding, in order to preserve and ensure its separate and distinct identity, Borrower shall conduct its affairs in accordance with the single purpose entity provisions set forth in the Deed of Trust.

6.10    Copies of Notices to Lender. Borrower shall immediately deliver to Lender any and all notices of default, potential default or orders to show cause or other alleged violations with respect any documents, instruments or agreements related to the Property or the other Collateral.

6.11    Maintenance of Property. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Property shall not be removed, demolished, or

materially altered (except for normal replacement of personal property, furniture, fixtures and equipment) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty or become damaged, worn or dilapidated and shall complete and pay for any structure at any time in the process of construction or repair on the Property except as otherwise permitted by Lender. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a non-conforming use, Borrower will not cause or permit the non-conforming use to be discontinued or any improved portion thereof to be abandoned without the express written consent of Lender.

6.12 <u>Management Agreement</u>.

(a) Except as provided in <u>Section 6.12(b)</u>, the Hotel shall be managed by the Manager pursuant to the Management Agreement or such other bona fide third-party manager approved by Lender pursuant to a hotel management agreement approved by Lender.

(b) In the event Borrower desires to replace the Manager as the manager of the Hotel, Borrower may replace the Manager, subject to Lender's approval, provided (i) the terms of the new management agreement and/or franchise agreement are substantially the same in all material respects as the provisions of the Management Agreement, and (ii) the proposed replacement Manager agrees to subordinate the Management Agreement and executes an assignment and subordination agreement in form and substance similar to the Assignment of Management Agreement.

(c) Borrower shall diligently perform, observe and enforce all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Management Agreement and immediately send to Lender copies of any notice to Borrower of any default or potential default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Borrower to be performed and observed. Borrower shall not (i) surrender the Management Agreement, (ii) consent to the assignment by Manager of its interest under the Management Agreement, (iii) without the prior written consent of Lender, terminate or cancel the Management Agreement except as provided in subparagraph (b) above, or (iv) without the prior written consent of Lender, change, supplement, alter or amend the Management Agreement in any respect, either orally or in writing.

(d) Borrower hereby assigns to Lender as further security for payment of the Obligations, all the rights, privileges and prerogatives of Borrower to surrender the Management Agreement or to terminate, cancel, modify,

change, supplement, alter, or amend the Management Agreement in any respect without such prior written consent of Lender and, except as provided in Section 6.12(b), each such surrender of the Management Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Management Agreement without such prior consent of Lender shall be void and of no force and effect.

(e)     If Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality or the other provisions of this Loan Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act, or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower to end that the rights of Borrower in, to and under the Management Agreement shall be kept unimpaired and free from default. In such event, Lender and any person designated by Lender shall have, and are hereby granted the right to enter upon the Property at any time and from time to time while such default remains uncured for the purpose of taking any such action. If the Manager shall deliver to Lender a copy of any notice sent to Borrower of default under the Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.

(f)     Borrower shall, from time to time obtain from the Manager under the Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of the Management Agreement as may be reasonably requested by Lender.

(g)     Any sums expended by Lender pursuant to this Section 6.12 shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed and constituted a portion of the Obligations, shall be secured by the Lien of the Mortgage and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

6.13   Managed Account. Borrower shall maintain the Managed Account in accordance with the Reserves Account Control Agreement (Borrower) and the other Loan Documents, and only permit expenditures of revenues from the operation of the Property in accordance with the Reserves Account Control Agreement (Borrower) and the other Loan Documents.

6.14   Reserves.  Borrower shall maintain the Reserves in accordance with the Reserve Accounts Control Agreement and the other Loan Documents, and only permit expenditures of revenues from the operation of the Property in accordance with the Loan Documents.

6.15   Furniture, Fixtures and Equipment.  Borrower shall fully furnish and equip the Property with such fixtures, fittings, appliances, apparatus, equipment, machinery, furnishings, furniture, and other personal property as shall be appropriate for the complete and comfortable use, enjoyment, occupancy and operation of the Property as a first class hotel and casino in a manner consistent with its operation as of the date hereof.

6.16   Estoppels.  Borrower shall deliver to Lender, within ten (10) Business Days after Lender's request, estoppel certificates from (a) all tenants under any Lease, (b) any franchisor, or (c) Borrower, all of which shall be reasonably satisfactory to Lender.

6.17   Reports.  Borrower shall furnish such data and information relating to the affairs, assets and liabilities of Borrower, or the renovation, operation or marketing of the Property as Lender may from time to time reasonably request.

6.18   Inspection; Books and Records.  Borrower shall keep, at its principal place of business or at the Property, the records, books of accounting and all other applicable documents, reports and papers relating to the development, construction, marketing, leasing and operation of the Property. Lender shall be entitled, at any time, upon one (1) Business Day's notice, to inspect the Property, all records relating thereto, and the books and other financial records of Borrower, wherever located, and Borrower shall cooperate with Lender in enabling Lender to accomplish such inspection and permit Lender to make such copies as Lender may reasonably request; provided, however, Lender's inspection shall not unreasonably interfere with Borrower's operations at the Property. This authority is for Lender's protection only and Lender shall not be deemed to have assumed any responsibility to Borrower or any third party as a result of any such action. If no Event of Default has occurred and is continuing, nor any event or circumstance exists, which with the passage of time or the giving of notice, would constitute an Event of Default exists, Lender shall endeavor to give Borrower prior written or oral notice of such inspection at a site other than the Property, but Lender's failure to give such notice shall not be a default by Lender or a limitation on Lender's right to inspect.

6.19   Compliance with Contracts.  Borrower shall not enter into any Contract with a term of more than one year or which obligates Borrower to pay more than $10,000 in any annual period or more than $25,000 in the aggregate, without the prior written consent of Lender. Borrower shall comply with the terms of all Contracts.  Borrower shall deliver to Lender copies of all amendments or changes to the Contracts.

6.20   Title Exceptions.  Other than the Permitted Encumbrances and except as permitted in Section 7.1(b), Borrower shall not impose any restrictive covenants, easements, rights of way or encumbrances upon the Property without the prior written consent of Lender.

6.21   Injunction Defense and Notice.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction of the Improvements or the occupancy, maintenance or operation of the Property or any portion thereof, Borrower will give

LA1 93-4469

prompt written notice thereof to Lender and will cause such proceedings to be vigorously contested in good faith and, in the event of any adverse ruling or decision, prosecute all allowable appeals.

6.22 <u>Lender's Expenses</u>. Borrower shall pay all expenses directly or indirectly incurred in connection with the Loan and its documentation, closing, administration and enforcement, including, without limitation, travel costs, all recording costs, title insurance premiums, escrow charges, costs of surveys, appraisal fees, inspection fees, legal fees, release or reconveyance expenses, fees and costs of all other consultants to Lender or any participant or co-lender in the Loan engaged in connection with the underwriting of the Loan and the review of budgets, insurance, operation or management issues, draw requests, change order requests and other construction and hotel management and operation matters and the expenses and disbursements of the special counsel of Lender or any participant or co-lender in the Loan. All such fees and expenses shall be paid promptly upon the submission of statements therefor from time to time. To the extent possible, all legal fees for the preparation and completion of this Agreement and the other Loan Documents, and recording of security documents, shall be paid from the proceeds of the Loan as a reimbursement of costs incurred by Lender or any participant or co-lender in the Loan, and Lender is authorized to disburse all such amounts from the Loan directly to Lender, any participant or co-lender in the Loan and/or to the persons or entities providing such services. Borrower shall pay all costs and expenses of any appraisal or reappraisal of the Property and Improvements as required by Lender's policies or laws or regulations affecting Lender.

6.23 <u>Further Assurances</u>. Borrower will, at the request of Lender, execute, deliver and furnish such documents or take such further action as Lender may deem necessary or desirable to evidence the Loan, perfect the security therefor, or otherwise carry out the terms of the Loan Documents and any of the other documents delivered to Lender in connection therewith.

6.24 <u>No Further Liens</u>. All equipment, personal property, fixtures and other property subject to the lien of the security interest granted to Lender in the Deed of Trust shall be fully paid for by Borrower, and no Lien, other than Permitted Encumbrances, shall exist thereon. If Borrower enters into any equipment lease, regardless of whether Lender's consent is required thereto, Borrower shall provide Lender with a copy of such equipment lease within fifteen (15) Business Days of execution thereof and Borrower shall execute and deliver to Lender (and/or cause the lessor thereunder to execute and deliver to Lender) such documents and instruments reasonably requested by Lender to create and perfect a first priority security interest in the equipment lease and to ensure Lender's ability to assume the equipment lease and use the leased equipment upon any foreclosure of the Deed of Trust.

6.25 <u>Americans With Disabilities Act Compliance</u>. Borrower shall be solely responsible for all ADA costs of compliance and reporting. Within thirty (30) days after Closing, Borrower shall commence efforts to (a) increase the number of parking spaces available to handicapped persons to twelve (12) spaces, and (b) designate two (2) of such spaces as "van accessible;" provided, however, that Borrower shall not be required to increase the overall number of parking spaces at the Property, and shall diligently proceed to complete such work at all times thereafter and shall in all events complete such work within ninety (90) days after Closing.

6.26   Compliance.  The Improvements will not violate any applicable public or private restrictions and will not encroach upon or overhang any easements, rights-of-way, or land of others.

6.27   Mechanic's Liens and Other Encumbrances.  Borrower shall remove, pay or discharge (or bond in a manner reasonably acceptable to Lender) any mechanic's liens or other encumbrances recorded against the Property or any bonded stop notices served upon Lender, within twenty (20) calendar days of such recording or service or within five (5) calendar days of Lender's demand, whichever occurs first.  In the event that Borrower shall fail to pay or discharge (or bond in a manner reasonably acceptable to Lender) any such mechanic's lien, bonded stop notice or other encumbrance, Lender, in addition to such other rights as may be available to it, may pay and discharge such mechanic's lien, bonded stop notice or other encumbrance or deposit in escrow an amount sufficient to do so, and the amount so paid or deposited shall be treated as an advance of the Loan from Lender to Borrower.

6.28   Legal Proceedings.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Agency which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

6.29   Sales/Refinancing.  On or before the tenth (10) day of each calendar month, Borrower shall deliver to Lender a written report detailing any material developments in the sale of the Property or the refinancing of the Loan, in form and substance reasonably satisfactory to Lender.  Further, within three (3) Business Days after Borrower's execution of any letter of intent, term sheet, application, offer or commitment regarding the sale or refinancing of the Property, Borrower shall deliver a copy of the same to Lender, and Lender shall comply with any confidentiality provisions contained in such documents (provided that Lender shall be permitted to provide a copy of such documents to its accounts, attorneys and consultants and any participants in the Loan, which parties shall comply with any such confidentiality provisions).  An Event of Default shall not have occurred by reason of the first failure to deliver the report described in the first sentence of this Section 6.29 by Borrower only unless Lender shall have provided Borrower with written notice with respect to such breach and Borrower shall have failed to cure such breach within ten (10) days thereafter.

6.30   Liquor License.   Borrower shall keep Lender informed regarding all developments regarding the liquor license ("Liquor License") for the Hotel.  Borrower shall provide Lender with a copy of all notices, filings and other correspondence received by Borrower regarding the Liquor License.  If a Liquor License is issued to Borrower, then to secure Borrower's performance of its obligations under this Agreement and the other Loan Documents, Borrower shall deliver to Lender one (1) executed original Application for Transfer of Liquor License (the "Transfer Application").  As long as no Event of Default shall have occurred and remain uncured, Borrower shall be entitled to all rights and benefits relative to the Liquor License.  Upon the occurrence of an Event of Default and Lender's commencement of a foreclosure of the Deed of Trust, Lender may, to the fullest extent permitted by applicable law, complete the Transfer Application and process the same with the Liquor Commission in accordance with all laws, ordinances, rules and regulations applicable thereto.  At such time as

all of the principal sum, interest, indebtedness and other monetary obligations secured by the Loan Documents (including without limitation any indemnification obligations with respect to which any claim has arisen) have been satisfied in full, the Transfer Application shall be promptly returned to Borrower.

6.31    Operations and Maintenance Plan.    Prior to the Closing, Borrower shall prepare and submit to Lender (or at Lender's election, Lender may prepare) any and all required O&M Plans.. The O&M Plans shall be consistent with the criteria applicable to such plans as implemented by sophisticated, prudent and careful operators of similar properties. If required by law, the O&M Plans shall be approved by the applicable governmental agencies having jurisdiction with respect to the same. Borrower shall at all times diligently implement the O&M Plans or such substitute plans as Lender may approve in its sole discretion. The O&M Plans and their implementation shall be in all respects satisfactory to Lender in its sole discretion. In addition, within thirty (30) days after the Closing Borrower shall commence the abatement, removal and cleaning of all mold at the Property identified in the O&M Plans and any additional mold discovered during the abatement and shall diligently proceed with the completion of such work at all times thereafter and shall complete and prepare a summary report documenting the completion of such work (the "Borrower Mold Abatement Report") within ninety (90) days after the Closing. Lender may have its professional consultants review the Borrower Mold Abatement Report, reinspect the Property, or require Borrower to undertake additional tasks until such time as Lender is satisfied in its sole discretion that all mold conditions at the Property have been fully abated such that the Property is safe, fit for its intended uses and is commercially viable.

ARTICLE 7
NEGATIVE COVENANTS

As long as the Loan remains unpaid, or any other Obligation remains unpaid or unperformed, or any portion of the Loan remains outstanding, unless Lender otherwise consents in writing:

7.1    Hypothecation or Disposition of the Property.    Neither Borrower nor any of Borrower's Members shall sell, assign, exchange, transfer, lease, sublease or otherwise dispose of the Property and other Collateral, or create, incur, assume or suffer to exist any Lien of any nature or pledge or encumbrance upon or with respect to the Property and other Collateral, except:

（a)    liens securing taxes, assessments or governmental charges or levies or the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons not yet delinquent, and Liens of the foregoing nature, the validity of which is being contested in good faith in appropriate proceedings after posting such bond(s) as may be required by applicable Laws, and so long as no risk of forfeiture of any portion of the Collateral;

（b)    easements, rights of way, restrictions and other similar charges or encumbrances on the Property that do not interfere with the orderly

conduct of its business or materially detract from the value of the Property;

(c)     the Permitted Encumbrances;

(d)     the rental of rooms and other banquet facilities in the Property in the ordinary course of business;

(e)     with the prior written consent of Lender, entering into any Leases;

(f)     the sale of the entire Property to a third party and, concurrently therewith, the payment of all Obligations to Lender under the Loan Documents including, without limitation, any applicable Repayment Fee and Prepayment Fee (as such terms are defined in the Note).

7.2     Mergers.  Neither Borrower, Managing Member nor DI Development shall merge, consolidate or amalgamate with or into any Person.

7.3     ERISA.

(a)     Neither Borrower nor Managing Member shall, at any time, maintain, or be or become obligated to contribute on behalf of its employees to, any Plan, other than those Plans disclosed in Schedule 4.10.

(b)     Neither Borrower nor Managing Member shall, at any time, permit any Plan to:

(i)      engage in any "prohibited transaction", as such term is defined in Section 4975 of the Code;

(ii)     incur any material "accumulated funding deficiency", as that term is defined in Section 302 of ERISA; or

(iii)    terminate in a manner that could result in liability of Borrower to the Plan or to the PBGC or the imposition of a Lien on the Property or any other Collateral pursuant to Section 4068 of ERISA.

(c)     Neither Borrower nor Managing Member shall, at any time, assume any obligation to contribute to any Multiemployer Plan, nor shall Borrower acquire any Person or assets of any Person which has, or has had at any time from and after January 2, 1974, an obligation to contribute to any Multiemployer Plan.

(d)     Neither Borrower nor Managing Member shall fail immediately to notify Lender of the occurrence of any "reportable event" (as defined in Section 4043 of ERISA) or of any "prohibited transaction" (as defined in Section 4975 of the Code) with respect to any Plan or any trust created thereunder. Upon request by Lender, Borrower shall promptly furnish to Lender

copies of any reports or other documents filed by Borrower or Guarantor with the United States Secretary of Labor, the PBGC and/or the Internal Revenue Service, with respect to any Plan.

(e)  Neither Borrower nor Managing Member shall, at any time, permit any Plan to fail to comply with ERISA or other applicable Law in any material respect.

7.4  Change in Nature of Business/Ownership of Other Assets.  Borrower shall not make any material change in the nature of the business of Borrower as conducted and presently proposed to be conducted or own any assets (including the ownership interest in any entity) other than the Property or make any loans (secured or unsecured) to any Person.

7.5  Change in Fiscal Year.  Neither Borrower nor Managing Member shall change its Fiscal Year, or the fiscal months thereof.

7.6  Additional Debt.  Borrower shall not create, incur, assume or suffer to exist any debt of any nature (including, without limitation, loans from Guarantor or Borrower's Members) other than this Loan, other indebtedness owed to Lender and trade payables incurred by Borrower in the ordinary course of business consistent with the Approved Budget which are outstanding for not more than thirty (30) days after the date incurred and the Permitted Encumbrances.  Other than the Mezzanine Loan, Managing Member shall not incur any indebtedness or contingent liabilities.

7.7  Dissolution.  Neither Borrower nor Managing Member shall commence proceedings to dissolve or wind up Borrower or Managing Member, in whole or in part.

7.8  Affiliate Transactions.  Except for the agreements described on Schedule 4.20, neither Borrower nor any of Borrower's Members shall enter into any agreement with any Guarantor or any Affiliate of any Guarantor or Borrower related to the Property unless such agreement is for goods or services rendered in the ordinary course of business and is on terms and conditions at least as favorable to Borrower as the terms and conditions which could have been obtained in a similar arm's length transaction with a Person other than any Guarantor, an Affiliate of any Guarantor or an Affiliate of Borrower.

7.9  Franchise or License Agreement.  Neither Borrower nor Manager shall enter into, modify or terminate any franchise or license agreement with respect to the Property without the prior written consent of Lender.

7.10  Affiliate Payments.  Except for the payments described on Schedule 4.20, Borrower shall not make any payment or distribution of capital (in like or in kind) to Borrower's Members, Guarantor, any Affiliate of the Borrower's Members, the Guarantor or Borrower except for the fees described on Schedule 4.20.

7.11  Transfers and Pledges.  Borrower's Members and Guarantor shall not, and shall not permit any other Person to, transfer, assign (directly or collaterally), pledge, encumber or otherwise grant an direct or indirect interest or right in Borrower or any of Borrower's Members (irrespective of the number of tiers of ownership), except for (a) admissions of new members of

Managing Member or of DI Development, so long as each such Person hereafter admitted as a new member of Managing Member or of DI Development shall not be a Prohibited Person and the admission of such Person shall not adversely affect the Nevada Gaming Authorities' determination of the suitability of Borrower to be a landlord of the Casino; (b) transfers of membership interests in DI Development among existing members, provided that there is no change in control (as defined in the definition of "Affiliate") in DI Development, Managing Member or Borrower; and (c) transfers of membership interests in Borrower's Members that constitute Permitted Intercreditor Transfers.

7.12 <u>Use of Loan Proceeds</u>. Borrower shall not use any proceeds of the Loan for purposes other than that set forth in the Sources and Uses Statement.

7.13 <u>Amendment of Contracts, Etc</u>. Borrower shall not amend, modify or otherwise alter any of the Contracts or Licenses, Permits and Approvals in any material respect without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion. Borrower will not terminate any of the Contracts or Licenses, Permits and Approvals or accept a surrender thereof, or waive, excuse, condone or in any manner release or discharge any party to any of the Contracts, Licenses, Permits and Approvals from the obligations and agreements of such party to be performed thereunder without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion.

7.14 <u>Patriot Act</u>. Neither Borrower nor any of its officers, directors, shareholders, partners, members or Affiliates (including the indirect holders of equity interests in Borrower) will: (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224. Borrower further covenants and agrees to deliver (from time to time) to Lender any such certification or other evidence as may be requested by Lender in its sole and absolute discretion, confirming that: (i) neither Borrower nor its officers, directors, shareholders, partners, members or Affiliates (including the indirect holders of equity interests in Borrower) is a Prohibited Person; and (ii) neither Borrower nor its officers, directors, shareholders, partners, members or Affiliates (including the indirect holders of equity interests in Borrower) has engaged in any business, transaction or dealings with a Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person.

7.15 <u>Officers of Borrower and Managing Member</u>. Lender has the sole discretion to require the resignation of any officer or director of Borrower, in the event that any such director or officer (1) is called forward for licensing by Nevada Gaming Authorities or is found unsuitable by Nevada Gaming Authorities; (2) deemed unsuitable to be associated with a privileged business in the judgment of the Casino Tenant or CCD; or (3) in the judgment of the Lender will likely jeopardize the continuity of gaming operations at the Property.

# ARTICLE 8
## CASH MANAGEMENT/RESERVES

8.1 <u>Operating Budget</u>. Prior to Closing, Borrower shall cause Manager to submit to Lender for approval the Operating Budget for the remaining portion of year 2007 and for the first half of 2008. Such budget shall itemize allocations of expenses between the Casino and the Hotel in a manner acceptable to Lender. Upon Lender's approval thereof, the Operating Budget shall be the "<u>Approved Budget</u>". The Approved Budget for the period from Closing to June 30, 2008, is attached hereto as <u>Schedule 8.1</u>. Borrower shall not approve any Operating Budget or modification thereto without Lender's prior written approval. On or before December 1 of each year during the term of the Loan, Borrower shall submit for Lender's approval a revised Operating Budget for the next following calendar year. Upon Lender's approval, such revised and updated Operating Budget shall be the effective Approved Budget for the next following calendar year. Borrower shall not modify the Approved Budget, including, without limitation, any allocation of expenses between the Hotel and the Casino without Lender's prior approval.

8.2 <u>Reserves and Accounts</u>. Prior to Closing, Borrower shall establish and maintain at the Reserve Bank the following reserves:

    (a)   <u>Tax and Insurance Reserve</u>.

        (i)   Concurrently with the execution of this Agreement, Borrower shall establish at the Reserve Bank a reserve account to be governed by this <u>Section 8.2(a)</u> (the "<u>Tax and Insurance Reserve</u>").

        (ii)   Beginning on the first day of the month following the Closing Date, and on the first day of each month thereafter while the Loan remains outstanding, Borrower shall deposit or cause Manager to deposit into the Tax and Insurance Reserve the amount reasonably determined by Lender to be equal monthly payments in amounts sufficient to pay each next due installment of taxes and insurance premiums in full on the insurance policies required under the Deed of Trust, as such amounts are determined by Lender from time to time. Initially, the monthly amount to be deposited in the Tax and Insurance Reserve is estimated to be equal to $18,607.15. Lender may reasonably revise the amounts required to be deposited into the Tax and Insurance Reserve based upon actual tax and premium increases and adjustments.

        (iii)   The Tax and Insurance Reserve shall meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be responsible for any losses resulting from investment of the Tax and Insurance Reserve or for obtaining any specific level or percentage of earnings on such investment. All interest and other proceeds paid on the funds deposited in the Tax and Insurance Reserve shall accrue to the benefit of Borrower under Borrower's tax identification number and shall remain in the Tax and Insurance

Reserve as collateral for Borrower's obligations under the Loan Documents.

(iv) Borrower, promptly after receipt and in each event no later than fifteen (15) days before the same are due and payable, shall deliver to Lender a copy of all tax bills and assessment notices and invoices regarding insurance premiums for insurance required under the Loan Documents, and Lender shall, within ten (10) Business Days of receipt of such notice, authorize a disbursement from the Tax and Insurance Reserve to pay such amounts but only to the extent of funds in the Tax and Insurance Reserve. Notwithstanding the foregoing, in no event shall Lender be obligated to authorize the disbursement of funds from the Tax and Insurance Reserve if an Event of Default exists under this Agreement (including, without limitation, Borrower's failure to pay in full any fees, costs and expenses then due and payable under this Agreement) or under any of the other Loan Documents, or if an act, event or condition shall have occurred and then be existing that with notice and/or the lapse of time would constitute an Event of Default hereunder or under any of the other Loan Documents. From and after the date that Borrower fails to pay any property tax liability or required insurance premium, Lender may, in Lender's sole and absolute discretion, but without any obligation, pay, in whole or in part, such unpaid real property taxes and assessments and/or insurance premiums using the funds in the Tax and Insurance Reserve.

(b) **Interest Reserve.**

(i) Concurrently with the execution of this Agreement, Borrower shall establish at the Reserve Bank a reserve account with an initial deposit of $8,255,333.33 to be governed by this Section 8.2(b) (the "Interest Reserve"). Such funds are intended to sufficient to pay interest on the Loan for a period of one (1) year.

(ii) Beginning on August 1, 2007, and on the first day of each month thereafter, the amount of Borrower's monthly interest payment that becomes due and payable under the Note shall be periodically disbursed directly to Lender from the Interest Reserve to the extent of available funds. Lender is hereby authorized to charge the Interest Reserve directly for such interest payments when due. Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including, without limitation, payment of all accrued interest due under the Note and other Loan Documents. Borrower shall commence payment of interest due under the Note and other Loan Documents upon the depletion of the funds situated in the Interest

LAI 934460

Reserve to the extent that such interest is not be paid from the Managed Account pursuant to Section 8.5(a) below.

(iii) The Interest Reserve shall meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be responsible for any losses resulting from investment of the Interest Reserve or for obtaining any specific level or percentage of earnings on such investment. All interest and other proceeds paid on the funds deposited in the Interest Reserve shall accrue to the benefit of Borrower under Borrower's tax identification numbers and shall remain in the Interest Reserve as collateral for Borrower's obligations under the Loan Documents.

(iv) In no event shall Lender be obligated to authorize the disbursement of funds in the Interest Reserve if an Event of Default exists under this Agreement (including, without limitation, Borrower's failure to pay in full any fees, costs and expenses then due and payable under this Agreement) or under any of the other Loan Documents, or if an act, event or condition shall have occurred and then be existing that with notice and/or the lapse of time would constitute an Event of Default hereunder or under any of the other Loan Documents.

(c) Hazardous Materials Remediation Reserve.

(i) Concurrently with the execution of this Agreement, Borrower shall establish at the Reserve Bank a reserve account with a deposit of $13,400 to be governed by this Section 8.2(c) (the "Hazardous Materials Remediation Reserve"), for removal and/or remediation of Hazardous Materials on the Property and other work related to the Property's non-compliance with any Environmental Laws as indicated in the Environmental Reports or the property condition reports for the Property prepared and delivered prior to the Closing.

(ii) Within six (6) months after the Closing, Borrower shall complete such remediation and other work as may be required by Lender, and shall provide to Lender such closure reports, no-further-action letters, and other evidence of compliance with Environmental Laws and other Laws as Lender may require. The funds contained in the Hazardous Materials Remediation Reserve shall be utilized by Borrower solely for environmental remediation, and shall not be used by Borrower for purposes for which any other Reserve is established. Upon written application of Borrower, Borrower shall be entitled to draw upon the Hazardous Materials Remediation Reserve to pay for costs for which such Reserve has been established after such costs shall have been incurred by Borrower and invoiced, provided that (i) Borrower shall provide to Lender such documentation and certifications as Lender may reasonably

request to substantiate the requirement for and entitlement to such disbursement, (ii) Borrower shall provide Lender with all invoices, receipts, lien waivers and other documentation of lawful and workmanlike progress or completion, lien-free status, and availability of sufficient funds, all as may be requested by Lender, (iii) Borrower shall provide Lender such evidence as may be satisfactory to Lender that, after payment of such draw, the funds remaining in such Reserve shall be sufficient to pay for the remainder of the work for which the Reserve was established, (iv) Lender shall have completed such inspections (if any) as it deems appropriate under the circumstances, and the results of the same shall be satisfactory to Lender in its reasonable discretion, and (v) payments from such Reserve shall be used only to pay (or to reimburse Borrower for payment of) costs and expenses incurred in arms' length transactions to Persons who are not Affiliates of Borrower.

(iii)   The Hazardous Materials Remediation Reserve shall meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be responsible for any losses resulting from investment of the Hazardous Materials Remediation Reserve or for obtaining any specific level or percentage of earnings on such investment. All interest and other proceeds paid on the funds deposited in the Hazardous Materials Remediation Reserve shall accrue to the benefit of Borrower under Borrower's tax identification numbers and shall remain in the Hazardous Materials Remediation Reserve as collateral for Borrower's obligations under the Loan Documents.

(iv)   In no event shall Lender be obligated to authorize the disbursement of funds in the Hazardous Materials Remediation Reserve if an Event of Default exists under this Agreement (including, without limitation, Borrower's failure to pay in full any fees, costs and expenses then due and payable under this Agreement) or under any of the other Loan Documents, or if an act, event or condition shall have occurred and then be existing that with notice and/or the lapse of time would constitute an Event of Default hereunder or under any of the other Loan Documents.

(d)   Special Operating Account. At Closing, the sum of $200,000 from Loan proceeds will be deposited into the trust account of Borrower's counsel, Gibbons P.C., pending the settlement of certain claims against Borrower and its Affiliates which may exist as of Closing. Such funds may be used solely for the settlement of such claims and the payment of legal expenses and costs incurred in connection therewith. Upon the settlement of such claims, or at such time that Borrower determines upon advice of counsel that such claims are no longer viable any funds remaining in such trust

account shall be deposited by Borrower into a newly-opened account with the Reserve Bank, which account shall be pledged as additional collateral for the Loan pursuant to Lender's standard pledge and control agreements. So long as no Event of Default has occurred, Lender shall cause funds to be disbursed from such account in payment of pre-development and other expenses related to the development of the Property pursuant to a budget submitted by Borrower to Lender which has been approved by Lender prior to any disbursement therefrom.

8.3     All Reserves as Additional Security and Source of Payment.

    (a)     Borrower hereby assigns and grants to Lender a security interest in the Reserves and the Managed Account as additional security for all of Borrower's obligations under the Loan Documents. Upon an Event of Default, Lender shall have the rights and remedies accorded to Lender with respect to the Reserves and the Managed Account as set forth in the Accounts Pledge Agreement. The Reserves are solely for the added protection of Lender and entail no responsibility on Lender's part beyond allowing the due credit for sums actually deposited therein.

    (b)     If the Reserves are insufficient to pay the sums required when the same shall become due and payable, Borrower shall immediately deposit the full amount of any such deficiency in the respective Reserve.

    (c)     The Reserves and the Managed Account shall be subject to the terms of the Reserves Account Control Agreement (Borrower) and the Reserves Account Control Agreement (Lessee).

    (d)     Each of the Reserves shall be invested in a money market or other demand deposit account with Reserve Bank.

8.4     Flow of Funds.

    (a)     Deposits of Gross Revenues Into Managed Account; Rent Payment Direction Letters. Borrower shall cause, and shall cause Hotel Lease Tenant to cause, (i) all tenants under all Leases (including without limitation, the Hotel Lease and the Casino Lease) to pay all rents directly to the Managed Account Bank for deposit into the Managed Account, and (ii) all other Gross Revenues (other than Liquor Revenues) that are not paid directly to the Managed Account Bank in accordance with the foregoing to be deposited into the Managed Account promptly, and in no event later than one Business Day after the same are paid to or for the benefit of Borrower or Hotel Lease Tenant. To the extent that Borrower, Hotel Lease Tenant or any Person on behalf of Borrower or Hotel Lease Tenant, receives or holds any such Gross Revenues (other than Liquor Revenues), whether in accordance with this Agreement or otherwise, then such Person shall be deemed to hold the same in trust for Lender for the

protection of the interests of Lender hereunder and under the Loan Documents. Without limitation, Borrower represents that it has delivered to Lender a Rent Payment Direction Letter for each tenant under each existing Lease. Further, Borrower shall deliver to Lender a Rent Payment Direction Letter for each new tenant contemporaneously with the execution and delivery of its Lease after the date hereof. Also, if the Managed Account is changed, or otherwise if Lender shall request, then Borrower shall execute and deliver to Lender new Rent Payment Direction Letters for all tenants. Lender is authorized to deliver the Rent Payment Direction Letters to the tenants.

(b)     Credit Card Payment Direction Letters.  No later than August 1, 2007, Borrower and Hotel Lease Tenant shall cause all Credit Card Companies to pay all amounts due on account of any Gross Revenues (other than Liquor Revenues) directly into the Managed Account. Without limitation of the foregoing, Borrower, Hotel Lease Tenant and Manager shall promptly upon demand execute and deliver such written documentation as may be required by Lender (including any provisions required by any Credit Card Company) to authorize and instruct all Credit Card Companies irrevocably to pay all such amounts by wire transfer or the ACH System directly to Lender for deposit into the Managed Account, with a written acknowledgment from such Credit Card Companies of such authorization and instruction (a "Credit Card Payment Direction Letter"). Without the prior written consent of Lender, neither Borrower, Hotel Lease Tenant nor Manager shall cause or suffer to occur (i) any modification, amendment or termination of any Credit Card Payment Direction Letter, (ii) execution and delivery of any new Credit Card Agreement by or on behalf of any Borrower, Hotel Lease Tenant or Manager or which pertain in any way to any revenues for the Property, (iii) any modification, amendment or termination of any Credit Card Agreement, or (iv) any payment to occur by any Credit Card Company which is not in accordance with the applicable Credit Card Payment Direction Letter.

8.5     Cash Distribution.

(a)     Concurrently with the execution of this Agreement, Borrower has established at the Managed Account Bank an interest bearing account to be governed by this Section 8.5 (the "Managed Account"). All previously existing bank accounts of the Property shall be closed, except to the extent funds are required to remain in such accounts to cover outstanding checks, provided that the Hotel Lease Tenant may have one operating account into which distributions for operating expenses shall be disbursed from the Managed Account in accordance with this Section 8.5 below. All funds from such previously existing accounts shall be transferred to the Managed Account. Subject to the foregoing provisions of this Article 8, all Gross Revenues generated by the Property after Closing (other than

Liquor Revenues) shall be deposited into the Managed Account in accordance with Section 8.4 above, and (so long as no Event of Default exists, and no act, event or condition shall have occurred and be existing that with notice and/or the lapse of time would constitute an Event of Default hereunder or under any of the other Loan Documents) distributed by Lender as set forth below:

(i) First, to the payment of current debt service on the Loan to the extent that the funds in the Interest Reserve are insufficient to make such payment;

(ii) Second, to the Tax and Insurance Reserve in the amount required to be deposited therein pursuant to Section 8.2(a)(ii) above;

(iii) Third, on the first Business Day of each calendar month, to Manager, the management fee due to Manager under the Management Agreement (which is equal to ten percent (10%) of Gross Revenues with respect to the previous calendar month);

(iv) Fourth, at least twice a month (unless Lender permits more frequent distributions upon the request of Borrower or Hotel Lease Tenant), to Manager to pay for any and all approved expenses of the Property set forth on the Approved Budget (other than Liquor Expenses), including, without limitation, Hotel Lease Tenant's certified payroll and benefits; and

(v) Fifth, on the first day of each calendar month, to Hotel Lease Tenant, forty percent (40%) of the amount of Gross Revenues deposited into the Managed Account during the immediately previous calendar month that remain after the payment of all items in clauses (i) through (iv) above, less sixty percent (60%) of the amount, if any, by which Liquor Revenues exceeds Liquor Expenses for the previous calendar month.

(b) All sums remaining in the Managed Account after the payment of the items set forth above shall remain in the Managed Account as additional collateral for the Loan. At such time as the Loan and all other Obligations have been indefeasibly paid and satisfied in full, and Lender has released, transferred or disposed of all of its right, title and interest in the Collateral, and there has expired the maximum possible period thereafter during which any payment made by Borrower or others to Lender with respect to the Obligations could be deemed a preference under the United States Bankruptcy Code, Lender shall (and Borrower hereby authorizes Lender to) disburse all sums remaining in the Managed Account to Hotel Lease Tenant.

(c)     Except as expressly set forth in this Section 8.5, no other distributions to Borrower or any other Person or any payments from the Managed Account shall be made during the term of the Loan.

## ARTICLE 9
## INFORMATION AND REPORTING REQUIREMENTS

9.1     Financial and Business Information. As long as the Loan remains unpaid, or any other Obligation remains unpaid or unperformed, Borrower, at Borrower's sole expense, shall keep, or cause Manager to keep, adequate books and records in form reasonably acceptable to Lender, in accordance with GAAP and shall deliver the following reports to Lender:

(a)     As soon as practicable, and in any event, on or prior to the twenty first (21st) day of each calendar month during the term of the Loan monthly financial statements for the Casino and the Hotel. The monthly financial statements shall include the following schedules: (i) a balance sheet and profit and loss statement for the preceding calendar month, setting forth in comparative form the corresponding figures for the same month and year-to-date period for the preceding calendar year, and in comparison with the then current Approved Budget, as applicable; (ii) a cash summary detailing all cash activity and reconciling beginning and ending cash balances; (iii) a schedule of aged accounts payable and aged accounts receivable for the preceding calendar month; (iv) reconciliations of the cash accounts to the cash balances recorded on the balance sheet for the preceding calendar month together with copies of the corresponding bank statements; (v) a supplemental schedule that lists all capital expenditures; and (vi) such other reports in respect of the financial condition and operation of each of the Casino and Hotel as Lender may reasonably request. The preceding financial statements shall be certified by an officer of Borrower as fairly presenting the financial condition, results of operations and changes in financial position of the Property in accordance with generally accepted accounting practices, consistently applied, as at such date and for such periods, subject only to normal year-end audit adjustments.

(b)     As soon as practicable and, in any event, within sixty (60) days after the close of each Fiscal Year of Borrower, annual financial statements for the Casino and the Hotel. Such financial statements shall include at least the following: (i) a balance sheet and profit and loss statement, setting forth in comparative form the corresponding figures as at the end of the preceding Fiscal Year; (ii) a comparison of the actual cash flow activity for the previous year to the Approved Budget together with a written explanation for material variances, as reasonably determined by Lender; and (iii) such other reports in respect of the financial condition of the Property as Lender may reasonably request. The preceding financial statements shall be certified by an officer of Borrower as fairly presenting the financial condition, results of operations and changes in financial

position of the Property in accordance with generally accepted accounting practices, consistently applied, as at such date and for such periods.

(c) As soon as practicable and, in any event, within one hundred twenty (120) days after the close of each Fiscal Year of Borrower, (i) an audited balance sheet of Borrower as at the end of such Fiscal Year, setting forth in comparative form the corresponding figures as at the end of the preceding Fiscal Year; (ii) an audited profit and loss statement of Borrower, setting forth in comparative form the corresponding figures for the previous Fiscal Year; (iii) an audited statement of Borrower's Members' equity, setting forth in comparative form the corresponding figures for the previous Fiscal Year; and (iv) an audited statement of cash flows of Borrower, all in reasonable detail. An adverse opinion rendered by the independent accounting firm shall be deemed to be an Event of Default under this Agreement. Borrower's independent auditing firm shall be approved by Lender.

(d) As soon as practicable, and in any event within thirty (30) days prior to the end of each calendar year in which the Loan remains outstanding, a projection of gross revenues, operating expenses, capital expenditures, and debt service for the Property, allocated between the Casino and the Hotel, on a month by month basis for the next succeeding calendar year, together with all supporting schedules certified by an officer of Borrower to be true, correct and complete. This projection shall be in substantially the same form as the Approved Budget and shall be subject to Lender's approval. Such statements shall contain all information reasonably required by Lender.

(e) Promptly after request by Lender, copies of any detailed third party reports submitted to Borrower in connection with the accounts or books of Borrower or any audit of any of them, if any.

(f) Immediately upon becoming aware of the existence of any condition or event which constitutes an Event of Default, a written notice specifying the nature and period of existence thereof and what action is being taken with respect thereto.

(g) Borrower shall provide to Lender copies of all reports and notices delivered to Borrower by the Manager or to Manager by Borrower.

(h) Notice of additional capital calls made under the Operating Agreement of Managing Member and, upon Lender's request from time to time, updated information regarding the status and use of proceeds of capital contributions made under the Operating Agreement of Managing Member.

(i) Such other data and information as from time to time may be reasonably requested by Lender.

9.2  Financial Reporting for Guarantors. Borrower shall cause Guarantor to provide to Lender on a timely basis the financial reports required to be provided by Guarantor to Lender under the terms of the Guaranty.

ARTICLE 10
EVENTS OF DEFAULT; REMEDIES

10.1  Events of Default. The existence or occurrence of any one or more of the following events shall constitute an event of default hereunder (an "Event of Default"):

(a)  Borrower fails to pay all or any portion of any installment of principal or interest due under the Note or under the Loan Documents or to pay any fee or other amount due to be paid to Lender under any Loan Document, in each case, when due, including, without limitation, any required deposit into any of the Reserves; or

(b)  Borrower fails to perform or observe any term, covenant or agreement contained in this Agreement within the time period provided in this Agreement (other than any term, covenant or agreement otherwise addressed in another paragraph of this Section 10.1, for which Borrower will have the grace periods (if any) and notice rights (if any) set forth in such other paragraphs), provided, however, that if no time period is stated in this Agreement, then Borrower shall have a cure period of ten (10) Business Days after written notice from Lender of Borrower's failure to perform such term, covenant or agreement; provided, however, if such failure is not reasonably susceptible to cure within said ten (10) Business Day period, such cure period shall be extended so long as Borrower has commenced such cure within said ten (10) Business Day period, and thereafter diligently prosecutes such cure to completion and such cure in any event is effected within ninety (90) days after written notice from Lender of such failure; or

(c)  A breach or default shall occur and continue beyond any applicable grace or cure period with respect to any indebtedness of Borrower to any Person which breach or default could have a material adverse effect on the financial condition of Borrower, Borrower's ability to perform its Obligations or operations of the Property; or

(d)  Any insurance policy required under the Deed of Trust or any other Loan Documents shall lapse, cancel, or terminate for any reason, or Borrower shall fail to obtain any insurance policy required under the Deed of Trust or any other Loan Document, or any such insurance policy shall fail to name Lender as additional insured and/or the sole loss payee; or

(e)  Any representation or warranty in this Agreement or any other Loan Document, including the Guaranty, or in any certificate, agreement, instrument or other document made or delivered pursuant to or in

connection with any Loan Document, proves to have been materially incorrect or incomplete when made; or

(f)     Any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of Lender or satisfaction in full of all the Obligations, ceases to be in full force and effect or is declared by a court of competent jurisdiction to be null and void, invalid or unenforceable in any respect, or any Party thereto wrongfully denies that it has any or further liability or obligation under any Loan Document, or wrongfully purports to revoke, terminate or rescind same; or

(g)     A final judgment against Borrower is entered for the payment of money and such judgment remains unsatisfied without procurement of a stay of execution within thirty (30) days of the rendering of such judgment; or

(h)     Borrower, Managing Member or Guarantor (i) is the subject of an order for relief in a bankruptcy case, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; (ii) applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of the Property; (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of that Person and the appointment continues undischarged or unstayed for forty-five (45) calendar days; (iv) institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar case or proceedings relating to it or to all or any part of the Property under the Laws of any jurisdiction; (v) any similar case or proceeding is instituted without the consent Borrower, Managing Member or Guarantor, as the case may be, and continues undismissed or unstayed for forty-five (45) calendar days; or (vi) any judgment, writ, warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of Borrower, Managing Member or Guarantor and is not released, vacated or fully bonded within forty-five (45) calendar days after its issue or levy; or

(i)     Except as otherwise expressly permitted by any Loan Document or agreed to by Lender, at any time after the execution and delivery of any Loan Document and for any reason other than satisfaction in full of all Obligations, the Lien intended to be created by said Loan Document ceases or fails to constitute a valid, perfected and subsisting Lien on the Collateral purported to be covered thereby with a Lien priority as set forth in such Loan Document; or

(j)     Borrower or Guarantor shall fail to deliver to Lender any of the financial statements and information or federal or state tax returns as and when due

hereunder or under the Guaranty after fifteen (15) days written notice from Lender to Borrower or Guarantor of such failure to deliver; or

(k) Any failure by Borrower, Managing Member or Guarantor to perform any of their respective covenants or obligations under any of the Contracts and/or Licenses, Permits and Approvals after fifteen (15) days written notice from Lender to Borrower or any of them of such failure to perform; or

(l) The cessation of gaming or liquor operations at the Property or any suspension or termination of the gaming license or liquor license under which the Property operates, the termination, cancellation or rejection of the Casino Lease, or the appointment of a receiver with respect to such operations or licenses by the Nevada Gaming Authorities; or

(m) Borrower or Managing Member is dissolved or liquidated or all or substantially all of the assets of Borrower or Managing Member are sold or otherwise transferred in violation of the provisions of this Agreement or the other Loan Documents without the written consent of Lender or Guarantor dies or is declared incompetent unless the estate of Guarantor remains liable under the Guaranty pursuant to applicable law and, if the duties and responsibilities of the deceased or incompetent Guarantor are substantially assumed by another Person acceptable to Lender, that Person assumes the Guaranty within five (5) days of Lender's request pursuant to an assumption agreement in form satisfactory to Lender; or

(n) An event of default by Borrower under the Hotel Lease and the expiration of any applicable grace or notice and cure period contained therein or the breach by Hotel Tenant of Section 4 of the Hotel Lease and the failure of Borrower to cause Hotel Tenant to cure such breach within ten (10) days of written notice thereof by Lender ; or

(o) A default under Section 7.1 above; or

(p) The recording of any claim of lien against the Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for twenty (20) days from the date of recording or service, or five (5) days from the date of Lender's demand, whichever is earlier, without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender; or (ii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any portion of the Property or Improvements; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Property or Improvements, any other Collateral provided by Borrower under any of the Loan Documents, the Managed Account or in any of the Reserves, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or

execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby; or

(q) An event of default under any of the other Loan Documents and the expiration of any applicable grace or notice and cure period contained therein; or

(r) Borrower engages in any Gaming Related Activities without Lender's prior written consent or in violation of applicable law; or

(s) At any time, Borrower or its principals shall be deemed as unsuitable landlords by the Nevada Gaming Authorities for owning a casino; or

(t) A default under any of the Mezzanine Loan Documents and the expiration of any applicable grace or notice and cure period contained therein, but only if (i) Mezzanine Lender has accelerated the Mezzanine Loan or has taken any other enforcement action against Managing Member or the collateral securing the Mezzanine Loan as a result of such default, or (ii) the Mezzanine Loan has matured.

10.2 <u>Remedies</u>. Upon the occurrence of any Event of Default described in any of paragraphs (d), (h), (l), (o), (r), (s) or (t) above, the unpaid principal amount of and accrued interest and fees on the Loan and all other sums due hereunder or under any of the other Loan Documents shall automatically become immediately due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other requirements of any kind, all of which are hereby expressly waived by Borrower. Upon the occurrence of any Event of Default hereunder, in addition to any other rights or remedies available to it hereunder or under the Note, the Deed of Trust or any of the other Loan Documents or at law or in equity, Lender may exercise any or all of the following rights and remedies as it may deem necessary or appropriate without further notice or action:

(a) declare the outstanding principal balance of the Loan, together with all accrued and unpaid interest thereon and all other sums due hereunder or under any of the other Loan Documents, to be immediately due and payable in full.

(b) cease making any further disbursements or advances hereunder whether from the proceeds of the Loan, the Managed Account or any Reserve, including, without limitation the Interest Reserve.

(c) set off all property of Borrower now or hereafter at any time in Lender's possession in any capacity whatsoever including, but not limited to, any balance or share of any deposit, trust or agency account, as to all of which property Borrower hereby grants Lender a lien and security interest.

(d) with or without legal process, to the extent permitted under applicable law, take possession of the Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from the Property and

Improvements, complete the work of construction and market and sell or lease the Property and/or Improvements. For this purpose, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest. As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate, including, without limitation, exercising Borrower's rights under the Loan Documents and all contracts concerning the Property and/or Improvements.

## ARTICLE 11
## MISCELLANEOUS

11.1  <u>Cumulative Remedies; No Waiver</u>. The rights, powers, privileges and remedies of Lender provided herein or in the Note or the other Loan Documents are cumulative and not exclusive of any right, power, privilege or remedy provided by Law or equity. No failure or delay on the part of Lender in exercising any right, power, privilege or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power, privilege or remedy preclude any other or further exercise of the same or any other right, power, privilege or remedy. The terms and conditions of <u>Article 3</u> hereof are inserted for the sole benefit of Lender and Lender may waive them in whole or in part, with or without terms or conditions, without prejudicing Lender's rights to assert them in whole or in part at any future time.

11.2  <u>Amendments; Consents</u>. This Agreement, including the defined terms and all Exhibits, Schedules and Addenda, if any, attached hereto embodies the final and complete agreement between the parties hereto and supersedes all prior and contemporaneous negotiations, offers, proposals, agreements, commitments, promises, acts, conduct, course of dealing, representations, statements, assurances and understandings, whether oral or written, including the Commitment Letter and that certain term sheet executed by DI Development (an Affiliate of Borrower), Canyon Capital Realty Advisors LLC, and others, dated May 22, 2007, and may not be varied or contradicted by evidence of any such prior or contemporaneous matter or by evidence of any subsequent oral agreement of the parties hereto. The parties hereto expressly acknowledge and agree that, with regard to the subject matter of this Agreement and the transactions contemplated herein, there are no oral agreements between the parties hereto. The provisions of this Agreement and the other Loan Documents may be amended or waived only by an instrument in writing signed by the Parties hereto and thereto.

11.3  <u>Costs, Expenses and Taxes</u>. Whether or not the transactions contemplated in this Agreement actually close, Borrower shall pay on demand the actual costs and expenses of Lender in connection with the negotiation, preparation, execution and delivery of the Loan Documents, and of Lender in connection with the amendment, waiver, refinancing, restructuring, reorganization (including a bankruptcy reorganization), and enforcement or attempted enforcement of the Loan Documents, and any matter related thereto, including, without limitation, filing fees, recording fees, title insurance fees, appraisal fees, search fees, travel expenses, and other out-of-pocket expenses and the fees and out-of-pocket expenses of any legal counsel, independent public accountants and other outside experts retained by Lender, and including, without limitation, any costs, expenses or fees incurred or suffered by Lender in

connection with or during the course of any bankruptcy or insolvency proceedings of Borrower. Borrower shall pay any and all documentary and other taxes (other than income or gross receipts taxes applicable to Lender) and all costs, expenses, fees and charges payable or determined to be payable in connection with this Agreement, any other Loan Document or any other instrument or writing to be delivered hereunder or thereunder, or in connection with any transaction pursuant hereto or thereto, and shall reimburse, hold harmless and indemnify Lender from and against any and all loss, liability or legal or other expense with respect to or resulting from any delay in paying or failure to pay any such tax, cost, expense, fee or charge or that any of them may suffer or incur by reason of the failure of any Party to perform any of its Obligations. Any amount payable to Lender under this <u>Section 11.3</u> shall bear interest from the sixth (6th) day following the date of demand for payment at the Default Rate until such amount is repaid in full.

11.4   <u>Nature of Lender's Obligations</u>.  Nothing contained in this Agreement or any other Loan Document and no action taken by Lender pursuant hereto or thereto may, or may be deemed to, make Lender a partner of a partnership, an associate of an association, or a joint venturer of a joint venture or other entity, either with Borrower or any Affiliate of Borrower and, at all times, the relationship between Lender and Borrower shall be that of a lender and a borrower, respectively.

11.5   <u>Reliance Upon Representations and Warranties</u>.  All representations and warranties contained herein or in any other Loan Document, or in any certificate or other writing delivered by or on behalf of any one or more of the Parties to any Loan Document have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on its behalf.

11.6   <u>Notices</u>.  Any notices to be given under this Agreement or any of the other Loan Documents must be in writing and shall be (a) delivered personally, or (b) mailed by certified or registered mail, return receipt requested, or (c) sent via nationally recognized overnight courier (e.g. Federal Express), or (d) transmitted by facsimile, in each case to the parties at the following addresses or fax numbers:

If to Borrower:          GIH-SPE II, LLC
                         c/o DI Development Group, LLC
                         260 W. 54th Street, 29J
                         New York, New York 10019
                         Attn.: Mr. Harold Rothstein
                         Facsimile: (412) 279-2870

With a copy to:          Gibbons P.C.
                         One Pennsylvania Plaza, 37th Floor
                         New York, New York 10119-3701
                         Attn.: Frank T. Cannone, Esq.
                         Facsimile: (973) 639-8340

|                    |                                                       |
|--------------------|-------------------------------------------------------|
| If to Lender       | Canpartners Realty Holding Company IV LLC             |
|                    | c/o Canyon Capital Realty Advisors                    |
|                    | 9665 Wilshire Boulevard                               |
|                    | Beverly Hills, California 90212                        |
|                    | Attn.: Mr. K. Robert Turner                           |
|                    | Mr. Jonathan P. Roth                                  |
|                    | Facsimile: (310) 247-8067                             |
|                    |                                                       |
| With a copy to:    | Canpartners Realty Holding Company IV LLC             |
|                    | c/o Canyon Capital Realty Advisors                    |
|                    | 9665 Wilshire Boulevard                               |
|                    | Beverly Hills, California 90212                        |
|                    | Attn.: Head of Asset Management                       |
|                    |                                                       |
| With a copy to:    | Sidley Austin LLP                                     |
|                    | 555 West Fifth Street, 40th Floor                     |
|                    | Los Angeles, California 90013                         |
|                    | Attn.: Bruce W. Fraser, Esq.                          |
|                    | Facsimile: (213) 896-6600                             |

Any party hereto may change its address and/or fax number for service of notices by giving notice to the other parties in the manner provided in this Paragraph. Any such notice shall be deemed to have been received: (a) when the notice is received by the recipient or when delivery to said address is attempted but refused or on the date of attempted delivery if the address is no longer valid if sent by registered or certified mail or overnight courier; (b) on the date of sending by facsimile to said fax number if sent during business hours on a Business Day (otherwise on the next Business Day), and (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day).

11.7   Participations and Securitization.

(a)   Borrower acknowledges that Lender may elect from time to time in its sole discretion, on or after the date of this Agreement, to sell, assign or grant participations in the Loan and/or interests in the Loan to one or more Persons. Borrower acknowledges that Lender may distribute to such Persons all documents and information (including, but not limited to, financial information), which has been or is hereafter provided or known to Lender with respect to the Property and its operation and any Party connected with the Loan. In the event of any such sale, assignment or participation, Lender and any such Persons shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent that they agree among themselves. In connection with any such sale, assignment or participation, Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligation of Borrower to each purchaser, assignee or participant and, upon written request by Lender, Borrower, at Borrower's expense, shall enter into such amendments or modifications to the Loan Documents as may be required

by Lender in order to evidence any such sale, assignment or participation so long as such amendments or modifications do not increase the liabilities or obligations of Borrower, any of Borrower's Members or Guarantor under the Loan Documents and shall be completed at no expense to Borrower. The indemnity obligations of Borrower and any Guarantor under the Loan Documents shall also apply with respect to any purchaser, assignee or participant.

(b)     Borrower hereby acknowledges and makes the Note a registered obligation for United States withholding tax purposes. Borrower shall be the registrar for the Note (the "Registrar") with full power of substitution. In the event the Registrar becomes unable or unwilling to act as registrar under this Agreement, Borrower shall reasonably designate a successor Registrar. Any party which acquires a beneficial interest in the Loan (a "Holder") who is a foreign person, by its acceptance of its Note, hereby agrees to provide Borrower with a completed Internal Revenue Service Form W-8 (Certificate of Foreign Status) or a substantially similar form for such Holder, participants or other affiliates who are holders of beneficial interests in the Note. Notwithstanding any contrary provision contained herein or any of the other Loan Documents, neither the Note nor any interests therein may be sold, transferred, hypothecated, participated or assigned to any Person except upon satisfaction of the conditions specified herein. Each Holder, by its acceptance of its Note, agrees to be bound by the provisions of this section and to indemnify and hold harmless the Registrar against any and all loss or liability arising from the disposition by such Holder of the Note or any interest therein in violation of this section. The Registrar shall keep at its principal executive office (or an office or agency designated by it by notice to the last registered Holder) a ledger, in which, subject to such reasonable regulations as it may prescribe, but at its expense (except as specified below), it shall provide for the registration and transfer of the Note. No sale, transfer, hypothecation, participation or assignment of the Note or the interest therein shall be effective for any purpose until it shall be registered on the books of the Registrar to be maintained for such purpose. In the event of a sale, transfer, hypothecation, participation or assignment of the Note or any interest therein, each Holder, prior to such sale, transfer, hypothecation, participation or assignment of the Note or any interest therein shall provide the Registrar with notice of such transaction at the time of such transaction. The Registrar shall record the transfer of the Note on the books maintained for this purpose upon receipt by the Registrar at the office or agency designated by the Registrar of (i) a written assignment of the Note being assigned (or the applicable interest therein), (ii) funds sufficient to pay any transfer taxes payable upon the making of such transfer as well as the cost of reviewing the documents presented to the Registrar, and (iii) such evidence of due execution as the Registrar shall reasonably require. The Registrar shall record the transfer

of the Note on the books maintained for such purpose at the cost and expense of the assignee.

11.8    Counterparts.  This Agreement and any other Loan Document may be executed in any number of counterparts and any party hereto or thereto may execute any counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts of this Agreement or any other Loan Document, as the case may be, when taken together will be deemed to be but one and the same instrument.

11.9    Binding Effect; Assignment.    This Agreement and the other Loan Documents shall be binding upon and shall inure to the benefit of the parties hereto and thereto and Borrower may not assign its rights hereunder or thereunder or any interest herein or therein without the prior written consent of Lender, which may be given or withheld in Lender's sole discretion.

11.10    Indemnity by Borrower.  Borrower agrees to indemnify, defend, save and hold harmless Lender and its participants, directors, officers, agents, attorneys and employees and their respective successors and assigns (collectively, the "Indemnitees") from and against:  (a) any and all claims, demands, actions or causes of action that are asserted against any Indemnitee by any Person (other than Lender or a participant) if the claim, demand, action or cause of action; directly or indirectly relates to a claim, demand, action or cause of action that such Person has or asserts against Borrower, any Affiliate of Borrower or any officer, director or principal of Borrower and arises out of or relates to the relationship between Borrower and Lender under any of the Loan Documents or the transactions contemplated thereby; (b) any and all liabilities, losses, costs or expenses (including attorneys' fees and disbursements and other professional services) that any Indemnitee suffers or incurs as a result, directly or indirectly, of any event, circumstance or matter occurring by reason of Lender making the Loan and/or with respect to the Property or other Collateral; and (c) any and all liabilities, losses, costs or expenses (including attorneys' fees and disbursements and other professional services) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action or cause of action; provided that no Indemnitee shall be entitled to indemnification for any loss caused by its own gross negligence or willful misconduct.  Each Indemnitee is authorized to employ counsel of its own choosing in enforcing its rights hereunder and in defending against any claim, demand, action or cause of action covered by this Section 11.10.  Any obligation or liability of Borrower to any Indemnitee under this Section 11.10 shall be and hereby is covered and secured by the Loan Documents and the Collateral, and shall survive the expiration or termination of this Agreement and the repayment of the Loan and the payment and performance of all other Obligations owed to Lender.

11.11    Nonliability of Lender.  Borrower acknowledges and agrees that:

(a)    Any inspections of the Property made by or through Lender are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same;

(b)    By accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including

any certificate, financial statement, insurance policy or other document, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender; and

(c)     The relationship between Borrower and Lender is, and shall at all times remain, solely that of a borrower and lender; Lender shall not under any circumstance be construed to be a partner or joint venturer of Borrower or its Affiliates; Lender shall not under any circumstance be deemed to be in a relationship of confidence or trust or a fiduciary relationship with Borrower or its Affiliates, or to owe any fiduciary duty to Borrower or its Affiliates; Lender does not undertake or assume any responsibility or duty to Borrower or its Affiliates to select, review, inspect, supervise, pass judgment upon or inform Borrower or its Affiliates of any matter in connection with the Property, any Collateral held by Lender or the operations of Borrower or its Affiliates; Borrower and its Affiliates shall rely entirely upon their own judgment with respect to such matters; and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by Lender in connection with such matters is solely for the protection of Lender and neither Borrower nor any other Person is entitled to rely thereon.

11.12   No Third Parties Benefited.   This Agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Borrower and Lender in connection with the Loan, and is made for the sole protection of Borrower, Lender, and Lender's successors and assigns. Except as provided in Section 11.9 and in this Section 11.12, no other Person shall have any rights of any nature hereunder or by reason hereof.

11.13   Further Assurances.   Borrower shall, at its expense and without expense to Lender do, execute and deliver such further acts and documents as Lender from time to time reasonably requires for the assuring and confirming unto Lender of the rights hereby created or intended now or hereafter so to be, or for carrying out the intention of facilitating the performance of the terms of any Loan Document, or for assuring the validity, perfection, priority or enforceability of any Lien under any Loan Document.

11.14   Integration.   This Agreement and the Exhibits and Schedules hereto, together with the other Loan Documents, comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersede all prior or contemporaneous agreements, written or oral, on the subject matter hereof or thereof. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control and govern; provided that the inclusion of supplemental rights or remedies in favor of Lender in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

11.15 <u>Governing Law</u>. Except to the extent otherwise provided therein, each Loan Document shall be governed by, and construed and enforced in accordance with, the local Laws of the State of Nevada without giving effect to its conflict of laws principles. The parties stipulate and agree that the State of Nevada has a substantial relationship to the underlying transaction related to this Agreement and to the parties involved.

11.16 <u>Severability of Provisions</u>. Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid as to any party or in any jurisdiction shall, as to that party or jurisdiction, be inoperative, unenforceable or invalid without affecting the remaining provisions or the operation, enforceability or validity of that provision as to any other party or in any other jurisdiction, and to this end the provisions of all the Loan Documents are declared to be severable.

11.17 <u>Headings</u>. Article and Section headings in this Agreement and the other Loan Documents are included for convenience of reference only and are not part of this Agreement or the other Loan Documents for any other purpose.

11.18 <u>Time of the Essence</u>. Time is of the essence of this Agreement and the other Loan Documents.

11.19 <u>WAIVERS</u>.

(1) <u>JURY WAIVER</u>. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF LENDER'S AGREEMENT TO THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, BORROWER AND LENDER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER OR BORROWER IN CONNECTION WITH THE LOAN AND/OR THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO A TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO (A) ALLEGATIONS THAT A PARTNERSHIP EXISTS BETWEEN LENDER AND BORROWER; (B) USURY OR PENALTIES OR DAMAGES THEREFOR; (C) ALLEGATIONS OF UNCONSCIONABLE ACTS, DECEPTIVE TRADE PRACTICE, LACK OF GOOD FAITH OR FAIR DEALING, LACK OF COMMERCIAL REASONABLENESS, OR SPECIAL RELATIONSHIPS (SUCH AS FIDUCIARY, TRUST OR CONFIDENTIAL RELATIONSHIP); (D) ALLEGATIONS OF DOMINION, CONTROL, ALTER EGO, INSTRUMENTALITY, FRAUD, REAL ESTATE FRAUD, MISREPRESENTATION, DURESS, COERCION, UNDUE INFLUENCE, INTERFERENCE OR NEGLIGENCE; (E) ALLEGATIONS OF TORTIOUS INTERFERENCE WITH PRESENT OR PROSPECTIVE BUSINESS RELATIONSHIPS OR OF ANTITRUST; OR (F) SLANDER, LIBEL OR DAMAGE TO REPUTATION. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS

HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

(2) ADDITIONAL WAIVERS. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF LENDER'S AGREEMENT TO THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, BORROWER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER IN CONNECTION WITH THE LOAN AND/OR THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN, EXCEPT TO THE EXTENT THAT SAID COUNTERCLAIM MUST BE ASSERTED PURSUANT TO APPLICABLE LAW OR OTHERWISE BE BARRED FROM BEING ASSERTED IN ANY OTHER ACTION AND (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT BORROWER FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION WITH RESPECT TO ANY ASSERTED CLAIM.

11.20 Hold Harmless. Borrower represents and warrants to Lender that there are no commissions, finder's fees, brokerage fees or financial advisory fees arising out of the transactions contemplated by this Agreement other than those payable to the Disclosed Brokers under separate agreements with Borrower, which shall be paid by Borrower at Closing. Borrower shall indemnify and hold Lender harmless from and against any and all liabilities, claims, demands, damages, costs and expenses, including, without limitation, attorneys' fees and court costs, in connection with claims for any such commissions, finders' fees, brokerage fees, or financial advisory fees arising out of the inaccuracy of the foregoing representations and/or warranties of Borrower.

11.21 Attorneys' Fees; Enforcement. Borrower shall reimburse Lender for all actual attorneys' fees, costs and expenses, arising from and after the date hereof, incurred by Lender in connection with the enforcement of Lender's rights under this Agreement and each of the other Loan Documents, including, without limitation, actual attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements, and for enforcement of rights under any state or federal statute, including, without limitation, actual attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) in connection with seeking relief from stay in a bankruptcy proceeding. The term "expenses" means any expenses incurred by Lender in connection with any of the out-of-court, or state, or federal or bankruptcy proceedings referenced above, including but not limited to the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Lender in connection with any of those proceedings. Lender shall also be entitled to its actual attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. This provision is separate and several and shall survive the merger of this Agreement into any judgment on this Agreement.

11.22 Waiver of Statute of Limitations. Borrower hereby waives all rights to plead or assert at any time any statute of limitations as a defense or bar to any action or proceeding

brought to enforce this Agreement or any of the other Loan Documents or any Obligations hereunder or thereunder.

11.23 <u>Survival of Representations and Warranties</u>. All representations and warranties contained herein or in any other Loan Document, or in any certificate or other writing delivered by or on behalf of any one or more of the Parties to any Loan Document, shall survive the making and repayment of the Loan hereunder and have been or will be relied upon by Lender, notwithstanding any investigation made by or on behalf of Lender.

[Signatures on next page.]

LA1 934469

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be duly executed as of the date first above written.

BORROWER

GIH-SPE II, LLC,
a Delaware limited liability company

By:    GIH-SPE I, LLC,
        a Delaware limited liability company
        its Managing Member

        By:    DI DEVELOPMENT GROUP, LLC,
                a Delaware limited liability company,
                its Managing Member

                By: _____
                Name: HAROLD ROTHSTEN
                Title: AUTHORIZED PERSON

LENDER

CANPARTNERS REALTY HOLDING COMPANY IV LLC,
a Delaware limited liability company

By:    Canyon Capital Realty Advisors LLC,
        a Delaware limited liability company

        By: _____
        Name: _____
        Title: _____

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be duly executed as of the date first above written.

BORROWER

GIH-SPE II, LLC,
a Delaware limited liability company

By:  GIH-SPE I, LLC,
     a Delaware limited liability company
     its Managing Member

     By:  DI DEVELOPMENT GROUP, LLC,
          a Delaware limited liability company,
          its Managing Member


          By: _____
          Name: _____
          Title: _____


LENDER

CANPARTNERS REALTY HOLDING COMPANY IV LLC,
a Delaware limited liability company

By:  Canyon Capital Realty Advisors LLC,
     a Delaware limited liability company

     By: _____
     Name: ___K. ROBERT TURNER___
     Title: ___MANAGING PARTNER___

· EXHIBIT A

Legal Description

PARCEL 1:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 04°39'10" WEST ALONG THE EAST LINE OF SAID SECTION 9, A DISTANCE OF 702.66 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT DEED" TO WALTER S. HUNSAKER, ET UX, RECORDED MARCH 24, 1949 IN BOOK 59 OF DEEDS, PAGE 504 AS INSTRUMENT NO. 308745 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 89°05'00" WEST ALONG THE NORTH LINE OF SAID PARCEL OF LAND, 258.90 FEET TO A SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO CLIFFORD A. JONES, ET AL, RECORDED DECEMBER 4, 1951 IN BOOK 65, PAGE 461 OF DEEDS AS INSTRUMENT NO. 378222 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 00°11'23" EAST, 234.86 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE (80.00 FEET WIDE); THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 1237.25 FEET TO THE POINT OF BEGINNING, WHICH BEARS SOUTH 89°24'14" EAST, 100.00 FEET FROM THE NORTHWEST CORNER OF SAID JONES PARCEL; THENCE SOUTH 02°53'34" EAST PARALLEL WITH THE WEST LINE OF SAID JONES PARCEL, 277.78 FEET TO A POINT ON THE SOUTH LINE OF SAID JONES PARCEL; THENCE SOUTH 88°58'00" EAST ALONG THE SOUTH LINE OF SAID JONES PARCEL, 237.25 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO T.M. GRISS, ET UX, RECORDED FEBRUARY 13, 1952 IN BOOK 66 OF DEEDS, PAGE 26, AS INSTRUMENT NO. 380912 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE CONTINUING SOUTH 88°58'00" EAST ALONG THE NORTH LINE OF SAID GRISS PARCEL, 219.18 FEET TO THE NORTHEAST CORNER OF "DESERT INN CONDOMINIUMS" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 26, PAGE 86, IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE SOUTH 03°51'05" EAST ALONG THE EAST LINE OF SAID TRACT, 601.57 FEET TO A POINT BEING 50.00 FEET NORTH OF THE SOUTH LINE OF SAID SECTION 9, AND BEING ON THE NORTHERLY RIGHT OF WAY LINE OF DESERT INN ROAD (90.00 FEET WIDE); THENCE SOUTH 89°06'04" EAST ALONG SAID RIGHT OF WAY LINE, 127.16 FEET; THENCE CURVING TO THE LEFT ALONG A 25.0 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 95°11'28", AN ARC LENGTH OF 41.53 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEBBIE REYNOLDS DRIVE, FORMERLY KNOWN AS MEL DRIVE

(VARYING WIDTH); THENCE ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING THREE (3) COURSES, NORTH 04°17'32" WEST, 212.70 FEET TO AN ANGLE POINT IN SAID RIGHT OF WAY LINE; THENCE NORTH 03°16'28" WEST, 361.01 FEET TO A POINT ON THE SOUTH LINE OF THE AFOREMENTIONED JONES PARCEL; THENCE NORTH 02°14'14" WEST, 268.01 FEET; THENCE CURVING TO THE LEFT ALONG A 15.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 87°10'00", AN ARC LENGTH OF 22.82 FEET TO A POINT ON THE AFOREMENTIONED SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE; THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 601.44 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY IN A DEED RECORDED SEPTEMBER 2, 1993 IN BOOK 930902 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00213, AND DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTH QUARTER CORNER (S ¼ COR.) OF SAID SECTION 9; THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION, SOUTH 89°21'56" EAST, 1691.65 FEET; THENCE NORTH 03°51'05" WEST (RECORD NORTH 04°06'59" WEST) 50.17 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL, BEING THE TRUE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID PARCEL, NORTH 3°51'05" WEST (RECORD NORTH 4°06'59" WEST), 15.02 FEET, THENCE SOUTH 89°06'04" EAST A DISTANCE OF 127.04 FEET (RECORD SOUTH 89°21'56" EAST, 127.03 FEET) TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°12'00" AN ARC LENGTH OF 41.54 FEET (CHORD NORTH 43°02'04" EAST 36.92 FEET) TO A POINT OF TANGENCY ON THE WEST RIGHT OF WAY LINE OF MEL AVENUE; THENCE ALONG SAID LINE SOUTH 04°33'56" EAST, 15.06 FEET TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°21'00", AN ARC LENGTH OF 41.54 FEET (CHORD SOUTH 43°02'04" WEST, 36.92 FEET) TO A POINT OF TANGENCY ON THE NORTH RIGHT OF WAY LINE OF DESERT INN ROAD; THENCE ALONG SAID LINE NORTH 89°21'56" WEST, 127.14 FEET TO THE TRUE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M. CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET;

Exhibit A-2

THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING. THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75 FEET; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

# EXHIBIT B

Sources and Uses Statement

LA1 934469

# SCHEDULE 1.1(A)

## Schedule of Loan Documents

1. This Agreement.

2. The Note.

3. The Deed of Trust.

4. The Assignment of Leases.

5. The Assignment of Licenses and Contracts.

6. The Assignment of Management Agreement.

7. Casino Lease Non-Disturbance Agreement.

8. The Reserve Accounts Control Agreement (Borrower).

9. The Reserve Accounts Control Agreement (Lessee).

10. The Accommodation Pledge Agreement and Consent.

11. The Indemnity Agreement.

12. The Guaranty.

13. The Accounts Pledge Agreement (Borrower).

14. The Accounts Pledge Agreement (Lessee).

15. Hotel Lease Subordination Agreement.

16. Option Subordination Agreement.

17. The UCC Financing Statements.

18. The Opinion of Counsel.

19. The Closing Instruction Letter.

# SCHEDULE 4.1

## Organizational Chart



SCHEDULE 4.4

Non-Compliance with Environmental Laws

1. As described in TRC's Asbestos Report, dated June 18, 2007, a copy of which has been provided to Lender.

2. As described in the Microbial Visual Investigation Report issued by TRC dated June 6, 2007, a copy of which has been provided to Lender.

# SCHEDULE 4.8

## Litigation Affecting Borrower, Borrower's Members and/or Any Guarantor

None.

## SCHEDULE 4.10

### ERISA

None.

## SCHEDULE 4.18

### Litigation Affecting Property

None.

LAI 934469

## SCHEDULE 4.20

### Permitted Affiliate Payments and Agreements

ECALV II LLC is the Class Z member of the Borrower, the Class Z member of the Controlling Member, and the Class Z member of DI Development, and is an Affiliate of the Mezzanine Lender, the Seller, the Hotel Lease Tenant, the Option Holder, and the Manager.

Fees:

1.  Seller is receiving a portion of the proceeds of the Loan as set forth in the Sources and Uses Statement.

2.  Manager is receiving fees as set forth in the Management Agreement.

3.  Mezzanine Lender will receive certain fees as set forth in the Mezzanine Loan Agreement.

Affiliate Agreements:

1.  Management Agreement

2.  Hotel Lease

3.  Option Agreement

4.  Mezzanine Loan Documents

## SCHEDULE 4.21

### Agreements Affecting Property or Borrower

<u>Agreements related to the Property or other Collateral</u>:

1.    See attached due diligence index.

<u>Agreements related to Membership Interest</u>:

1.    Limited Liability Company Agreement of Borrower.

## SCHEDULE 4.30

### Leases

1. Hotel Accommodation Agreement dated January 25, 2007 by and between British Midland Airways Limited and Seller

2. Hotel Room Agreement dated August 2, 2006 by and between Seller and Delta Air Lines, Inc. (Delta Air Lines, Inc. filed for Chapter 11 Bankruptcy)

3. Space Lease dated September 2, 2005 by and between Seller and United Coin Machine Co.

4. Agreement dated September 15, 2006 by and between Seller and Vegas Chapels LLC,

5. Housing Agreement dated September 1, 2006 by and between Seller and Continental Airlines, Inc. (not signed - Continental is using rooms pursuant to the terms of the Housing Agreement)

6. Turn-Key Lease Agreement, of even date herewith, by and between Borrower and Hotel Lease Tenant

7. Agreement for the Provision of Hotel Rooms last executed on March 27, 2007, between MyTravel Airline Services Limited and Greek Isles Hotel & Casino

8. Entertainment/Showroom Agreement dated October 1, 2006 by and between Seller and TRP Entertainment, LLC

9. Other airline and occupancy agreements

## SCHEDULE 8.1

## APPROVED BUDGET

[to be attached]

LA1 934469

# EXHIBIT 2

**EXHIBIT A**

**LEGAL DESCRIPTION**

**PARCEL 1:**

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 04°39'10" WEST ALONG THE EAST LINE OF SAID SECTION 9, A DISTANCE OF 702.66 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT DEED" TO WALTER S. HUNSAKER, ET UX, RECORDED MARCH 24, 1949 IN BOOK 59 OF DEEDS, PAGE 504 AS INSTRUMENT NO. 308745 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 89°05'00" WEST ALONG THE NORTH LINE OF SAID PARCEL OF LAND, 258.90 FEET TO A SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO CLIFFORD A. JONES, ET AL, RECORDED DECEMBER 4, 1951 IN BOOK 65, PAGE 461 OF DEEDS AS INSTRUMENT NO. 378222 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 00°11'23" EAST, 234.86 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE (80.00 FEET WIDE); THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 1237.25 FEET TO THE POINT OF BEGINNING, WHICH BEARS SOUTH 89°24'14" EAST, 100.00 FEET FROM THE NORTHWEST CORNER OF SAID JONES PARCEL; THENCE SOUTH 02°53'34" EAST PARALLEL WITH THE WEST LINE OF SAID JONES PARCEL, 277.78 FEET TO A POINT ON THE SOUTH LINE OF SAID JONES PARCEL; THENCE SOUTH 88°58'00" EAST ALONG THE SOUTH LINE OF SAID JONES PARCEL, 237.25 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO T.M. GRISS, ET UX, RECORDED FEBRUARY 13, 1952 IN BOOK 66 OF DEEDS, PAGE 26, AS INSTRUMENT NO. 380912 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE CONTINUING SOUTH 88°58'00" EAST ALONG THE NORTH LINE OF SAID GRISS PARCEL, 219.18 FEET TO THE NORTHEAST CORNER OF "DESERT INN CONDOMINIUMS" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 26, PAGE 86, IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE SOUTH 03°51'05" EAST ALONG THE EAST LINE OF SAID TRACT, 601.57 FEET TO A POINT BEING 50.00 FEET NORTH OF THE SOUTH LINE OF SAID SECTION 9, AND BEING ON THE NORTHERLY RIGHT OF WAY LINE OF DESERT INN ROAD (90.00 FEET WIDE); THENCE SOUTH 89°06'04" EAST ALONG SAID RIGHT OF WAY LINE, 127.16 FEET; THENCE CURVING TO THE LEFT ALONG A 25.0 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 95°11'28", AN ARC LENGTH OF 41.53 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEBBIE REYNOLDS DRIVE, FORMERLY KNOWN AS MEL DRIVE

(VARYING WIDTH); THENCE ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING THREE (3) COURSES, NORTH 04°17'32" WEST, 212.70 FEET TO AN ANGLE POINT IN SAID RIGHT OF WAY LINE; THENCE NORTH 03°16'28" WEST, 361.01 FEET TO A POINT ON THE SOUTH LINE OF THE AFOREMENTIONED JONES PARCEL; THENCE NORTH 02°14'14" WEST, 268.01 FEET; THENCE CURVING TO THE LEFT ALONG A 15.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 87°10'00", AN ARC LENGTH OF 22.82 FEET TO A POINT ON THE AFOREMENTIONED SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE; THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 601.44 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY IN A DEED RECORDED SEPTEMBER 2, 1993 IN BOOK 930902 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00213, AND DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTH QUARTER CORNER (S ¼ COR.) OF SAID SECTION 9; THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION, SOUTH 89°21'56" EAST, 1691.65 FEET; THENCE NORTH 03°51'05" WEST (RECORD NORTH 04°06'59" WEST) 50.17 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL, BEING THE TRUE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID PARCEL, NORTH 3°51'05" WEST (RECORD NORTH 4°06'59" WEST), 15.02 FEET, THENCE SOUTH 89°06'04" EAST A DISTANCE OF 127.04 FEET (RECORD SOUTH 89°21'56" EAST, 127.03 FEET) TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°12'00" AN ARC LENGTH OF 41.54 FEET (CHORD NORTH 43°02'04" EAST 36.92 FEET) TO A POINT OF TANGENCY ON THE WEST RIGHT OF WAY LINE OF MEL AVENUE; THENCE ALONG SAID LINE SOUTH 04°33'56" EAST, 15.06 FEET TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°21'00", AN ARC LENGTH OF 41.54 FEET (CHORD SOUTH 43°02'04" WEST, 36.92 FEET) TO A POINT OF TANGENCY ON THE NORTH RIGHT OF WAY LINE OF DESERT INN ROAD; THENCE ALONG SAID LINE NORTH 89°21'56" WEST, 127.14 FEET TO THE TRUE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M. CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET;

Exhibit A

THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING. THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75 FEET; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

# EXHIBIT 3

# PROMISSORY NOTE

$56,000,000.00

Date: July 10, 2007

FOR VALUE RECEIVED, the undersigned, GIH-SPE II, LLC, a Delaware limited liability company ("Borrower"), having an address at c/o DI Development Group, LLC, 260 W. 54th Street, 29J, New York, New York 10019, promises to pay, as hereinafter provided, to the order of CANPARTNERS REALTY HOLDING COMPANY IV LLC, a Delaware limited liability company ("Lender"), having an address c/o Canyon Capital Realty Advisors, 9665 Wilshire Boulevard, Suite 200, Beverly Hills, California 90212, without set-off, counterclaim or deduction, the sum of Fifty-Six Million and 00/100 Dollars ($56,000,000.00) (the "Stated Principal Amount"), or so much thereof as shall have been advanced by Lender, together with interest on the Outstanding Principal Balance (as hereinafter defined) at the rate(s) hereinafter provided.

Section 1.     Definitions.

Borrower agrees that, for the purposes of this Note, the following terms shall have the following respective meanings ascribed thereto. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement of even date herewith between Borrower and Lender, as the same may hereafter be amended or modified (the "Loan Agreement").

1.1     "Additional Sums" shall have the meaning set forth in Section 3.6 hereof.

1.2     "Affiliate" shall have the meaning set forth in the Loan Agreement.

1.3     "Borrower" shall have the meaning set forth in the preamble to this Note.

1.4     "Business Day" shall have the meaning set forth in the Loan Agreement.

1.5     "Default Interest" shall have the meaning set forth in Section 2.3 hereof.

1.6     "Default Rate" shall mean a rate equal to six percent (6.0%) per annum in excess of the Interest Rate (as hereinafter defined).

1.7     "Disbursement Date" means July 9, 2007, regardless of when Loan funds are actually funded or released by escrow or received by Borrower.

1.8     "Dollars" shall have the meaning set forth in the Loan Agreement.

1.9     "Event of Default" shall have the meaning set forth in the Loan Agreement.

1.10     "Extension Fee" means the sum equal to two percent (2.0%) of the Outstanding Principal Balance at the time Borrower exercises the First Extension Option, four

percent (4.0%) of the Outstanding Principal Balance at the time Borrower exercises the Second Extension Option

1.11 "First Extended Maturity Date" means January 10, 2009.

1.12 "First Extension Option" shall have the meaning set forth in Section 2.4.3 hereof.

1.13 "First Extension Period" shall have the meaning set forth in Section 2.4.3 hereof.

1.14 "Holder" shall have the meaning as set forth in Section 3.14(b).

1.15 "Interest" shall have the meaning as set forth in Section 2.1 hereof.

1.16 "Interest Rate" shall mean the rate of fourteen and one-half percent (14.5%) per annum and calculated in accordance with Section 2.5 hereof.

1.17 "Interest Reserve" shall have the meaning as set forth in the Loan Agreement.

1.18 "Initial Maturity Date" shall mean July 10, 2008.

1.19 "Laws" shall have the meaning set forth in the Loan Agreement.

1.20 "Lender" shall have the meaning set forth in the preamble to this Note.

1.21 "Loan" shall have the meaning set forth in the Loan Agreement.

1.22 "Loan Agreement" shall have the meaning set forth in Section 1 hereof.

1.23 "Loan Documents" shall have the meaning set forth in the Loan Agreement.

1.24 "Maturity Date" means the Initial Maturity Date; provided, however, that in the event Borrower validly exercises the First Extension Option, the "Maturity Date" shall be the First Extended Maturity Date; provided, further, however, that in the event Borrower validly exercises the Second Extension Option, the "Maturity Date" shall be the Second Extended Maturity Date.

1.25 "Maximum Rate" shall mean the maximum rate of non-usurious interest permitted from day to day by applicable Laws and calculated after taking into account any and all Additional Sums that are deemed to be interest under applicable Laws.

1.26 "Note" means this Promissory Note, as the same may hereafter be amended or modified.

1.27 "Obligations" shall have the meaning set forth in the Loan Agreement.

2

1.28    "Outstanding Principal Balance" means, at any time, the portion of the Stated Principal Amount advanced by Lender but not then repaid plus amounts added to the principal balance of this Note in accordance with the terms hereof and the other Loan Documents.

1.29    "Party" shall have the meaning set forth in the Loan Agreement.

1.30    "Payment Date" means the first (1st) day of September, 2007, and the first (1st) day of each calendar month thereafter through and including the first (1st) day of the calendar month in which the Maturity Date occurs.

1.31    "Person" shall have the meaning set forth in the Loan Agreement.

1.32    "Prepayment Fee" means an amount, in the event of a prepayment of the Loan in whole or in part prior to the Initial Maturity Date, equal to interest at the Interest Rate under this Note on the principal amount of the Loan being prepaid for a period that commences on the date of such prepayment and that terminates on the Initial Maturity Date.

1.33    "Prepayment Date" shall have the meaning set forth in Section 2.2 hereof.

1.34    "Prepayment Notice" shall have the meaning set forth in Section 2.2 hereof.

1.35    "Prepayment Notice Fee" shall have the meaning ascribed to it in Section 2.2 of this Note.

1.36    "Property" shall have the meaning set forth in the Loan Agreement.

1.37    "Registrar" shall have the meaning set forth in Section 3.14(b) hereof.

1.38    "Repayment Fee" means an amount equal to two percent (2.0%) of any Outstanding Principal Balance then being repaid, in whole or in part.

1.39    "Reserves" shall have the meaning as set forth in the Loan Agreement.

1.40    "Second Extended Maturity Date" means July 10, 2009.

1.41    "Second Extension Option" shall have the meaning set forth in Section 2.4.4 hereof.

1.42    "Second Extension Period" shall have the meaning set forth in Section 2.4.4 hereof.

1.43    "Security Instrument" means the Deed of Trust (as defined in the Loan Agreement).

1.44    "Stated Principal Amount" shall have the meaning set forth in the first paragraph of this Note.

3

1.45 "Tax and Insurance Reserve" shall have the meaning set forth in the Loan Agreement.

1.46 "USAH" means the Uniform System of Accounting for Hotels as adopted by the American Hotel and Motel Association, 9th Revised edition (1996).

Section 2. Payment of Interest and Principal.

2.1 Scheduled Payments of Interest and Principal. Subject to Section 2.3 hereof, interest shall accrue on the Outstanding Principal Balance from the Disbursement Date at the lesser of (a) the Interest Rate or (b) the Maximum Rate (such sums accrued, the "Interest"). For the period commencing on the Disbursement Date up to and including the Maturity Date, the Outstanding Principal Balance and Interest shall be payable as follows:

2.1.1 Commencing August 1, 2007, and continuing on each and every Payment Date thereafter until the Maturity Date, Borrower shall pay to Lender, in arrears, the Interest.

2.1.2 The Outstanding Principal Balance together with all unpaid Interest shall be due and payable in full on the Maturity Date or such earlier date as the Loan may become due.

2.1.3 All payments under this Note shall be made in immediately available funds on or before the date when due.

2.2 Prepayment. From and after the Disbursement Date, upon not less than thirty (30) days' prior written notice to Lender, Borrower may prepay the Loan, in whole (but not in part) in accordance with the terms of this Section 2.2. In the event Borrower desires to prepay this Note in whole as permitted herein, it shall send a written notice to Lender in accordance with the notice provisions of the Loan Agreement (the "Prepayment Notice"), which Prepayment Notice shall state the expected date on which Borrower will make such prepayment, which date shall be not sooner than thirty (30) days nor longer than forty-five (45) days from Lender's receipt of the Prepayment Notice (unless otherwise agreed to by Lender in its sole and absolute discretion) and which date must be a Business Day (the "Prepayment Date"). On the Prepayment Date, Borrower shall pay to Lender (a) the Outstanding Principal Balance; (b) all unpaid Interest thereon; (c) in the event of a prepayment made prior to the Initial Maturity Date, the Prepayment Fee; (d) the Repayment Fee and (e) all other amounts due under this Note and the other Loan Documents as of the Prepayment Date such prepayment is made. In addition, in the event Lender agrees, in its sole and absolute discretion, to accept a prepayment on a date less than thirty (30) days from the date of receipt by Lender of the Prepayment Notice, then Borrower shall also pay an amount (the "Prepayment Notice Fee") equal to the interest at the Interest Rate under this Note on the Outstanding Principal Balance for a period that commences on the date that is fifteen (15) days from Lender's receipt of such Prepayment Notice and terminates on the Prepayment Date (provided, however, that Borrower shall not be obligated to pay such interest for any portion of such period prior to the Initial Maturity Date (for which Borrower shall pay the Prepayment Fee)). In the event Borrower fails to make the prepayment described in the Prepayment Notice on the Prepayment Date, Borrower shall have no further right to make a

4

Notice Fee") equal to the interest at the Interest Rate under this Note on the Outstanding Principal Balance for a period that commences on the date that is fifteen (15) days from Lender's receipt of such Prepayment Notice and terminates on the Prepayment Date (provided, however, that Borrower shall not be obligated to pay such interest for any portion of such period prior to the twelve (12) month anniversary of the Disbursement Date (for which Borrower shall pay the Prepayment Fee)). In the event Borrower fails to make the prepayment described in the Prepayment Notice on the Prepayment Date, Borrower shall have no further right to make a prepayment unless and until Borrower provides a new Prepayment Notice to Lender. Except as set forth herein, no full or partial prepayments of the Outstanding Principal Balance shall be allowed. Borrower acknowledges that it possesses no right to prepay this Note, except as expressly provided herein. By initialing below, Borrower expressly acknowledges and understands that notwithstanding any applicable law to the contrary, pursuant to the terms of this Note, it has agreed that it has no right to prepay this Note without the payment of the Prepayment Fee and the Prepayment Notice Fee, as applicable, except as otherwise provided in this Note and that it shall be liable for the payment of the Prepayment Fee and the Prepayment Notice Fee, as applicable, for prepayment of this Note on acceleration of this Note in accordance with its terms. Furthermore, by initialing below, Borrower expressly acknowledges and understands that Lender has made the Loan in reliance on these waivers and agreements of Borrower and that Lender would not have made the Loan without such waiver and agreements of Borrower.

Borrower's initials: _____

2.3   <u>Default Interest</u>. If any payment of principal, Interest, Prepayment Fee, Prepayment Notice Fee, Repayment Fee or Additional Sums is not paid when due (including failure to pay all amounts outstanding hereunder on the Maturity Date or such earlier date upon acceleration of this Note in accordance with its terms), then such principal, Interest, Prepayment Fee, Prepayment Notice Fee, Repayment Fee or Additional Sums shall bear interest at the Default Rate from the date due (without regard to grace periods) through and including the date such amount is received by Lender. In addition and without limiting the foregoing, upon the occurrence of and during the continuance of an Event of Default, the Outstanding Principal Balance shall bear interest at the Default Rate. All interest payable at the Default Rate hereunder is referred to herein as the "<u>Default Interest</u>". Default Interest shall be payable, from time to time, immediately upon demand. Borrower expressly acknowledges and agrees that the Default Interest provisions are reasonable under the circumstances existing on the date of this Note, that it would be extremely difficult and impractical to fix Lender's actual damages arising out of any late payment by Borrower, and that the Default Interest (together with the late charge described in <u>Section 2.8</u> of this Note, as applicable) shall be conclusively presumed to be the actual amount of such damages incurred by Lender.

2.4   <u>Payments at Maturity; Extension of Maturity</u>.

2.4.1   The entire Outstanding Principal Balance, unpaid Interest, the Prepayment Fee (if applicable), the Prepayment Notice Fee (if applicable) and any and all Additional Sums which are due and payable pursuant to the terms and provisions of the Note and the other Loan Documents, shall be due and payable on the Maturity Date or such earlier date as the Loan may become due or is otherwise paid in full.

5

2.4.2   On the Maturity Date (or such earlier date as the Loan may become due or is otherwise paid in full), Borrower shall pay the Repayment Fee to Lender, the payment of which is an essential bargained-for part of the consideration to Lender for its agreement to disburse the Loan. The Repayment Fee has been fully earned by Lender as of the Closing and shall be in addition to all other amounts required to be paid by Borrower under the Loan Documents. By initialing below, Borrower expressly acknowledges and understands that notwithstanding any applicable law to the contrary, pursuant to the terms of this Note, it has agreed that it has no right to repay this Note in part or in whole without the payment of the Repayment Fee and that it shall be liable for the payment of the Repayment Fee for payment of this Note on acceleration of this Note in accordance with its terms. Furthermore, by initialing below, Borrower expressly acknowledges and understands that Lender has made the Loan in reliance on these agreements of Borrower and that Lender would not have made the Loan without such agreements of Borrower.

Borrower's initials: 

2.4.3   Notwithstanding the foregoing, Borrower shall have an option (the "First Extension Option") to extend the maturity of the Loan for a period of six (6) calendar months commencing on the Initial Maturity Date and ending on the First Extended Maturity Date (the "First Extension Period"), upon the terms and conditions set forth in this Note and upon satisfaction of all the following conditions:

(a)   No Event of Default relating to the failure to pay a sum of money, or material non-monetary Event of Default, or event which, with the giving of notice, the passage of time, or both, would constitute an Event of Default relating to the failure to pay a sum of money or material non-monetary Event of Default, exists upon the date on which the First Extension Option is exercised or on or prior to the commencement date of the First Extension Period;

(b)   Borrower delivers to Lender written notice of its intent to exercise the First Extension Option not less than sixty (60) days prior to the then scheduled Maturity Date, which notice shall include payment of the Extension Fee, which Extension Fee is non-refundable to Borrower and shall be deemed fully earned by Lender upon receipt;

(c)   If requested by Lender, Borrower shall obtain the issuance of any endorsements to the Title Policy requested by Lender in connection with the First Extension Option;

(d)   Borrower shall have paid to Lender all costs and expenses including, without limitation, reasonable attorneys' fees and costs and documentation charges, incurred in connection with Borrower's exercise or request to exercise the First Extension Option; and

(e)   Not later than the twentieth (20th) day prior to the commencement date of the First Extension Period, Borrower shall have deposited into the Reserves, including, without limitation, the Tax and Insurance Reserve and the Interest Reserve, such amounts

6

commencing on First Extended Maturity Date and ending on the Second Extended Maturity Date (the "Second Extension Period"), upon the terms and conditions set forth in this Note and upon satisfaction of all the following conditions:

        (a)    No Event of Default relating to the failure to pay a sum of money, or material non-monetary Event of Default, or event which, with the giving of notice, the passage of time, or both, would constitute an Event of Default relating to the failure to pay a sum of money or material non-monetary Event of Default, exists upon the date on which the Second Extension Option is exercised or on or prior to the commencement date of the Second Extension Period;

        (b)    Borrower delivers to Lender written notice of its intent to exercise the Second Extension Option not less than sixty (60) days prior to the then scheduled Maturity Date, which notice shall include payment of the Extension Fee, which Extension Fee is non-refundable to Borrower and shall be deemed fully earned by Lender upon receipt;

        (c)    If requested by Lender, Borrower shall obtain the issuance of any endorsements to the Title Policy requested by Lender in connection with the Second Extension Option;

        (d)    Borrower shall have paid to Lender all costs and expenses including, without limitation, reasonable attorneys' fees and costs and documentation charges, incurred in connection with Borrower's exercise or request to exercise the Second Extension Option; and

        (e)    Not later than the twentieth (20th) day prior to the commencement date of the Second Extension Period, Borrower shall have deposited into the Reserves, including, without limitation, the Tax and Insurance Reserve and the Interest Reserve, such amounts determined by Lender to be sufficient, when added to the funds then remaining in the Reserves, to pay the amounts likely to be paid from the Reserves during the Second Extension Period.

Upon satisfaction of the terms above, the "Maturity Date" shall be deemed to be Second Extended Maturity Date.

        2.5    Calculation of Interest.  All interest on this Note shall be compounded monthly and shall be calculated on the basis of a three hundred sixty (360) day year and the actual number of days elapsed, unless use of a three hundred sixty (360) day year would result in collection of interest in excess of the Maximum Rate, if any, in which case interest shall be calculated based on the Maximum Rate.

        2.6    Application of Payments.  Except as otherwise provided in Section 2.2 of this Note regarding prepayments, prior to, during and after the occurrence of an Event of Default, all monies paid by Borrower to Lender, including, without limitation, all fees, charges and Default Interest, shall be applied to the following in such order as Lender may elect in its sole and absolute discretion: (a) the Additional Sums; (b) the Repayment Fee; (c) the Prepayment Fee; (d) the Prepayment Notice Fee; (e) the late charge as provided in Section 2.8 below; (f) the unpaid Interest; (g) the Outstanding Principal Balance; or (h) any combination thereof.

LA1 935687

2.7     Place of Payment; Business Days. All payments in respect of this Note shall be paid by Borrower to Lender in accordance with Section 2.11 of this Note. If any payment in respect of this Note becomes due and payable on any date which is not a Business Day, such payment shall be payable on the next succeeding Business Day.

2.8     Late Charge. If any installment of interest or principal is not paid by the fifth (5th) day of each month, Borrower shall pay to Lender a late charge of five percent (5%) of the amount so overdue in order to defray part of the expense incident to handling such delinquent payment or payments. Such late charge shall be immediately due and payable without notice or demand by Lender. Such late charge shall be in addition to and separate from any increase in interest due hereunder as a result of calculation of Default Interest. Acceptance by Lender of any late charge or Default Interest shall not be deemed a waiver of any of Lender's rights hereunder or under the other Loan Documents with respect to such late payment. Borrower expressly acknowledges and agrees that the foregoing late charge provisions are reasonable under the circumstances existing on the date of this Note, that it would be extremely difficult and impractical to fix Lender's actual damages arising out of any late payment, and that the foregoing late charge (and the Default Interest) shall be presumed to be the actual amount of such damages incurred by Lender.

2.9     Use of Loan Proceeds. Borrower certifies to Lender that the Loan evidenced by this Note is obtained for business or commercial purposes and that the proceeds thereof will not be used for personal, family, household or agricultural purposes.

2.10     Acceleration. If there is an Event of Default by Borrower, Lender may, at its option, declare any or all of the indebtedness due hereunder to be immediately due and payable without any presentment, demand, protest or notice of any kind.

2.11     Wire Transfer. All payments in respect of this Note shall be made by Borrower to Lender by wire transfer of good funds as follows:

| Wire to: | Bank: | City National Bank, Los Angeles, CA |
| | ABA No.: | 122 016 066 |
| | Account Name: | Canpartners Realty Holding Company IV LLC |
| | Account No.: | 210 036 881 |

Lender shall have the right to change the foregoing account and other information from time to time in Lender's sole and absolute discretion, provided such change will not be effective as to Borrower until Borrower receives notice of such change in accordance with the notice provisions of the Loan Agreement.

Section 3.     Miscellaneous.

3.1     Security for Payment. The payment of this Note is secured by, among other things, the Security Instrument and the other Loan Documents, all of which are incorporated herein by reference as if fully set forth herein.

8

3.2    Governing Law. This Note shall be governed by, and construed and enforced in accordance with, the local laws of the State of Nevada, without regard to principles of conflicts of laws.

3.3    Headings. Article and Section headings in this Note are included for convenience of reference only and are not part of this Note for any other purpose.

3.4    Time of the Essence. Time is hereby declared to be of the essence of this Note and of every part hereof.

3.5    Waiver. Borrower agrees to be bound hereby and, except as may otherwise be set forth herein or in the other Loan Documents, to the extent permitted by law: (a) waives and renounces any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (b) waives presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (c) waives all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder, except as expressly provided in the Loan Agreement; (d) waives any and all lack of diligence and delays in the enforcement of the payment hereof; (e) agrees that the liability of Borrower shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by Lender to any of them with respect hereto; (f) consents to any and all extensions of time, renewals, waivers or modifications that may be granted by Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; (g) consents to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agrees that the addition of any such obligors or security or the taking of any of the other acts described above shall not affect the liability of Borrower for the payment hereof; and (h) waives all rights to plead or assert at any time any statute of limitations as a defense or bar to any action or proceeding brought to enforce this Note or any obligations secured hereby.

3.6    Additional Sums as Interest. All fees, charges or other sums payable by Borrower to Lender pursuant to this Note or otherwise with respect to the Loan, the Obligations, the Security Instrument or any other Loan Document (collectively, the "Additional Sums"), which under the laws of the State of Nevada may be considered to be interest, shall, for the purpose of any law of the State of Nevada limiting the maximum rate of interest to be charged with respect to the Loan or indebtedness, be payable by Borrower as, and shall be considered to be, additional interest, and for such purposes only, the agreed upon and contracted Interest Rate as calculated herein shall be considered increased to reflect the payment of such Additional Sums as interest, which increased Interest Rate Borrower hereby agrees to pay.

3.7    Binding Effect; Assignment. This Note shall be binding upon and shall inure to the benefit of the parties hereto and thereto, and Borrower may not assign its rights hereunder or any interest herein.

3.8   Cumulative Remedies; No Waiver.  The rights, powers, privileges and remedies of Lender provided herein are cumulative and not exclusive of any right, power, privilege or remedy provided by Law or equity. No failure or delay on the part of Lender in exercising any right, power, privilege or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power, privilege or remedy preclude any other or further exercise of the same or any other right, power, privilege or remedy.

3.9   Amendments; Consents.  No amendment, modification, supplement, extension, termination or waiver of any provision of this Note, no approval or consent thereunder, and no consent to any departure by Borrower or any other party therefrom may, in any event, be effective unless in writing signed by Lender and Borrower, and then only in the specific instance and for the specific purpose given.

3.10   Nature of Lender's Obligations.  Nothing contained in this Note and no action taken by Lender pursuant hereto may, or may be deemed to, make Lender a partner of a partnership, an associate of an association, or a joint venturer of a joint venture, or other entity, either with Borrower or any Affiliate of Borrower and, at all times, the relationship between Lender and Borrower shall be that of a lender and a borrower, respectively.

3.11   Attorneys' Fees; Enforcement.  Borrower shall reimburse Lender for all reasonable attorneys' fees, costs and expenses; arising from and after the date hereof, incurred by Lender in connection with the enforcement of Lender's rights under this Note and each of the other Loan Documents, including, without limitation, reasonable attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements, and for enforcement of rights under any state or federal statute, including, without limitation, reasonable attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) in connection with seeking relief from stay in a bankruptcy proceeding. The term "expenses" means any actual and reasonable expenses incurred by Lender in connection with any of the out-of-court, state, federal or bankruptcy proceedings referenced above, including but not limited to the reasonable fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Lender in connection with any of those proceedings. Lender shall also be entitled to its reasonable attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce its judgment(s). This provision is separate and several and shall survive any merger of this Note into any judgment on this Note.

3.12   Severability of Provisions.  Any provision in this Note that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions of this Note, and to this end, all the provisions of this Note are declared to be severable.

3.13   WAIVERS.

(a)   JURY WAIVER. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF LENDER'S AGREEMENT TO THE PROVISIONS OF THIS NOTE AND THE OTHER LOAN DOCUMENTS, BORROWER AND LENDER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVE, IN

CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER OR BORROWER IN CONNECTION WITH THE LOAN AND/OR THIS NOTE, ANY AND EVERY RIGHT IT MAY HAVE TO A TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS NOTE, THE LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH INCLUDING, BUT NOT LIMITED TO THOSE RELATING TO (A) ALLEGATIONS THAT A PARTNERSHIP EXISTS BETWEEN LENDER AND BORROWER; (B) USURY OR PENALTIES OR DAMAGES THEREFOR; (C) ALLEGATIONS OF UNCONSCIONABLE ACTS, DECEPTIVE TRADE PRACTICE, LACK OF GOOD FAITH OR FAIR DEALING, LACK OF COMMERCIAL REASONABLENESS, OR SPECIAL RELATIONSHIPS (SUCH AS FIDUCIARY, TRUST OR CONFIDENTIAL RELATIONSHIP); (D) ALLEGATIONS OF DOMINION, CONTROL, ALTER EGO, INSTRUMENTALITY, FRAUD, REAL ESTATE FRAUD, MISREPRESENTATION, DURESS, COERCION, UNDUE INFLUENCE, INTERFERENCE OR NEGLIGENCE; (E) ALLEGATIONS OF TORTIOUS INTERFERENCE WITH PRESENT OR PROSPECTIVE BUSINESS RELATIONSHIPS OR OF ANTITRUST; OR (F) SLANDER, LIBEL OR DAMAGE TO REPUTATION. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

(b) ADDITIONAL WAIVERS. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF LENDER'S AGREEMENT TO THE PROVISIONS OF THIS NOTE AND THE OTHER LOAN DOCUMENTS, BORROWER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER IN CONNECTION WITH THE LOAN AND/OR THIS NOTE, ANY AND EVERY RIGHT IT MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN, EXCEPT TO THE EXTENT THAT SAID COUNTERCLAIM MUST BE ASSERTED PURSUANT TO APPLICABLE LAW OR OTHERWISE BE BARRED FROM BEING ASSERTED IN ANY OTHER ACTION AND (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT BORROWER FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION WITH RESPECT TO ANY ASSERTED CLAIM.

3.14   Participations and Securitization.

(a)   Borrower acknowledges that Lender may elect from time to time in its sole discretion, after the date of this Note, to sell, assign or grant participations in the Loan and/or interests in the Loan to one or more Persons. Borrower acknowledges that Lender may distribute to such Persons all documents and information (including, but not limited to, financial information), which has been or is hereafter provided or known to Lender with respect to the Property and its operation and any Party connected with the Loan. In the event of any such sale,

11

assignment or participation, Lender and any such Persons shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent that they agree among themselves. In connection with any such sale, assignment or participation, Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligation of Borrower to each purchaser, assignee or participant and, upon written request by Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation, all at Lender's sole cost and expense. The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any purchaser, assignee or participant.

(b) Borrower hereby acknowledges and makes this Note a registered obligation for United States withholding tax purposes. Borrower shall be the registrar for the Note (the "Registrar") with full power of substitution. In the event the Registrar becomes unable or unwilling to act as registrar under this Note, Borrower shall reasonably designate a successor Registrar. Any party which acquires a beneficial interest in the Loan (a "Holder") who is a foreign person, by its acceptance of this Note, hereby agrees to provide Borrower with a completed Internal Revenue Service Form W-8 (Certificate of Foreign Status) or a substantially similar form for such Holder, participants or other affiliates who are holders of beneficial interests in this Note. Notwithstanding any contrary provision contained herein or any of the other Loan Documents, neither this Note nor any interests therein may be sold, transferred, hypothecated, participated or assigned to any Person except upon satisfaction of the conditions specified herein. Each Holder, by its acceptance of its Note, agrees to be bound by the provisions of this section and to indemnify and hold harmless the Registrar against any and all loss or liability arising from the disposition by such Holder of this Note or any interest therein in violation of this section. The Registrar shall keep at its principal executive office (or an office or agency designated by it by notice to the last registered Holder) a ledger, in which, subject to such reasonable regulations as it may prescribe, but at its expense (except as specified below), it shall provide for the registration and transfer of this Note. No sale, transfer, hypothecation, participation or assignment of this Note or the interest therein shall be effective for any purpose until it shall be registered on the books of the Registrar to be maintained for such purpose. In the event of a sale, transfer, hypothecation, participation or assignment of this Note or any interest herein, each Holder, prior to such sale, transfer, hypothecation, participation or assignment of this Note or any interest therein shall provide the Registrar with notice of such transaction at the time of such transaction. The Registrar shall record the transfer of this Note on the books maintained for this purpose upon receipt by the Registrar at the office or agency designated by the Registrar of (i) a written assignment of the Note being assigned (or the applicable interest therein), (ii) funds sufficient to pay any transfer taxes payable upon the making of such transfer as well as the cost of reviewing the documents presented to the Registrar, and (iii) such evidence of due execution as the Registrar shall reasonably require. The Registrar shall record the transfer of this Note on the books maintained for such purpose at the cost and expense of the assignee.

[signatures on following page]

IN WITNESS WHEREOF, Borrower has executed and delivered this Promissory Note as of the day and year first above written.

BORROWER:

GIH-SPE II, LLC,
a Delaware limited liability company

By:    GIH-SPE I, LLC,
       a Delaware limited liability company
       its Managing Member

       By:    DI DEVELOPMENT GROUP, LLC,
            a Delaware limited liability company,
            its Managing Member

            By:
            Name:  _HAROLD ROTHSTEIN_
            Title:  _AUTHORIZED PERSON_