# EXHIBIT 9

# ACCOMMODATION PLEDGE AGREEMENT
### (Membership Interests in Borrower)

This ACCOMMODATION PLEDGE AGREEMENT (MEMBERSHIP INTERESTS IN BORROWER) (this "Agreement") is made and entered into as of July 10, 2007, by and among CANPARTNERS REALTY HOLDING COMPANY IV LLC, a Delaware limited liability company ("Secured Party") and GIH-SPE I, LLC, a Delaware limited liability company ("Managing Member"), and ECALV II LLC, a Delaware limited liability company ("Non-Managing Member"; and each of Managing Member and Non-Managing Member, individually, a "Pledgor" and collectively, "Pledgors").

## RECITALS

WHEREAS, Secured Party and GIH-SPE II, LLC, a Delaware limited liability company ("Borrower"), have entered into that certain Loan Agreement, dated as of even date herewith (as the same may be amended, modified, extended, supplemented or replaced, the "Loan Agreement"), pursuant to which Secured Party has made, or committed to make, a loan (the "Loan") to Borrower in the original principal amount of Fifty-Six Million and 00/100 Dollars ($56,000,000.00), which is secured by, among other things, a Deed of Trust and Security Agreement, Assignment of Leases and Rents and Fixture Filing made by Borrower for the benefit of Secured Party (the "Security Instrument");

WHEREAS, Pledgors own one hundred percent (100%) of the outstanding membership interests in Borrower, and have agreed to pledge to Secured Party all of their respective right, title and interest in and to (a) their membership interests in Borrower, and (b) their rights as creditors of Borrower, as collateral for the payment and performance of the obligations and liabilities of Borrower to Secured Party in respect of the Loan;

WHEREAS, Secured Party would not have extended the Loan to Borrower but for Pledgors' execution of this Agreement;

WHEREAS, capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement; and

WHEREAS, each Pledgor acknowledges that it will receive substantial benefit from the Loan.

NOW THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
### GRANT OF SECURITY INTEREST

1.1     Pledge. As security for the obligations specified in Article 2 hereof, each Pledgor hereby pledges, assigns, transfers and grants to Secured Party (and to Secured Party's successors, endorsees and assignees) a security interest in and to all of such Pledgor's right, title and interest,

whether now owned or hereafter acquired, whether legal, beneficial or economic, whether fixed or contingent, whether arising under the Organizational Documents (as hereinafter defined), under applicable law or otherwise: (a) as a member (and manager with respect to Managing Member) of Borrower (including all right, title and interest of such Pledgor in such Pledgor's current membership interest in Borrower as shown on Exhibit A and in any additional membership interest in Borrower acquired hereafter by such Pledgor; such Pledgor's interest in any other rights to participate in the equity of Borrower, including any purchase option, right of first refusal, right of first offer or buy/sell right; such Pledgor's share of the profits, losses and capital of Borrower; such Pledgor's related voting rights in respect of its membership interest(s) in Borrower; and all other rights of such Pledgor in, to and under the Organizational Documents); (b) in all monies, securities, rights and property, of any nature whatsoever (whether in respect of contractual obligations, damages, insurance proceeds or otherwise), to which such Pledgor at any time is or becomes entitled in respect of such Pledgor's interest in Borrower, including, but not limited to, any cash dividends or distributions, rights or other property that such Pledgor may hereafter receive or be entitled to receive in exchange therefor or in respect thereof, whether upon a merger, reorganization, consolidation, dissolution, recapitalization, redemption, repurchase or otherwise (collectively, the "Distributions"); (c) in all contributions to the capital of Borrower, whether mandatory or discretionary (the "Capital Contributions"); (d) in all rights of such Pledgor, if any, as creditor of Borrower; (e) in all supporting obligations with respect to any other property constituting "Collateral" hereunder; (f) in all books and records (in whatever form or media, whether tangible or electronic, together with related software, and including all "records", as such term is defined in the Uniform Commercial Code as enacted in the State of Nevada, as amended from time to time (the "UCC")) relating to or evidencing any of the foregoing; and (g) to the extent not included in any of the foregoing, in any and all additions and substitutions for, proceeds of, and claims against third parties with respect to, any of the foregoing, including without limitation proceeds of proceeds (all of the foregoing, collectively, the "Collateral").

1.2    Delivery. Concurrently with the execution hereof, Pledgors shall cause Borrower to deliver to Secured Party (a) the Certificate of Formation of Borrower, certified as of a recent date by the Delaware Secretary of State, (b) a copy of Borrower's Operating Agreement, certified by an authorized officer/member of Borrower as being a true and correct copy thereof, as currently in full force and effect ((a) and (b) are collectively referred to herein as the "Borrower Organizational Documents"), and (c) similarly certified copies of the certificate of formation and operating agreement of each Pledgor (the "Pledgor Organizational Documents", and, together with the Borrower Organizational Documents, the "Organizational Documents").

1.3    Additional Collateral Received by Pledgors. Any money or other property hereafter received by any Pledgor in respect of or in exchange or substitution for any of the Collateral shall constitute Collateral and shall be deemed to have been received by such Pledgor as trustee for Secured Party. Pledgors shall pay and deliver all such sums, securities and other property over to Secured Party immediately, without demand or notice, and the same shall then be held as Collateral by Secured Party as additional security for the obligations secured hereby. Pledgors shall promptly thereafter deliver to Secured Party a certificate describing such sums and other property and certifying that the same have been duly pledged to Secured Party hereunder; provided that any Pledgor's failure to do so shall not impair Secured Party's security interest therein.

1.4    Duties and Rights of Secured Party. Each Pledgor agrees that Secured Party shall have no liability of any kind or nature whatsoever with respect to the Collateral, other than to hold, release or dispose of the same in accordance with the terms and provisions of this Agreement and the provisions of the UCC and other applicable laws, as amended from time to time. With respect to each particular item of Collateral, the security interest herein granted shall attach immediately upon the relevant Pledgor's execution hereof or as soon as such Pledgor acquires rights in and to such item of Collateral, whichever is later.

ARTICLE 2
OBLIGATIONS TO BE SECURED

Whether or not recovery upon any of the following secured obligations (the "Secured Obligations") is now or hereafter becomes barred by any statute of limitations or is now or hereafter becomes otherwise unenforceable, the security interests herein granted shall secure:

2.1    Obligations Evidenced by Note and Other Agreements. The prompt and complete payment and performance of all of the indebtedness, obligations and covenants in favor of Secured Party arising under the Loan Agreement, the Note and any of the other Loan Documents, whether such indebtedness, obligations and covenants be direct or indirect, joint or several, absolute or contingent, liquidated or unliquidated and whether or not the same be from time to time modified, increased, decreased, or extinguished and later recreated; and including, without limitation, the payment of amounts which would become due but for the operation of the automatic stay under Section 362(a) of the U.S. Bankruptcy Code, 11 U.S.C. § 362(a), and interest and other amounts which, but for the filing of a petition in bankruptcy, would accrue on, or otherwise become payable with respect to, such obligations.

2.2    Fees and Expenses. The payment and reimbursement of all sums and expenses, including, without limitation, attorneys' fees (including allocated costs of internal counsel), court costs and collection, legal and receivers' expenses, advanced or incurred by Secured Party in connection with the perfection and protection of the security interest herein granted, the preservation or disposition of the Collateral, or any part thereof, or the enforcement by Secured Party of any of the foregoing obligations of Borrower, any guarantor thereof and any Pledgor to Secured Party whether upon default by Borrower, any such guarantor or any Pledgor, or otherwise.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF PLEDGORS

Each Pledgor hereby represents and warrants to Secured Party:

3.1    Status of Pledgors. Such Pledgor is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and has all requisite limited liability company power and authority to own, lease and operate its assets, properties and business, to carry on its business as now conducted and as proposed to be conducted, and to execute and deliver this Agreement, to pledge its membership interest in Borrower as provided herein and to perform its obligations in accordance with the terms hereof and the Organizational Documents; and is qualified or licensed to conduct business in each jurisdiction in which the nature of its

assets or business activities requires such licensing or qualification under applicable law. Such Pledgor's sole "place of business," within the meaning of Section 104.9307 of the UCC (or, if Pledgor has more than one place of business, its "chief executive office," within the meaning of the UCC, is (and has been, since its inception) located at its address for notices set forth in Exhibit A. Pledgor's "location" within the meaning of Section 104.9307 of the UCC, is the state of Delaware and is so indicated in the "Location" portion of Exhibit A. Pledgor's organizational identification number is as indicated in the "Organizational Identification Number" portion of Exhibit A.

3.2    Title to Collateral. Such Pledgor is the sole legal and beneficial owner of its membership interest in Borrower and the Collateral related thereto. Except for the security interests granted to Secured Party pursuant to this Agreement, such Pledgor has and will at all times while this Agreement remains in effect have, good and marketable title to the Collateral, free and clear of any other security interest, lien, pledge, encumbrance, option, conditional sale contract, lease or other title retention agreement, or any other adverse claim of any nature whatsoever.

3.3    No Adverse Agreements. There exist no instruments, agreements, contracts or documents which restrict, adversely affect, or require the consent of any Person for the pledge of (a) such Pledgor's membership interest in Borrower or (b) such Pledgor's right to the Distributions, to Secured Party in accordance with the terms of this Agreement. To the extent that any such consent is required under the Borrower Organizational Documents, such Pledgor hereby consents to the grant by the other Pledgor to Secured Party of a security interest in such other Pledgor's interest in the Collateral pursuant to this Agreement, and to the grant to Secured Party by such other Pledgor of the rights, powers and remedies provided for in this Agreement.

3.4    Nature of Membership Interest Collateral. The Collateral will at all times while this Agreement remains in effect constitute one hundred percent (100%) of each Pledgor's interest in Borrower and the applicable Distributions, and one hundred percent (100%) of all interests in Borrower and the Distributions. Each Pledgor's percentage interest in Borrower is equal to the "Percentage Membership Interest in Borrower" indicated on Exhibit A for that Pledgor.

3.5    Priority. Upon the execution and delivery of this Agreement by such Pledgor and the filing of UCC Financing Statements with respect to the Collateral with the Delaware Secretary of State, Secured Party will have a perfected security interest in the Collateral held by such Pledgor, which security interest will be of first priority for the full amount of all of the Secured Obligations.

3.6    Binding Agreement. This Agreement has been duly authorized and executed by such Pledgor and constitutes the legal, valid and binding obligation of such Pledgor, enforceable against such Pledgor in accordance with its terms.

3.7    No Default or Required Consent. Neither the execution or delivery of this Agreement by such Pledgor nor the effectuation by Secured Party of any of its rights or remedies herein, whether upon default or otherwise, will result in a breach of or constitute a default under any provision of the Organizational Documents or any other agreement or instrument to which

such Pledgor or Borrower is a party or by which any of the Collateral or the assets of such Pledgor or Borrower is/are bound, or violate any law or any rule or regulation of any administrative agency or any order, writ, injunction or decree of any court or administrative agency, nor does any of the foregoing require the consent of any Person, entity or governmental agency or any notice or filing with any governmental or regulatory body (except as may be required in connection with any sale or disposition of the Collateral by laws affecting the offering and sale of securities generally and except for such approval of the Nevada Gaming Authorities as may be required in connection with any subsequent application by Borrower for an unrestricted license from the Nevada Gaming Authorities).

3.8. No Litigation. There is no action, legal, administrative or other proceeding pending or threatened against such Pledgor's title to or interest in the Collateral, or any portion thereof, or against such Pledgor's pledge of its interest in the Collateral hereunder, nor does such Pledgor know of any basis for the assertion of any such claim.

3.9 Credit Information. Any and all credit or other information heretofore furnished to Secured Party by such Pledgor or Borrower in connection with the indebtedness and obligations secured hereby or the financial condition, assets, liabilities, business or prospects of such Pledgor or Borrower or the value or condition of the Collateral is true and correct in all material respects and all such information hereafter furnished to Secured Party by such Pledgor or Borrower will be true and correct when furnished.

3.10 Charter Documents. The Organizational Documents of Borrower and of such Pledgor delivered pursuant to Section 1.2 hereof (a) have been duly authorized, executed and delivered by the parties thereto, (b) have not been further amended or otherwise modified, (c) are in full force and effect and (d) are binding upon and enforceable against the parties thereto in accordance with their respective terms, subject to the effect of any applicable bankruptcy or similar law affecting creditors' rights generally and to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law). There exists no default under any of the Organizational Documents by such Pledgor or, to such Pledgor's knowledge, by any other party thereto.

3.11 No Violation of Securities Law. None of the Collateral pledged by such Pledgor hereunder, nor the pledge and security interest granted hereunder, is required to be registered under any state or federal securities laws, including, without limitation, the Securities Act of 1933, the Securities Exchange Act of 1934, and so-called "Blue Sky Laws" or any rule or regulations promulgated under any of the foregoing (as such laws may be modified from time to time, collectively, the "Securities Laws"). Secured Party's exercise of any and all remedies under this Agreement will not violate the Securities Laws. Such Pledgor has not taken any action, will take no action, and will cause the pledged entity to take no action, which would cause the exercise of remedies by Secured Party hereunder to violate, or to require that any filing, registration or other act be taken which respect to, any Securities Law. Such Pledgor shall at all times comply with the Securities Laws as the same pertain to all or any portion of the Collateral or pledge and security interest made and granted hereunder.

3.12 Un-Certificated Securities. The membership interests pledged hereunder are not represented by any "certificated security" as that term is defined in Section 104.8-102(1)(d) of

the UCC. In addition all of the membership interests pledged hereunder are considered "securities" under Article 8 of the UCC, and will be governed by Article 8 of the UCC as in effect from time to time. Borrower has not specified any jurisdiction other than Delaware as the "issuer's jurisdiction" for purposes of the UCC.

3.13    Pledgor's Organizational Documents. Such Pledgor's limited liability company agreement contains single purpose entity provisions substantially identical to the single purpose entity provisions enumerated in Section 4.2 of the Security Instrument.

ARTICLE 4
AFFIRMATIVE COVENANTS

Each Pledgor covenants that until such time as all of the Secured Obligations are indefeasibly paid or satisfied in full, unless Secured Party shall otherwise consent in writing:

4.1    Financing Statements. Such Pledgor shall from time to time at the request of Secured Party execute or otherwise authenticate (if required) and deliver to Secured Party such documents as Secured Party may request, and Secured Party is authorized to file such financing statements as Secured Party may elect showing such Pledgor, as debtor, and Secured Party, as secured party, covering the Collateral and otherwise in form and substance satisfactory to Secured Party to fully perfect, when filed, the security interests granted to Secured Party hereunder. Such Pledgor hereby authorizes Secured Party at any time and from time to time to file any or all such financing statements, amendments, instruments and documents held by it, and any or all such further financing statements, documents and instruments, and amendments thereto, and to take all such other actions, as Secured Party may deem appropriate to perfect and to maintain perfected the security interests granted hereunder, without the signature of any Pledgor. Before and after the occurrence of any Event of Default (as hereinafter defined), at Secured Party's request, such Pledgor shall execute or otherwise authenticate all such further financing statements, amendments, instruments, documents and other records; and shall do all such further acts and things, as may be deemed reasonably necessary or desirable by Secured Party to create and perfect, and to continue and preserve, indefeasible security interests in the Collateral in favor or Secured Party, or the priority thereof.

4.2    Records. Such Pledgor shall make appropriate notations and entries in such Pledgor's ledgers and books of account and financial statements disclosing the security interest of Secured Party in and to the Collateral, and shall cause Borrower to make appropriate notations and entries in Borrower's ledgers reflecting such Pledgor's pledge of its membership interests in Borrower to Secured Party.

4.3    Protection of Security and Legal Proceedings. Such Pledgor shall, at its own expense, (a) promptly take any and all actions necessary to preserve, protect and defend the Collateral and the security interest of Secured Party in the Collateral and the perfection and priority thereof against any and all claims, liens or encumbrances, including appearing in and defending any and all actions and proceedings which purport to affect any of the foregoing, and (b) promptly reimburse Secured Party for any and all sums, including costs, expenses and attorneys' fees, which Secured Party may pay or incur in defending, protecting or enforcing its security interest in the Collateral or the perfection or priority thereof, or in discharging any prior

or subsequent lien, encumbrance or claim against the Collateral or any part thereof, or by reason of becoming or being made a party to or intervening in any action or proceeding affecting the Collateral or the rights of Secured Party therein, all of which actions such Pledgor hereby agrees that Secured Party shall have the right to take in its sole and absolute discretion.

4.4    Reporting.   Such Pledgor shall deliver to Secured Party, as soon as practicable, copies of all reports, petitions or communications filed with or sent to the authorities regulating such Pledgor's and Borrower's operation of their respective businesses or to any city, state or federal agency, department or board pertaining to any aspect of their respective operations.

4.5    Proceeds of Authorized Sales of Collateral.   Without limiting Section 5.1, such Pledgor shall keep the proceeds of any collection, sale or disposition of any Collateral authorized by Secured Party separate from such Pledgor's other property (if any), shall promptly deliver to Secured Party, for application to the Secured Obligations (or, in the Secured Party's sole discretion, to be held as additional Collateral), all cash (including cash equivalents) proceeds of such disposition; and, in the case of proceeds consisting of future obligations, until otherwise notified by Secured Party, shall enforce all of such Pledgor's rights with respect to any such collection, sale or disposition, maintain accurate and complete records thereof and promptly deliver to Secured Party the proceeds thereof as and when received.

4.6    Inspection.   Such Pledgor shall give Secured Party such information as may be reasonably requested concerning the Collateral and permit Secured Party and its agents and representatives to enter upon any premises upon which such Pledgor's records concerning the Collateral or Borrower are located for the purpose of inspecting and auditing the same, upon one (1) Business Day's prior written notice to such Pledgor. Such Pledgor shall also cause Borrower to permit Secured Party and its agents and representatives full access during business hours to all property and records of Borrower for the purpose of inspecting and auditing the same, upon one (1) Business Day's prior written notice to Borrower.

4.7    Notification.   Such Pledgor shall promptly notify Secured Party in writing of any event which materially affects the value of any Collateral, the ability of such Pledgor or Secured Party to dispose of the Collateral or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any order, arrangement or procedure affecting any Collateral, whether governmental or otherwise.

4.8    Other Documents.   Such Pledgor shall deliver to Secured Party copies of all contracts, reports, documents or other items now or hereafter in such Pledgor's or Borrower's possession that adversely affect any Collateral or Secured Party's security interests therein.

4.9    Borrower Organizational Documents.   Such Pledgor shall, at its own expense, unless Secured Party shall otherwise consent in writing in advance:

(a)    Use commercially reasonable efforts to ensure that Borrower performs and observes all of the terms and provisions of the Borrower Organizational Documents to be performed or observed by it, maintain all of the Borrower Organizational Documents in full force and effect, enforce in accordance with its terms

each of the Borrower Organizational Documents, and take all such action to such end as may be from time to time requested by Secured Party.

(b)    Furnish to Secured Party promptly after receipt thereof copies of (i) all notices, requests and other documents, other than financial statements, received by such Pledgor under or pursuant to any of the Borrower Organizational Documents relating to any matter requiring consent from Secured Party under Section 6.1, (ii) all amendments to, restatements of, and newly executed, as the case may be, Borrower Organizational Documents, and (iii) such other information and reports regarding the Collateral as Secured Party may reasonably request.

(c)    Upon the reasonable request of Secured Party, make to Borrower such demands and requests for information, reports or actions as such Pledgor is entitled to make under each of the Borrower Organizational Documents.

(d)    Not cause Borrower to specify any jurisdiction other than Delaware as the "issuer's jurisdiction" for purposes of the UCC.

4.10   <u>Pledgor Organizational Documents</u>.  Such Pledgor shall not amend or otherwise modify its Pledgor Organizational Documents without the express written consent of Secured Party, which consent may be withheld in Secured Party's sole discretion.  Such Pledgor's limited liability company agreement or by-laws or limited partnership agreement, as applicable, shall contain single purpose entity provision substantially identical to the single purpose entity provisions enumerated in <u>Section 4.2</u> of the Security Instrument, and Pledgor shall at all times comply with such provisions.

4.11   <u>Conduct of Business</u>.  Such Pledgor shall, and such Pledgor shall cause Borrower to, (a) comply with all laws, statutes and regulations pertaining to Borrower's use and ownership of Borrower's property and Borrower's conduct of Borrower's business; (b) care for and maintain all of Borrower's property in good condition, free of misuse, abuse, waste and deterioration, reasonable wear and tear of intended use excepted; (c) observe and perform promptly all contracts or agreements (including without limitation each of the Loan Documents) to which such Pledgor or Borrower, as applicable, is a party or by which any of such Pledgor's or Borrower's property is bound, and (d) carry on such Pledgor's or Borrower's business in the ordinary course.

4.12   <u>Maintenance of Insurance</u>.  Subject to the provisions of any other Loan Document requiring Borrower to maintain insurance, Pledgors shall cause Borrower to keep Borrower's property and businesses insured against loss by fire, theft and other extended coverage hazards for the full replacement value thereof and against such losses, casualties and contingencies (including public liability and property damage and liability for invasion of privacy), of such types and in such amounts as is customary in the case of persons of established reputation engaged in the same or similar business as Borrower.

4.13   <u>Preservation of Collateral</u>.  In case of any failure of Pledgors to keep the Collateral free from liens or adverse claims, or to pay taxes on or in respect thereof, or to fully and punctually keep and perform any other covenant hereof, then Secured Party may (but shall

not be required to) pay or contest or settle such taxes, liens or adverse claims, or any judgments based thereon, take any action to preserve any rights of or against any prior or other parties in connection with the Collateral, exercise any voting rights or managerial rights with respect to any Collateral, initiate any calls for Capital Contributions, make or give any presentments, demands for performance, notices of nonperformance, protests, notices of protests, notices of dishonor or notices of any other nature whatsoever in connection with the Collateral or the Secured Obligations, or otherwise make good any other aforesaid failure of Pledgors. Pledgors shall promptly reimburse Secured Party for any sums paid or advanced by Secured Party for any such purpose, together with interest at the maximum rate permitted by law from the date of any such advance to the date of reimbursement.

4.14    Attorney-In-Fact. Such Pledgor hereby appoints Secured Party its attorney-in-fact with full power of substitution to do, upon the occurrence of an Event of Default, any and all acts which such Pledgor is obligated by this Agreement to do and for the purpose of carrying out the purposes of this Agreement and taking any action and executing any instruments which Secured Party may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, Secured Party, upon the occurrence of an Event of Default, shall have the right and power, to receive, endorse and collect all checks made payable to such Pledgor representing any payment or distribution in respect of the Collateral or any part thereof and to give full discharge for the same, to take any other action deemed necessary or desirable by Secured Party for the enforcement of its rights in respect of any Collateral and to execute or otherwise authenticate and deliver as such attorney-in-fact on behalf of such Pledgor all necessary instruments or other records of sale, assignment, lease and transfer of the Collateral, and any part thereof, sold, leased or otherwise disposed of pursuant to this Agreement.

4.15    Management; Member. Such Pledgor covenants that Managing Member shall remain the sole managing member of Borrower at all times that any of the Secured Obligations are outstanding.

ARTICLE 5
NEGATIVE COVENANTS

Each Pledgor covenants that until such time as all of the Secured Obligations are indefeasibly paid or satisfied in full, without the prior written consent of Secured Party:

5.1    Sale or Hypothecation of Collateral; Agreements.

(a)    Pledgors shall not, directly or indirectly, and shall not permit Borrower to, directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise, except as otherwise expressly permitted under the Loan Agreement, (i) exchange, lease, lend, sell, encumber, hypothecate or dispose of the Collateral or any part thereof, or any Pledgor's rights therein, or grant any option with respect thereto; or (ii) cause, suffer or permit the Collateral to be affected by any encumbrance, security interest, option or adverse claim of any kind or nature whatsoever, except the security interests in favor of Secured Party. Pledgors shall not permit Borrower to, directly or indirectly, except as expressly may be permitted pursuant to the Loan Agreement, (A)

incur any secured or unsecured debt, other than trade payables incurred in the ordinary course of Borrower's business, (B) enter into any contracts, licenses or agreements, or (C) issue any options, warrants or other rights to acquire any interest in Borrower.

(b)     The inclusion of "proceeds" as a component of the Collateral shall not be deemed a consent by Secured Party to any sale or disposition of all or any part of the Collateral.

5.2     No Issuance of Additional Membership Interests or Change in Operating Agreement. Pledgors shall not permit Borrower to issue any additional membership interests, or to take any other act, or omit to take any act, the result of which is to render the Collateral of all Pledgors to be less than one hundred percent (100%) of the issued and outstanding membership interests of Borrower. Pledgors shall not cause, suffer or permit any cancellation or termination of any Borrower Organizational Document or any amendments, modifications or changes in (a) the Borrower Organizational Documents, (b) the terms of any of the membership interests pledged to Secured Party hereunder, or (c) any Pledgor Organizational Document.

5.3     Certain Agreements. Pledgors shall not, and shall not permit Borrower to, make any compromise, adjustment, amendment, modification, settlement, substitution or termination in respect of the Collateral or any obligation owed to, or other asset of, Borrower; nor cause, suffer or permit anything to be done which might impair, or fail to do anything necessary or advisable in order to preserve, the value of the Collateral or Borrower and the security interest of Secured Party in the Collateral.

5.4     Reorganization or Disposition of Assets, Etc. Pledgors shall not, and shall not permit Borrower to, become a party to any transaction whereby all or a substantial part of its property, undertakings or assets would become the property of any other person or entity, whether by way of liquidation, dissolution, reorganization, merger, transfer, sale, lease, sale and leaseback or any other disposition; nor shall Pledgors make, or permit Borrower to make, any material change in the character of its business as conducted on the date hereof. Each Pledgor shall notify Secured Party promptly of any change in such Pledgor's sole place of business (if it has only one place of business) or chief executive office (if it has more than one place of business), and shall keep its books and records regarding the Collateral at its sole place of business or chief executive office, as applicable. No Pledgor shall change its "Location" as designated on Exhibit A, its jurisdiction of organization, its form of organization, or its name, except with Secured Party's prior written consent.

5.5     Additional Payments and Obligations to Pledgors. Except as expressly permitted in the Loan Documents, or with the prior written consent of Secured Party, Pledgors will not enter into any transaction with Borrower that will directly or indirectly benefit Pledgors. Except as expressly permitted in the Loan Documents or with the prior written consent of Secured Party, Pledgors shall stand still and not accept any payments due from Borrower, including without limitation in respect of Distributions, loans and royalties, until the Loan is paid in full. Any such payment accepted by Pledgors shall be deemed to be held in trust for Secured Party. Each Pledgor does hereby unconditionally subordinate (a) all payments due from Borrower, and all transactions with Borrower that benefit Pledgors, to the Loan and all other present and future debts and obligations of Borrower to Secured Party, said obligations including all obligations of

Borrower to Secured Party of every kind and description, direct or contingent, due or not due, secured or unsecured, original, renewed or extended, whether now in existence or hereafter arising, and (b) all security interests, liens and other encumbrances in property of Borrower securing any such obligation of Borrower to Pledgors to the security interests, liens and other encumbrances of Secured Party in such property created under the Loan Documents. Pledgors shall not take any security interest in, or lien or other encumbrance on, any of Borrower's property, for any purpose.

5.6     Securities.     Pledgors shall not take any action to alter the status of any membership interests pledged hereunder to convert it into (x) a "certificated security" as that term is defined in Section 8-102 of the UCC, or (y) any type of property other than a "security" subject to the provisions of Article 8 of the UCC. Without limiting the generality of the foregoing, in no event shall Pledgors allow any amendment to the Organizational Documents to remove or amend any provisions under which membership interests in Borrower are designated and/or qualify as "securities" under Article 8 of the UCC, nor shall any Pledgor amend, or allow an amendment to the Organizational Documents that has the effect of making any such membership interest into a "certificated security".

ARTICLE 6
RIGHTS INCIDENT TO COLLATERAL

6.1     Irrevocable Proxy/Voting Rights.

(a)     General.     Each Pledgor hereby irrevocably appoints Secured Party as such Pledgor's proxy holder with respect to the Collateral, with full power and authority to vote, give consents, ratifications and waivers and otherwise act with respect to such Collateral on behalf of such Pledgor, provided that this proxy shall be operative only upon the occurrence of (i) an Event of Default hereunder, or (ii) an event which, with notice or lapse of time, or both, would become an Event of Default, provided that Secured Party will not exercise such vote or grant any consent for 90 days following an Event of Default with respect to any Management Rights of the Class Z member under Section 9 (e) or any subsection thereof nor shall Secured Party exercise such vote in a manner inconsistent with its obligations under the Option Subordination Agreement or the Intercreditor Agreement. This proxy shall be irrevocable for so long as any Secured Obligation remains outstanding. Until such time, if any, as an Event of Default occurs, or there occurs an event which, with notice or lapse of time, or both, would become an Event of Default, each Pledgor shall be entitled to exercise any and all of such Pledgor's voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement; provided, however, that Pledgors shall not exercise or refrain from exercising any such right if such action or inaction would have an adverse effect on the financial or business condition of Borrower or the value or salability of the Collateral or any part thereof or on Secured Party's security or would cause a breach of any obligation of Borrower to Secured Party under any Loan Document; and, provided, further, that at least five (5) Business Days prior to taking any such action or refraining to take any such action, each Pledgor shall give Secured Party written notice of the action that such Pledgor intends to take or refrain from taking, and shall not thereafter take such action or refrain from taking such action,

as the case may be, if Secured Party notifies such Pledgor that Secured Party objects to the proposed action or inaction on the grounds that the proposed action or inaction would be inconsistent with the terms of this Agreement, would have an adverse effect on the financial or business condition of Borrower or the value or salability of the Collateral or any part thereof or on Secured Party's security, or would cause any breach of a Loan Document.

      (b)    <u>Article 8 Matters</u>.

        (i)    Each Pledgor hereby further irrevocably constitutes and appoints Secured Party, from the date of this Agreement until the termination of this Agreement in accordance with its terms (and irrespective of the existence of any Event of Default or event that, with the giving of notice or the lapse of time, or both, would constitute an Event of Default), as such Pledgor's true and lawful proxy, for and in such Pledgor's name, place and stead to vote such Pledgor's membership interest in Borrower and any and all other equity interests in Borrower, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired (such membership interest, together with all such other equity interests, such "<u>Pledgor's Interests</u>"), with respect to any Article 8 Matter (as hereinafter defined). The foregoing proxy shall include the right to sign such Pledgor's name (as member of Borrower) to any consent, certificate or other document relating to Borrower that applicable law may permit or require, to cause the Pledgor's Interests of such Pledgor to be voted in accordance with the preceding sentence. Each Pledgor hereby revokes all other proxies and powers of attorney with respect to the Pledgor's Interests of such Pledgor that such Pledgor may have appointed or granted, to the extent such proxies or powers extend to any Article 8 Matter. Pledgors will not give a subsequent proxy or power of attorney (and any subsequent proxy or power of attorney, if given, will not be effective) or enter into any other voting agreement with respect to the Pledgor's Interests of such Pledgor with respect to any Article 8 Matter.

        (ii)    As used herein, "<u>Article 8 Matter</u>" means any action, decision, determination or election by the Borrower or its member(s) that its membership interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

      (c)    <u>Additional Agreements of Pledgors</u>.    Without limiting the generality of the foregoing, Pledgors shall not, in their respective capacities as members of Borrower or otherwise, without Secured Party's prior written consent:

        (i)    Execute any irrevocable proxies or enter into any voting trust agreements, or vote or consent to amend such irrevocable proxies or voting trust agreements in effect on the date hereof, with respect to Borrower or otherwise grant any Person other than Secured Party any voting rights with respect to any Collateral or Borrower; or

(ii)    Waive any default under any of Borrower's Organizational Documents.

(d)    THE PROXIES AND POWERS GRANTED BY PLEDGORS PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF EACH PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

6.2    <u>Rights to Distribution - Event of Default</u>.  Upon the occurrence of an Event of Default, or an event which, with notice or lapse of time, or both, would become an Event of Default, at the option of Secured Party, all rights of any Pledgor to receive any Distributions or other amounts from Borrower that it would otherwise be authorized to receive and retain, shall cease, and all such rights shall thereupon become vested in Secured Party.  Secured Party shall thereafter have the sole right to receive, and Pledgors shall, and shall cause Borrower to, pay directly to Secured Party, one hundred percent (100%) of all Distributions or other amounts, whether in cash, cash equivalents or otherwise, which property and funds may be held by Secured Party as Collateral hereunder and/or applied by Secured Party against the Secured Obligations in such order and manner as Secured Party, in its sole and absolute discretion, determines.

6.3    <u>Distributions Held in Trust</u>.  All distributions or payments from Borrower that are received by any Pledgor contrary to the provisions of this Agreement (whether before or after the occurrence of an Event of Default) shall be deemed to have been received in trust for the benefit of Secured Party, shall be segregated from other funds of such Pledgor, and shall forthwith be paid over to Secured Party as pledged Collateral in the same form as so received (with any necessary endorsements).

## ARTICLE 7
## EVENTS OF DEFAULT

The occurrence of any of the following shall constitute an event of default (an "<u>Event of Default</u>") hereunder:

7.1    <u>Default Under Other Loan Documents</u>.  An "Event of Default" as defined under the Loan Agreement, the Note and/or the Security Instrument or any of the other Loan Documents.

7.2    <u>Pledgor Actions and Inactions</u>.  The default in the performance of or compliance with any other term, condition or covenant in favor of Secured Party contained in this Agreement, including, but not limited to, the failure of any Pledgor, for any reason, to take (or permit) any of the actions specified in <u>Article 4</u>, or the taking (or permitting) by any Pledgor of any of the actions prohibited to be taken or permitted in <u>Article 5</u> without the prior written consent of Secured Party, which consent may be withheld in Secured Party's sole discretion.

7.3    <u>Bankruptcy</u>.  The insolvency, failure in business or appointment of a receiver to take charge of the business or property of any Pledgor or the commission of an act of bankruptcy, the making of a general assignment for the benefit of creditors or the filing of any petition in bankruptcy by or against any such party or for relief under the U.S. Bankruptcy Code,

as amended, or under any other law, whether federal or state, for the relief of debtors, now or hereafter existing, unless the same is dismissed within thirty (30) calendar days after the filing thereof.

7.4 <u>Liens on Collateral</u>. The initiation of steps by any third party to obtain a lien, levy or writ of attachment or garnishment upon any or all of the Collateral or substantially all of any of the other property of any Pledgor or to affect any of the Collateral or any such other property by other legal process, where the same is not dismissed or bonded within fifteen (15) Business Days after the initiation thereof.

7.5 <u>Inability to Pay Debts</u>. The admission by any Pledgor of its inability to pay its debts as they mature.

7.6 <u>Certain Transfers</u>. Any transfer of property by any Pledgor or Borrower under circumstances that would entitle a trustee in bankruptcy or similar fiduciary to avoid such transfer under the U.S. Bankruptcy Code, as amended, or under any other law, whether state or federal, for the relief of debtors, now or hereafter existing.

7.7 <u>Appointment of Receiver</u>. The appointment of a receiver, trustee or custodian for any Pledgor or Borrower or for any substantial part of the assets of any of the foregoing parties, or the institution of proceedings for the dissolution or the full or partial liquidation of any of the foregoing parties, and such receiver or trustee shall not be discharged within thirty (30) calendar days of his or its appointment, or such proceedings shall not be discharged within thirty (30) calendar days of their commencement, or the discontinuance of the business or a material change in the nature of the business of any of the foregoing parties.

7.8 <u>Misrepresentation</u>. Should any representation of any Pledgor to Secured Party concerning the financial condition or credit standing of any Pledgor, or any representation or warranty of any Pledgor contained in this Agreement or in any document, certificate or instrument delivered pursuant hereto, prove to be false or misleading in any material respect.

7.9 <u>Adverse Judgment</u>. If final judgment for the payment of money shall have been rendered by any court of competent jurisdiction against any Pledgor or Borrower, and the same shall not have been discharged or varied or execution thereunder stayed, whether pursuant to appeal or otherwise, within sixty (60) calendar days of the entry thereof, or if any final order, ruling or direction of any competent authority is issued with respect to any Pledgor or Borrower that materially adversely affects any Pledgor or Borrower, or that requires a substantial or adverse change in the business or affairs of any Pledgor or Borrower or any material disposition of the assets of such Pledgor or Borrower.

## ARTICLE 8
## REMEDIES UPON DEFAULT

Upon the occurrence of any Event of Default hereunder, then in addition to all other rights and remedies of Secured Party hereunder or under any other agreement, or at law or in equity, upon the occurrence of such Event of Default or any time thereafter, Secured Party may exercise any and all of the following rights and remedies, all of which shall be cumulative and not mutually exclusive:

8.1   <u>Acceleration of Indebtedness</u>. Secured Party may declare any or all Secured Obligations, or any part thereof, to be immediately due and payable in accordance with the terms of the Loan Agreement without demand or notice or set-off and proceed to collect the same.

8.2   <u>Notification to Borrower/Members</u>. Secured Party may instruct Borrower and/or Pledgors to make one hundred percent (100%) of all Distributions or other payments in respect of the Collateral directly to Secured Party.

8.3   <u>Compromise of Claims</u>. Secured Party may (a) settle and adjust all disputes and claims directly with Borrower or any Pledgor with respect to any Distributions or other payments in respect of the Collateral; (b) alter, accelerate, extend or change the time, manner and/or amount of any payments made or to be made by Borrower or any Pledgor with respect to any Distributions or other payments in respect of the Collateral; (c) consent from time to time to the acceptance of security or additional or substituted security of any kind for any obligation of Borrower or any Pledgor or to the release, surrender or alteration of any such security; and (d) deal as aforesaid or in any other manner with Borrower and any Pledgor with respect to any Distributions or other payments in respect of the Collateral.

8.4   <u>Termination of Agreements</u>. Secured Party may terminate any agreement or commitment of Secured Party for the granting of further credit to any Pledgor or, in accordance with the terms of any such agreement or commitment, to Borrower.

8.5   <u>Other Rights and Remedies</u>. Secured Party may pursue and enforce all of the rights and remedies provided in this Agreement or provided to secured parties at law or in equity, including, without limitation, the provisions of the UCC. Without limiting the generality of the foregoing, Secured Party may dispose of the Collateral or, upon compliance with applicable law, accept it in full or partial satisfaction of the Secured Obligations, and Secured Party may obtain specific performance of any obligation of any Pledgor contained herein without the necessity of posting bond or proving that money damages are an inadequate remedy.

8.6   <u>Voting Rights</u>. Secured Party may exercise the voting and consensual rights and powers, if any, that any Pledgor would be entitled to exercise absent the provisions of <u>Article 6</u> hereof.

8.7   <u>Other Rights Provided in Agreement</u>. Secured Party may exercise any other rights and remedies provided in this Agreement including, without limitation, the right to Distributions as set forth in <u>Article 6</u> hereof.

## ARTICLE 9
## DEMANDS, NOTICES ETC.

9.1   <u>Commercially Reasonable Sale</u>. All demands of performance, advertisements, notices of sale or retention, as well as the presence of the Collateral at any sale and the constructive possession of the Collateral by the person conducting any sale, except only as provided by any and all applicable provisions of the UCC, are hereby specifically waived by Pledgors. Furthermore, the parties hereto deem the following to be commercially reasonable in compliance with said provisions: After an Event of Default, Secured Party may apply, set off, collect or sell in one or more sales the whole or any part of the Collateral in such order as

Secured Party elects; any such sale may be public or private and conducted at Secured Party's place of business or at any other place deemed in good faith by Secured Party to be commercially reasonable; any such sale may be either for cash, notes or property upon credit for future delivery, and at such price or prices as Secured Party in good faith considers fair; any such sale may be conducted by an officer or agent of Secured Party who may deliver possession of the Collateral so sold to the purchaser or purchasers thereof; Secured Party in its own right and free from any claim of Pledgors and from any right of redemption may purchase and hold any of the Collateral at any such sale; any such sale may be conducted with at least ten (10) calendar days' prior written notice to Pledgors; and Secured Party shall be authorized at any such sale, should Secured Party deem it advisable to do so, to restrict the prospective bidders or purchasers to persons who shall have obtained all necessary authorizations and approvals of any applicable federal, state or local regulatory agency, authority or instrumentality necessary to purchase the Collateral or any part thereof or to conduct the business activities for which the Collateral is intended, as the successor in interest of any Pledgor, or, alternatively, to condition the closing of the sale to the successful bidder or prospective purchaser upon the subsequent obtaining of all such authorizations and approvals. Secured Party shall not be obligated to make any sale of the Collateral if it shall determine not to do so, regardless that a notice of sale of the Collateral may have been given. Secured Party may adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon completion of any sale or sales under and by virtue of this Agreement, Secured Party shall cause the Collateral to be assigned to the purchaser or purchasers thereof. Pledgors, at the request of Secured Party, shall ratify and confirm any such sale or sales by executing and delivering to the purchaser or purchasers all such further assignments and other documents as may be deemed necessary by Secured Party for the purpose of further confirming the sale and assignment of such portion of the Collateral as shall have been sold thereby. Upon the completion of each such sale or sales, each such sale or sales shall operate to transfer to the purchaser or purchasers all of the rights of Pledgors in and to the Collateral sold and, to the extent permitted by law, shall be a perpetual bar both at law and in equity against Pledgors and all persons claiming, or who may claim, by, through or under any Pledgor, any right or interest in and to such portion of the Collateral. If a sale of any of the Collateral is made on credit or for future delivery, the Collateral sold may be retained by Secured Party until the selling price is paid in full by the purchaser thereof, but Secured Party shall have no liability in the event the purchaser thereof fails to take up and pay for the Collateral so sold. In case of any such failure, such Collateral may be resold in such manner as Secured Party deems appropriate. Each Pledgor hereby waives to the extent permitted by applicable law any claims against Secured Party arising by reason of the fact that the price at which the Collateral may be sold at such a private sale is less than the price which might be obtained at a public sale or less than the aggregate amount of the indebtedness and obligations secured hereby, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree.

9.2   Sale of Collateral Consisting of Securities.   With respect to any Collateral consisting of securities, and whether or not any of such Collateral has been effectively registered under the Securities Act of 1933 or other applicable laws, Secured Party may, in its sole and absolute discretion, sell all or any part of such Collateral at private sale in such manner and under such circumstances as Secured Party may deem necessary or advisable in order that the sale may be lawfully conducted. Without limiting the foregoing, Secured Party may (a) approach and

negotiate with a limited number of potential purchasers and (b) restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing such Collateral for their own account for investment and not with a view to the distribution or resale thereof. In the event that such Collateral is sold at private sale, each Pledgor agrees that if such Collateral is sold for a price which Secured Party in good faith believes to be reasonable under the circumstances then existing, then (i) the sale shall be deemed to be commercially reasonable in all respects, (ii) such Pledgor shall not be entitled to a credit against any Secured Obligations in an amount in excess of the purchase price and (iii) Secured Party shall not incur any liability or responsibility to any Pledgor in connection therewith, notwithstanding the possibility that a substantially higher price might have been realized at a public sale. In this regard each Pledgor understands and agrees that Secured Party is under no obligation to seek approval of and to become effective with respect to a "public offering" of the Collateral, that any decision of Secured Party not to do so shall be conclusively deemed a reasonable decision of Secured Party, and that such a decision may very strictly limit the course of conduct of Secured Party with respect to any disposition of all or any portion of the Collateral by Secured Party, and also may limit the extent to which or the manner in which any subsequent transferee of all or any portion of the Collateral may dispose of the same. Similarly, there may be other legal restrictions or limitations affecting Secured Party in any attempt to dispose of all or any part of the Collateral under applicable state Blue Sky or other state securities laws or similar laws analogous in purpose or effect. Without limiting the generality of the foregoing, the foregoing provisions of this Section shall be applicable if, for example, Secured Party were to transfer all or any part of the Collateral for private placement by an investment banking firm of reputation satisfactory to Secured Party, or if Secured Party were to place all or any part of the Collateral privately with a purchaser or purchasers thereof.

9.3     Right of Purchaser to Become Member.    Any Person or Persons (including Secured Party or its designee) who becomes the owner of the membership interests in Borrower or any portion thereof at any public or private sale, or by assignment or other transfer in lieu of foreclosure (i.e., in full or partial satisfaction of the Secured Obligations), shall be entitled, upon notice to Borrower, to be admitted to Borrower as a member, with all of the rights, privileges and powers attending to the interest so acquired. In furtherance thereof, Pledgors hereby irrevocably authorize and direct Borrower, on receipt of any such notice, (i) to admit such successful bidder/transferee or its designee as a member in Borrower, entitled to exercise all the rights, powers and privileges (including voting rights, the right to receive all dividends, distributions and other proceeds of the membership interest so acquired) and be credited with the capital account of the affected Pledgor or Pledgors (to the extent of the membership interest so acquired), the right to participate in the management and operation of Borrower, all rights in, to and under the relevant Organizational Documents of Borrower, including any purchase option, right of first refusal, right of first offer or buy/sell right and the right to exercise all other powers and privileges pertaining to such membership interest, to which the affected Pledgor or Pledgors would have been entitled had no such notice been delivered; and (ii) to file such amendment to any Organizational Document of Borrower constituting a public record as may be required or permitted under applicable law to reflect the admission of such successful bidder/transferee or its designee as a member and/or manager (as appropriate) in substitution of any Pledgor; provided, however, that no such amendment shall be necessary or required to effectuate such successful bidder's/transferee's or its designee's rights as owner, and successor-in-interest to, all of any affected Pledgor's or Pledgors' rights in, to and under such membership (and, if applicable,

management interest). Each Pledgor acknowledges that neither the sending of a notice as provided herein, nor the compliance by any Pledgor or Borrower with the requirements hereof, shall be deemed to violate any automatic stay that may be in effect under applicable bankruptcy law with respect to an insolvency proceeding involving Borrower or any other Person.

9.4 Information as to Compliance with Law. If Secured Party determines to exercise its right to sell any or all of the Collateral, upon written request, Pledgors shall, and shall cause each issuer of any Collateral to be sold hereunder, from time to time to furnish to Secured Party all such information as Secured Party may request in order to determine the number of and other instruments included in the Collateral which may be sold by Secured Party as exempt transactions under the Securities Act of 1933 and the rules of the Securities Exchange Commission thereunder, as the same are from time to time in effect and amended.

9.5 Further Assurances. Each Pledgor further agrees to use its best efforts to do or cause to be done all such other acts as may be necessary to make any sale or sales of all or any portion of the Collateral pursuant to this Article 9 valid and binding and in compliance with any and all applicable requirements of law. Each Pledgor further agrees that such Pledgor's failure to use such best efforts will cause irreparable injury to Secured Party, that Secured Party has no adequate remedy at law in respect to such breach and, as a consequence, that such covenant shall be specifically enforceable against Pledgors. Each Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred.

9.6 Receipts of Sale. The receipt or receipts of any person conducting a sale of any of the Collateral pursuant to this Agreement for the purchase money paid at such sale shall be a sufficient discharge therefor to any purchaser of the Collateral or any part thereof, and no such purchaser, after paying such purchase money and receiving such receipt, shall be bound to see to the application of such purchase money for any purpose of this Agreement, or shall be bound to inquire as to the authorization, necessity, expediency or regularity of such sale.

9.7 Application of Proceeds. All sums received or collected by Secured Party, whether before or after default, on or on account of the Collateral, including without limitation the proceeds of any sale or disposition thereof, shall be applied to the installments of the Secured Obligations, to the payment of any advances, charges, costs and expenses incurred or paid by Secured Party and secured hereby, and to the payment of any and all other obligations secured hereby, all in such order and manner as Secured Party in its sole discretion determines. Secured Party shall pay any balance to Pledgors or to the person or persons entitled thereto upon proper demand being made therefor.

9.8 Return of Collateral. Subject to any duty imposed by law or otherwise to the holder of any subordinate lien on the Collateral known to Secured Party, and subject to the direction of a court of competent jurisdiction, upon payment in full of the Secured Obligations, Pledgors shall be entitled to return of the Collateral in the possession of Secured Party; provided, however that Secured Party shall not be obligated to return to Pledgors or deliver to the holder of any subordinate lien any such Collateral until it is satisfied that all amounts with respect to the Secured Obligations are no longer subject to being recaptured under applicable bankruptcy or insolvency laws or otherwise. The return of Collateral, however effected, shall be without

recourse to Secured Party, and Secured Party shall be entitled to receive appropriate documentation to such effect. The return of Collateral shall be effected without representation or warranty and shall not entitle Pledgors to any right to endorsement.

9.9 <u>Required Approvals</u>. In furtherance of the exercise by Secured Party of the power of sale granted to it herein, each Pledgor agrees that, upon request of Secured Party and without expense to Secured Party, such Pledgor shall use its best efforts to obtain all necessary approvals from all applicable federal, state and local governmental agencies, authorities and instrumentalities for the sale by Secured Party of the Collateral, or any part thereof, or the transfer to the successful bidder or prospective purchaser of any governmental licenses or franchises necessary to allow it to conduct the business or activities for which the Collateral is intended; provided, however, such Pledgor shall have no obligation to register the Collateral under the Securities Act of 1933.

9.10 <u>Cumulative Rights</u>. The several rights and remedies of Secured Party hereunder or referred to herein shall, to the full extent permitted by law, be construed as cumulative, and no one of them is exclusive of the others. No delay or omission of Secured Party in exercising any right or remedy created by, connected with or provided in this Agreement or arising from any Event of Default hereunder shall be construed as or deemed to be an acquiescence therein or a waiver of such default or a waiver of or limitation upon the right of Secured Party to exercise, at any time and from time to time thereafter, any right or remedy under this Agreement. No waiver of any breach of any of the covenants or conditions of this Agreement shall be construed to be a waiver of or acquiescence in or consent to any preceding or subsequent breach of the same or of any other condition or covenant. If the performance of any Secured Obligation is at any time secured by one or more other security agreements or instruments, the exercise by Secured Party of any right or remedy under any such other security agreement or instrument shall not be construed as or deemed to be a waiver of any limitation upon the right of Secured Party to exercise, at any time and from time to time thereafter, any right or remedy under this Agreement or under any such other security agreement or instrument. Without limiting the generality of the foregoing, Pledgors acknowledge that the Secured Obligations are also secured by other Loan Documents and that Secured Party may, in its absolute discretion, proceed against any other debtor or collateral prior to, after or concurrently with any proceedings against Pledgors and/or the Collateral hereunder and the order in which Secured Party may proceed against any other debtor or collateral shall not in any way affect Secured Party's right to proceed against Pledgors and/or the Collateral under this Agreement. In the event of an Event of Default hereunder, Secured Party may maintain an action hereon and may maintain successive actions for each other Event of Default. The rights of Secured Party hereunder shall not be exhausted by its exercise of any of its rights and remedies or by any such action or by any number of successive actions until and unless all indebtedness secured hereby has been paid in full.

ARTICLE 10
<u>SECURED PARTY'S POSSESSION OF COLLATERAL</u>

Secured Party's sole duty with respect to any Collateral in its possession shall be to use reasonable care in the custody and preservation thereof. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which Secured Party accords its own

property, it being understood that Secured Party shall not have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral. Under no circumstances shall Secured Party be responsible for any injury or loss to the Collateral, or any part thereof, arising from theft, acts of God, flood, fire or from any other cause beyond the reasonable control of Secured Party.

## ARTICLE 11
## LIABILITY AND INDEMNIFICATION

Secured Party shall incur no liability if any action (including, without limitation, acts of active negligence) taken by Secured Party or on Secured Party's behalf in good faith pursuant to any provision of this Agreement shall prove to be in whole or in part inadequate or invalid. Pledgors jointly and severally agree to indemnify and hold Secured Party, and its officers, directors, shareholders, employees, agents and attorneys free and harmless from and against any loss, liability, claim or damage, including without limitation, all attorneys' fees and court costs actually incurred, (a) in connection with any such action or actions, and/or (b) in respect of any claims or allegations of third parties arising out of any Pledgor's use and ownership of the Collateral or Secured Party's possession of the Collateral or its security interest therein, unless caused by the gross negligence or willful misconduct of Secured Party.

## ARTICLE 12
## ACCOMMODATION

12.1    Each Pledgor has a financial interest in Borrower and has executed and delivered this Agreement as an accommodation in order to induce Secured Party to extend to Borrower the credit that is secured hereby. Each Pledgor hereby authorizes and empowers Secured Party to exercise, in its sole discretion, any rights and remedies, or any combination thereof, that may then be available to Secured Party, since it is the intent and purpose of each Pledgor that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances. Nothing herein shall obligate the Non-Managing Member to any liability of Borrower or any other member of Borrower other than as to its hypothecation of its Class Z Membership interest in Borrower.

12.2    Without limiting the generality of the foregoing, each Pledgor consents and agrees that Secured Party may, at any time and from time to time, in Secured Party's sole and absolute discretion, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) supplement, modify, amend, extend, renew, accelerate, waive or otherwise change the time for payment or the terms of the Secured Obligations or any part thereof or any additional security or guaranties now or hereafter held therefor; (b) enter into or give any agreement, approval or consent with respect to the Secured Obligations or any part thereof or any additional security or guaranties now or hereafter held therefor; (c) accept new or additional instruments, documents or agreements in exchange for or relative to the Secured Obligations or any part thereof; (d) accept partial payments on the Secured Obligations; (e) receive and hold additional security or guaranties for the Secured Obligations or any part thereof; (f) settle, release, liquidate and/or fail to enforce any Secured Obligation; (g) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, transfer and/or fail to enforce any other security or guaranties now or hereafter held for the Secured Obligations or any part

thereof; (h) substitute, exchange, amend or alter any other security or guaranty now or hereafter held for the Secured Obligations or any part thereof, whether or not the security or guaranty received upon the exercise of such power is of the same character or value as the security or pledge so affected; (i) release any Person from any personal liability with respect to the Secured Obligations or any part thereof; (j) consent to the transfer of any such other security and bid and purchase the same at any sale thereof; and/or (k) consent to any merger, change or other restructuring or termination of the legal existence of Borrower or any other Person, and correspondingly restructure the Secured Obligations.

12.3    To the fullest extent permitted by law, each Pledgor waives:

(a)     Any right to require Secured Party to proceed against Borrower, any other Pledgor or any other Person or to proceed against or exhaust any other security held by Secured Party at any time or to pursue any other remedy in Secured Party's power before exercising any right or remedy under this Agreement;

(b)     Any defense that may arise by reason of: (i) Secured Party's failure to proceed against Borrower or any of Borrower's property, or any other party against whom Secured Party might assert a claim, before proceeding against such Pledgor under this Agreement; (ii) the release, suspension, discharge or impairment of any of Secured Party's rights against Borrower or any other party against whom Secured Party might assert a claim, whether such release, suspension, discharge or impairment is explicit, tacit or inadvertent; (iii) Secured Party's failure to pursue any other remedies available to Secured Party that would reduce the burden of the indebtedness secured hereby on any Pledgor's interests in the Collateral; (iv) any lack of authority, death, disability or other incapacity of Borrower, any Pledgor, or any other Person with respect to the Secured Obligations or any part thereof; (v) the unenforceability or invalidity of any security or other guaranties for the Secured Obligations or the lack of perfection or continuing perfection or failure of priority of any security for the Secured Obligations or any part thereof; (vi) any failure of Secured Party to give notice of sale or other disposition of collateral to Borrower, any Pledgor or any other Person or any defect in any notice that may be given in connection with any sale or disposition of collateral; (vii) any failure of Secured Party to comply with applicable laws in connection with the sale or other disposition of any collateral for any Secured Obligation, including, without limitation, any failure of Secured Party to conduct a commercially reasonable sale or other disposition of any collateral for any Secured Obligation; (viii) any act or omission of Secured Party or others that directly, indirectly, by operation of law or otherwise results in or aids the discharge or release of Borrower, any Pledgor or any other Person, or any security or guaranties now or hereafter held for the Secured Obligations or any part thereof; (ix) any law which provides that the obligation of an accommodating party must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or pledgor's obligation in proportion to the principal obligation; (x) any failure of Secured Party to file or enforce a claim in any bankruptcy or other proceeding with respect to any Person; (xi) the election by Secured Party, in any bankruptcy proceeding of any Person, of the application or non-application of Section 1111(b)(2) of the U.S. Bankruptcy Code; (xii) any extension of credit or the grant of any lien under Section 364 of the U.S. Bankruptcy Code; (xiii) any use of cash collateral

under Section 363 of the U.S. Bankruptcy Code; (xiv) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy proceeding of any Person; (xv) the avoidance of any Lien in favor of Secured Party for any reason; (xvi) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any of the Secured Obligations in or as a result of any such proceeding; or (xvii) any defense based upon an election of remedies by Secured Party, including without limitation an election to proceed by non-judicial rather than judicial foreclosure;

(c)     Demand, protest and notice of any kind, including without limitation, the following notices: (i) notice of the evidence, creation or incurring of any new or additional indebtedness or obligation (provided that such indebtedness or obligation is not secured by this Agreement); (ii) notice of any action or non-action on the part of Borrower, any other Pledgor or Secured Party in connection with any obligation or evidence of indebtedness held by Secured Party as collateral for all or any portion of the Secured Obligations; or (iii) notice of payment or non-payment by Borrower of the indebtedness secured by this Agreement;

(d)     Any duty on the part of Secured Party to disclose to Pledgors any facts Secured Party may now know or may hereafter know about Borrower or Borrower's successors in interest (if any) regardless of whether Secured Party (i) has reason to believe that any such facts increase the risk beyond the risk which any Pledgor intends to assume by executing this Agreement, (ii) has reason to believe that these facts are unknown to any Pledgor, or (iii) has a reasonable opportunity to communicate such facts to Pledgors, it being understood and agreed that each Pledgor is fully responsible for being and keeping informed of the financial condition of Borrower and any successor in interest of Borrower and of all circumstances bearing on the risk of non-payment of any indebtedness of Borrower to Secured Party that is secured hereby; and

(e)     Any and all rights and defenses that such Pledgor may have because Borrower's debt is secured by real property; this means, among other things, that: (i) Secured Party may collect from any Pledgor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Secured Party forecloses on any real property collateral pledged by Borrower, then (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Secured Party may collect from Pledgors (or any of them) even if Secured Party, by foreclosing on the real property collateral, has destroyed any right Pledgors may have to collect from Borrower. The foregoing sentence is an unconditional and irrevocable waiver of any rights and defenses Pledgors may have because Borrower's debt is secured by real property. Finally, each Pledgor agrees that the performance of any act or any payment that tolls any statute of limitations applicable to the Loan Documents shall similarly operate to toll the statute of limitations applicable to such Pledgor's liability hereunder. Without limiting the generality of the foregoing, to the full extent permitted by Nevada Revised Statutes 40.495, Pledgors waive the benefits of the one-action rule under Nevada Revised Statutes 40.430.

12.4    Each Pledgor also waives with respect to Borrower, its successors and assigns and any other Person, including other guarantors and any other Pledgor, who may have similar rights against Borrower, any and all rights of subrogation, reimbursement, exoneration, contribution or setoff, any and all rights to participate in any claim or remedy of Secured Party against Borrower or any collateral, and any and all other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated or to a holder or transferee against a maker, and which such Pledgor may have or hereafter acquire against Borrower or any such other Person by contract, at law or in equity in connection with or as a result of any Pledgor's execution, delivery and/or performance of this Agreement or any other Loan Document. Pledgors hereby acknowledge and agree that this waiver is intended to be for the benefit of Borrower, as a third party beneficiary, as well as for the benefit of Secured Party. Therefore, the waiver set forth herein shall remain at all times hereafter in full force and effect, and may be enforced by Borrower in its own name and right, notwithstanding that all Secured Obligations have been repaid in full. Each Pledgor further agrees that, to the extent the waiver of their respective rights of subrogation as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation which such Pledgor may have against Borrower or against any Collateral or other security shall be junior and subordinate to any right Secured Party may have against Borrower or any other Pledgor and to all right, title and interest Secured Party may have in any Collateral or other security, and until the Secured Obligations have been indefeasibly paid in full, such Pledgor shall not have or assert any such claims or rights against Borrower, its successors and assigns or any such other Persons, either directly or as an attempted setoff to any action commenced against any Pledgor by Borrower, Secured Party or any other Person. Secured Party may use, sell or dispose of any item of Collateral or other security as it sees fit without regard to any subrogation right any Pledgor may have, and upon disposition or sale, any right of subrogation any Pledgor may have shall terminate.

12.5    Each Pledgor acknowledges and agrees that by virtue of this accommodation pledge, it has specifically assumed any and all risks of a bankruptcy or reorganization case or proceeding with respect to Borrower and that no modification of the Secured Obligations in any bankruptcy or reorganization of Borrower or any other Pledgor shall affect Secured Party's rights to pursue its remedies against the Collateral in which such first Pledgor has granted a security interest to Secured Party in respect of any Event of Default as though no such bankruptcy or reorganization case had occurred.

12.6    Before executing this Agreement, each Pledgor has made such independent legal and factual inquiries and investigations as such Pledgor deemed necessary or desirable with respect to the ability of Borrower to honor all of Borrower's covenants and agreements which are secured hereby, and each Pledgor has relied solely on said independent inquiries and investigations preparatory to entering into this Agreement. Each Pledgor warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of their significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Pledgor otherwise may have against Borrower, Secured Party or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents

herein are determined to be contrary to any applicable law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

## ARTICLE 13
## MISCELLANEOUS

13.1 _Attorneys' Fees; Expenses_. Pledgors, jointly and severally, shall reimburse Secured Party for all attorneys' fees and expenses, and all other costs and expenses, arising from and after the date hereof, incurred by Secured Party in connection with the enforcement of Secured Party's rights under this Agreement and each of the other Loan Documents, including, without limitation, attorneys' fees and expenses and other costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements, and for enforcement of rights under any state or federal statute, including, without limitation, attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) in connection with seeking relief from stay in a bankruptcy proceeding. The term "expenses", as used in the preceding sentence, includes any expenses incurred by Secured Party in connection with any of the out-of-court, state, federal or bankruptcy proceedings referenced above, including but not limited to the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Secured Party in connection with any of those proceedings. Secured Party shall also be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. Pledgors will upon demand pay to Secured Party the amount of any and all expenses, including the fees and expenses of its counsel and of any experts and agents, which Secured Party may incur in connection with (a) the administration of this Agreement, (b) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (c) the exercise or enforcement of any of the rights of Secured Party hereunder, and/or (d) the failure by any Pledgor to perform or observe any of the provisions hereof. This provision is separate and severable and shall survive the merger of this Agreement into any judgment on this Agreement.

13.2 _Notices_. All notices and other communications to be given hereunder shall be given in the manner described in Section 11.6 of the Loan Agreement to the address (or fax number) of each party set forth on under their respective signatures to this Agreement.

13.3 _Time of Essence_. Time is hereby declared to be of the essence of this Agreement and of every part hereof.

13.4 _Statute of Limitations_. Each Pledgor hereby waives all rights to plead or assert at any time any statute of limitations as a defense or bar to any action or proceeding brought to enforce this Agreement or any obligations secured hereby.

13.5 _Continuing Security Interest; Revival of Security Interests_. This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Secured Obligations. Secured Party's rights and security interest hereunder shall be reinstated and revived, and the enforceability of this Agreement shall continue, with respect to any amount at any time paid on account of the Secured Obligations which thereafter shall be required to be restored or returned by Secured Party upon the

bankruptcy, insolvency or reorganization of Borrower, or any other person, all as though such amount had not been paid.

13.6  Entire Agreement; Waiver; Construction.  This Agreement, the Loan Agreement and the other Loan Documents and all instruments or documents delivered pursuant hereto or thereto, together with all exhibits thereto contain the entire understanding and agreement of the parties hereto with respect to the subject matter hereof. Each of the parties hereto acknowledges that no other party, or agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter hereof, to induce the other party to execute this instrument, and each party hereto acknowledges that it has not executed this instrument in reliance upon any such promise, representation, or warranty not contained herein.  This Agreement may not be altered or amended except by the written agreement of the parties hereto.  No provision of this Agreement or right of Secured Party hereunder can be waived, nor can any Pledgor be released from its obligations hereunder, except by a writing duly executed by Secured Party.  Each of the parties hereto hereby acknowledges that it has been represented by independent counsel of its own choice throughout all negotiations which have preceded the execution of this document and that it has received such consent and advice of said independent counsel regarding the execution and delivery of this Agreement as such party deemed necessary.  All parties and their respective counsel have cooperated in the drafting and preparation of this Agreement, such that it shall be deemed to be their joint work product and may not be construed against any party by reason of its preparation.

13.7  Security Interest Absolute.  Without limiting the operation of Article 12:  all rights of Secured Party and security interests hereunder, and all Secured Obligations of Pledgors hereunder, shall be absolute and unconditional irrespective of:

(a)  any lack of validity or enforceability of the Note, any other Loan Document or any other document or any other agreement or instrument relating thereto;

(b)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Note, any other Loan Document any other document or any other agreement or instrument relating thereto;

(c)  any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Secured Obligations; or

(d)  any other circumstance which might otherwise constitute a defense available to, or a discharge of, any Pledgor.

13.8  Binding on Successors.  This Agreement shall remain in full force and effect until each of the obligations hereby secured has been fully performed, and each of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no Pledgor may assign its rights hereunder or any interest herein without the prior written consent of Secured Party.  Secured Party may assign or otherwise transfer any Secured Obligation to any other Person (if applicable, in accordance

with the provisions of the Loan Agreement), and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Secured Party, herein or otherwise.

13.9    Severability.  Any provision in this Agreement that is held to be inoperative, unenforceable or invalid as to any party or in any jurisdiction shall, as to that party or jurisdiction, be inoperative, unenforceable or invalid without affecting the remaining provisions or the operation, enforceability or validity of that provision as to any other party or in any other jurisdiction, and to this end the provisions of this Agreement are declared to be severable.

13.10   Joint and Several Liability.  The obligations of Pledgors under this Agreement shall be joint and several.

13.11   Terminology.  Where the context or construction requires, all words applied in the plural shall be deemed to have been used in the singular and vice versa, the neuter shall include the masculine and feminine and, if "Pledgor", "Pledgors" or "Borrower" is comprised of more than one Person, all references to "Pledgor", "Pledgors" or "Borrower" shall mean each or any one or more of them unless the context clearly implies otherwise.  All terms used herein shall have the same meaning as in the provisions of the UCC.

13.12   Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered will be deemed to be an original and all of which counterparts of this Agreement when taken together will be deemed to be but one and the same instrument.

13.13   Headings.  The headings of the several paragraphs hereof are included only for the convenience of reference and are not intended to govern, construe or modify any provisions of the several paragraphs hereof.

13.14   Applicable Law.   This Agreement is to be governed by and construed in accordance with the laws of the State of Nevada without giving effect to any conflict of laws principles that would result in the application of the law of another jurisdiction, other than such principles as cannot be waived. Each Pledgor consents to the jurisdiction of any Federal or State Court within the State of Nevada as having proper venue and also consents to service of process by any means authorized by the laws of the State of Nevada or Federal law.

13.15   WAIVERS.

(i)     JURY WAIVER.  TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF SECURED PARTY'S AGREEMENT TO THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, PLEDGOR AND SECURED PARTY HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY SECURED PARTY OR PLEDGOR IN CONNECTION WITH THE LOAN AND/OR THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO A TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH INCLUDING, BUT NOT LIMITED TO THOSE

RELATING TO (A) ALLEGATIONS THAT A PARTNERSHIP EXISTS BETWEEN SECURED PARTY AND PLEDGOR; (B) USURY OR PENALTIES OR DAMAGES THEREFOR; (C) ALLEGATIONS OF UNCONSCIONABLE ACTS, DECEPTIVE TRADE PRACTICE, LACK OF GOOD FAITH OR FAIR DEALING, LACK OF COMMERCIAL REASONABLENESS, OR SPECIAL RELATIONSHIPS (SUCH AS FIDUCIARY, TRUST OR CONFIDENTIAL RELATIONSHIP); (D) ALLEGATIONS OF DOMINION, CONTROL, ALTER EGO, INSTRUMENTALITY, FRAUD, REAL ESTATE FRAUD, MISREPRESENTATION, DURESS, COERCION, UNDUE INFLUENCE, INTERFERENCE OR NEGLIGENCE; (E) ALLEGATIONS OF TORTIOUS INTERFERENCE WITH PRESENT OR PROSPECTIVE BUSINESS RELATIONSHIPS OR OF ANTITRUST; OR (F) SLANDER, LIBEL OR DAMAGE TO REPUTATION. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PLEDGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. SECURED PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY PLEDGOR.

(ii) ADDITIONAL WAIVERS. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION OF SECURED PARTY'S AGREEMENT TO THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, PLEDGOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY SECURED PARTY IN CONNECTION WITH THE LOAN AND/OR THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN, EXCEPT TO THE EXTENT THAT SAID COUNTERCLAIM MUST BE ASSERTED PURSUANT TO APPLICABLE LAW OR OTHERWISE BE BARRED FROM BEING ASSERTED IN ANY OTHER ACTION AND (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT PLEDGOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION WITH RESPECT TO ANY ASSERTED CLAIM.

13.16 No Third Parties Benefited. This Agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Pledgors and Secured Party in connection with the Loan, and is made for the sole protection of Pledgors, Secured Party, and Secured Party's successors and assigns. Except to the extent expressly provided in Section 12.4 with respect to Borrower's rights to enforce any Pledgor's waiver of its rights of subrogation, reimbursement, exoneration, contribution or setoff, no other Person shall have any rights of any nature hereunder or by reason hereof.

13.17 Further Assurances. Each Pledgor shall, at its expense and without expense to Secured Party do, execute and deliver such further acts and documents as Secured Party from time to time requires for the assuring and confirming unto Secured Party of the rights hereby created or intended now or hereafter so to be, or for carrying out the intention of facilitating the performance of the terms of this Agreement, or for assuring the validity, perfection, priority or enforceability of this Agreement.

13.18  Non Recourse.  Notwithstanding anything to the contrary, the Pledge by the Non-Managing Member shall be non recourse to the Non-Managing Member except to the extent that the Non-Managing Member impairs Secured Party's recourse to the Collateral owned by the Non-Managing Member.  Secured Party waives any recourse or claim against the Non-Managing Member other than Secured Party's rights to the Collateral owned by the Non-Managing Member upon an Event of Default or with respect to any claim of any kind arising from or relating to a representation or covenant made by (or other obligation arising from the execution of the Pledge Agreement) by such Managing Member or any Pledgor other than the Class Z Member or in connection with the Company's acknowledgement.

## ARTICLE 14
## AGREEMENT SUBJECT TO NEVADA GAMING LAWS

For purposes of this Agreement, "Nevada Gaming Authorities" means, collectively, the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, or any governmental agency of the State of Nevada or its political subdivisions that succeeds to the functions of such agencies.

Notwithstanding any term, condition, provision or requirement in this Agreement, the rights, obligations, remedies and effect of this Agreement shall be subject in all respects to the Nevada Gaming Authorities and their rules and regulations.  Secured Party acknowledges that, among other things, before it can exercise its rights and remedies set forth in this Agreement, Secured Party may have to obtain the consent of the Nevada Gaming Authorities to take the actions Secured Party deems necessary under the terms of this Agreement.

[signatures begin on following page]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

MANAGING MEMBER:

GIH-SPE I, LLC,
a Delaware limited liability company

By:   DI DEVELOPMENT GROUP, LLC,
       a Delaware limited liability company,
       its Managing Member

       By:   _____
       Name: _____
       Title:  _____

<u>Address for Notices:</u>

GIH-SPE II, LLC
c/o DI Development Group, LLC
260 W. 54th Street, 29J
New York, New York 10019
Attn.: Mr. Harold Rothstein
Facsimile: (412) 279-2870

with a copy to:

Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Attn.: Frank T. Cannone, Esq.
Facsimile: (973) 639-8340

**NON-MANAGING MEMBER:**

ECALV II LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

Address for Notices:

ECALV II LLC
One East Wacker Drive, Suite 3600
Chicago, Illinois 60601
Attention: Mr. John Marks
Facsimile No.: (312) 832-9111

with a copy to:

Holland & Knight LLP
131 South Dearborn Street, 30th Floor
Chicago, Illinois 60603
Attention: Elias N. Matsakis, Esq.
Facsimile: (312) 578-6666

Neither the absence of one or more acknowledgments of the signatures hereto, nor Secured Party's acceptance of this Agreement notwithstanding such absence, shall affect the validity of this Agreement.

SECURED PARTY:

CANPARTNERS REALTY HOLDING COMPANY IV
LLC,
a Delaware limited liability company

By:   Canyon Capital Realty Advisors LLC,
      a Delaware limited liability company


      By:      _____
      Name:    _____
      Title:   _____


<u>Address for Notices</u>:

Canpartners Realty Holding Company IV LLC
c/o Canyon Capital Realty Advisors
9665 Wilshire Boulevard
Beverly Hills, California 90212
Attention:    Mr. K. Robert Turner
              Mr. Jonathan P. Roth
Facsimile No.: (310) 247-8067

with a copy to:

Canpartners Realty Holding Company IV LLC
c/o Canyon Capital Realty Advisors
9665 Wilshire Boulevard
Beverly Hills, California 90212
Attention: Head of Asset Management
Facsimile No.: (310) 247-8067

# EXHIBIT 13

# OPTION TO PURCHASE PROPERTY

This Option to Purchase Property ("**Instrument**") is entered into this _____ day of _____, 2007, by and between GIH-SPE II, LLC, a Delaware limited liability company ("**Optionor**"), and ECALV I LLC, a Delaware limited liability company ("**Optionee**") for valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the recent conveyance to Optionor of the Real Property (defined below).

## RECITALS

A.      Convention Center Drive, LLC, a Nevada limited liability company ("**Seller**"), an affiliate of Optionee and, DI Development Group, LLC, a Delaware limited liability company ("**Buyer**"), an affiliate of Optionor, are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of April 24, 2007 (as amended, the "**Purchase Agreement**"), and Optionor and an affiliate of Optionee are parties to that certain Amended and Restated Turn-Key Lease Agreement dated _____, 2007 (the "**Lease**"). Pursuant to the Purchase Agreement, Seller has concurrently herewith conveyed to Optionor the real property described on Schedule A attached hereto and incorporated herein by this reference (the "**Real Property**") via deed recorded concurrently herewith in the Recorder's Office of Clark County, Nevada;

B.      The term "Optionor", as used herein, shall mean Optionor, its designees, successors in interest by way of merger, consolidation, business combination, recapitalization or similar transaction and shall include any entity which acquires substantially all of the assets of Optionor;

C.      Optionor has entered into a certain Loan Agreement dated July ___, 2007 ("**Senior Loan**"), with Canpartners Realty Holding Company IV, LLC (together with its successors and assigns, the "**Senior Lender**"), pursuant to which Optionor borrowed certain funds to purchase the Real Property; and

D.      Buyer formed Optionor to take title to the Real Property pursuant to the Purchase Agreement and to enter into this Instrument and the Senior Loan, and Buyer has formed GIH-SPE I, LLC, a Delaware limited liability company, to enter into the Mez Loan (as defined below); and Seller has consented to the financing and the assignment of Buyer's interest in the Purchase Agreement to Optionor in consideration of Optionor's entry into and performance of its obligations under this Instrument.

NOW, THEREFORE, the parties hereto agree as follows:

## AGREEMENT

1.      <u>Grant of Option</u>. Optionor hereby grants to Optionee an exclusive option (the "**Option**") to purchase the Real Property SUBJECT ONLY TO:

(a)      Current taxes and assessments.

(b)   Matters affecting title existing at the time the Option is granted.

(c)   Matters affecting title which are created, made, assumed, consented to or requested by Optionee, its successors or assigns, including but not necessarily limited to the Senior Loan.

(d)   Matters suffered, permitted or arising through the act of lessee or any sublessee under the Lease, or arising from a breach by the lessee of a covenant under the Lease.

2.   Conditions to Exercise. Subject to the earlier termination of the Option pursuant to Section 5 hereof, Optionee may exercise the Option upon the earlier of (either of the below being an "**Option Event**"):

(a)   The date Optionee receives written notice from Senior Lender of the acceleration or maturity of the Senior Loan, unless, in the case of acceleration, such acceleration arises from a breach or default of or by Optionee or any of its affiliates under the Lease, any management agreement for the Real Property, or the intercreditor agreement with Senior Lender; or

(b)   January 5, 2008 (time is of the essence as to both such dates in this Section 2).

Notwithstanding subsection (a) above, in the event the acceleration of the Senior Loan arises from a breach or default of or by Optionor, the lender under the Mez Loan (as defined in Section 3(a)) shall have the right to cure such breach or default pursuant to the provisions of its inter-creditor agreement with Senior Lender. In such event, if Optionor fails to reimburse the lender under the Mez Loan within three (3) business days from such lender's demand, an Option Event shall be deemed to have occurred.

3.   Exercise of Option. The Option shall be exercised by Optionee (if at all) by Optionee's written notice to Optionor at any time after the occurrence of an Option Event (but in any event prior to the termination of this Option pursuant to the terms herein), on the following terms:

(a)   Optionee shall assign to Optionor, without recourse, the promissory note (and all associated documents) under that certain mezzanine loan ("Mez Loan") entered into by Optionor in connection with, and at the time of, its purchase of the Real Property;

(b)   Optionee shall assign to Optionor the Class Z membership interests in Optionor (and all affiliates of Optionor), but such assignment is subject to the rights of Senior Lender under the Senior Loan and all related agreements between Optionor, its affiliates and Senior Lender;

(c)   Optionee shall cause the repayment or assumption of the Senior Loan, which amount of repayment or the outstanding amount of the Senior Loan, plus the outstanding balance under the Mez Loan, shall be deemed the "Purchase Price"; and

(d)   Optionor shall convey, by warranty deed, good and marketable and insurable title to the Real Property to Optionee.

Each of the actions described in the foregoing clauses (a) through (d) shall be completed by Optionee and Optionor on the Closing (as defined below).

4.   <u>Repurchase Process</u>.

(a)   <u>Opening of Escrow</u>. Concurrently with the exercise of the Option, Optionee shall deliver a copy of the written notice of exercise of the Option, together with a copy of this Instrument, to Nevada Title Company ("Escrow Holder"). Upon delivery of such documents to Escrow Holder, an escrow ("Escrow") for the repurchase of the Real Property shall be deemed to be opened. Upon exercise of the Option, Optionee shall cause the deposit of earnest money in an amount no less than Three Million Dollars US ($3,000,000.00) into a reserve with the Senior Lender if the Senior Loan is to be repaid in connection with the purchase, and otherwise such deposit shall be made with the Escrow Holder. Optionee and Optionor agree to be bound by the standard escrow General Provisions of Escrow Holder as in effect at such time and to execute and deliver to Escrow Holder the same. In the event of any discrepancy between this Instrument and such further instructions, the provisions of this Instrument shall prevail.

(b)   <u>Close of Escrow</u>. If Optionee timely notifies Optionor of Optionee's election to exercise the Option, then the closing of such repurchase transaction (the "Closing") shall take place within sixty (60) days after Optionee provides notice of that election, or within an additional sixty (60) days thereafter as may be required in the sole and reasonable discretion of Optionee. If Optionee exercises the Option, then Optionor agrees to convey the Real Property to Optionee or other party as provided herein in substantially the same physical condition as of the date of closing of the Real Property, except for improvements made thereto.

(c)   If Optionee gives written notice to Optionor that it does not elect to exercise the Option after an Option Event, or if Optionee fails to give written notice to Optionor within the time period(s) provided herein, then the Option shall nonetheless continue to be available to Optionee upon the occurrence of another Option Event, except as provided in Section 5 hereof.

(d)   The Closing shall be subject only to Escrow Holder's delivering to Optionee through Escrow an ALTA Standard Coverage Owner's Policy of Title Insurance (the "Title Policy") issued by Nevada Title Company (the "Title Company"), dated as of the Closing, insuring Optionee in an amount equal to the Purchase Price, showing title vested in Optionee as set forth in Section 1 above, and subject only to the same exceptions to title contained in the title policy received by Optionor upon its purchase of

the Real Property (Optionee may choose to accept additional exceptions to title in its sole discretion). Upon receipt of the Warranty Deed (as defined below) and the Purchase Price and provided Escrow Holder is then ready to deliver the Title Policy to Optionee and all other conditions contained herein have either been satisfied or waived, Escrow Holder shall cause the Warranty Deed to be recorded and shall deliver the Purchase Price (less appropriate charges) to Optionor. At the Closing, Optionor shall assign and/or deliver to Optionee at Closing the same items instruments (subject to commercially reasonable changes to such items over time) that were assigned and/or delivered from Optionee to Optionor related to the Real Property, including but not limited to the "Personal Property" and the "Intangible Property", as such terms are defined in the Purchase Agreement.

(e) <u>Escrow and Title Fees</u>. Optionee and Optionor shall each pay one-half (1/2) of the Escrow fees. Optionor shall bear the cost of (i) all documentary transfer taxes, (ii) the premium which would be required for the Title Policy if issued by Title Company insuring Optionee in the amount of the Purchase Price and (iii) the cost of recording the warranty deed for the Real Property and the Improvements thereon (the "**Warranty Deed**"). Optionor shall deposit the Warranty Deed into Escrow prior to the Closing. The Warranty Deed shall be in a form acceptable to Optionee, sufficient to convey good title to Optionee as required herein and adequate for the Title Company to deliver the Title Policy. All other costs or expenses not otherwise provided for in this Instrument shall be apportioned or allocated between Optionee and Optionor in the manner customary in Clark County, Nevada. If the Real Property is encumbered by a mortgage, deed of trust or other monetary encumbrance to which the Option is subordinate, Optionee shall instruct Escrow Holder to satisfy the indebtedness secured by such mortgage, deed of trust or other monetary encumbrance out of the proceeds payable to Optionor through Escrow.

(f) <u>Assumption of Mortgage or Deed of Trust</u>. With the consent of Senior Lender, Optionee may elect to assume rather than pay the Senior Loan debt secured by a mortgage or deed of trust on the Real Property, so long as Senior Lender releases Optionor and any pledgors of collateral for and any guarantors of the Senior Loan.

5. <u>Termination of Option</u>.

(a) Notwithstanding anything to the contrary set forth herein, the Option shall permanently cease to be available to Optionee upon the earlier of the following, each being a "**Termination Event**":

(i) May 31, 2017; or

(ii) the full payment and discharge of the Mez Loan.

(b) Upon the occurrence of a Termination Event, Optionor and Optionee shall immediately enter into a Notice of Termination of Option to Purchase ("Notice of Termination") in substantially the same form as Schedule C attached hereto, and shall record

same with the Office of the Clerk of Clark County, Nevada. If Optionee has failed to execute the Notice of Termination within ten (10) days of the Termination Event, Optionor may execute the Notice of Termination for and on behalf of Optionee as its attorney-in-fact. In acknowledgement thereof, Optionee hereby appoints Optionor as its irrevocable attorney-in-fact coupled with an interest solely to execute and deliver the Notice of Termination on behalf of Optionee.

6.    _Insolvency or Bankruptcy._ If at any time prior to expiration of the Option, Optionor shall become insolvent or generally fail to pay, or admit in writing its inability to pay, its debts as they become due or apply for, consent to, or acquiesce in the appointment of, a trustee, receiver or other custodian for any of its Real Property, or make a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Optionor, or for a substantial part of any of Optionor's Real Property and is not discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of Optionor, or any event shall occur similar to any of the foregoing under the laws of any jurisdiction, and if such case or proceeding is not commenced by Optionor, it is consented to or acquiesced in by Optionor or remains for thirty (30) days undismissed, then the Option may, in the sole discretion of Optionee, be treated as automatically exercised.

7.    _Successors and Assigns._ This Instrument shall be binding upon the successors in interest of Optionor.

8.    _Waiver, Consent and Remedies._ Either party may specifically and expressly waive in writing any portion of this Instrument or any breach hereof, but no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach of the same or any other provision. A waiving party may at any time thereafter require further compliance by the other party with any breach or provision so waived. The consent by one party to any act by the other for which such consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or any similar acts in the future. No waiver or consent shall be implied from silence or any failure of a party to act, except as otherwise specified in this Instrument. All rights, remedies, undertakings, obligations, options, covenants, conditions and agreements contained in this Instrument shall be cumulative and no one of them shall be exclusive of any other. Except as otherwise specified herein, Optionee may pursue any one or more of its rights, options or remedies hereunder or may seek damages or specific performance in the event of Optionor's breach hereunder, or may pursue any other remedy at law or equity, whether or not stated in this Instrument.

9.    _Attorneys' Fees._ In the event of any action or proceeding instituted between Optionee, Optionor and/or Escrow Holder in connection with this Instrument, then as between Optionor and Optionee the prevailing party shall be entitled to recover from the losing party all of its costs and expenses, including, without limitation, court costs, all costs of appeals and reasonable attorneys' fees.

10.    _Notices._ Any notices or other communications to be given or other documents to be delivered by any party to the other under this Instrument shall be delivered in the same

manner as provided in the Purchase Agreement. Any party hereto may from time to time, by written notice to the other, designate a different address that shall be substituted for the one above specified.

     11.    <u>Gender and Number</u>. In this Instrument (unless the context requires otherwise), the masculine, feminine and neuter genders and the singular and the plural shall be deemed to include one another, as appropriate.

     12.    <u>Entire Agreement</u>. This Instrument and its exhibits, together with that certain Option Subordination Agreement of even date herewith, by and among Senior Lender, Optionee and Optionor, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and the final, complete and exclusive expression of the terms and conditions thereof. All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written, express or implied, are hereby superseded and merged herein.

     13.    <u>Captions</u>. The captions used herein are for convenience only and are not apart of this Instrument and do not in any way limit or amplify the terms and provisions hereof.

     14.    <u>Governing Law</u>. This Instrument and the exhibits attached hereto have been negotiated and executed in the State of Nevada and shall be governed by and construed under the laws of the State of Nevada.

     15.    <u>Invalidity of Provision</u>. If any provision of this Instrument as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Instrument, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Instrument as a whole.

     16.    <u>Amendments</u>. No addition to or modification of any provision contained in this Instrument shall be effective unless fully set forth in writing by both Optionee and Optionor.

     17.    <u>Counterparts</u>. This Instrument may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

     18.    <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed and approved this Instrument and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Instrument or any amendments or exhibits hereto.

     19.    <u>Sale of Real Property by Optionee</u>. Notwithstanding anything to the contrary herein, the Option may be exercised directly by Optionee or in connection with a sale of the Real Property by Optionee to a third party with the net proceeds after payment of the Senior Loan (or its assumption by the Optionee with the consent of the Senior Lender) to be paid to Optionee.

20. **Actions by Optionor.** Except for the Senior Loan, any and all other agreements relative to the sale or development of the Real Property shall be subordinate to the Option described herein, and Optionor shall not take any action to affect the zoning or licensure of the Real Property without the written consent of Optionee. Optionor shall not take any action to circumvent the exercise of the Option upon or after the occurrence of an Option Event, and will indemnify and hold Optionee harmless from all loss, cost or expense, including attorneys' fees, relating to a breach of this covenant or a breach by Optionor of its obligations under this Instrument. Optionor shall not cause or permit any lien, encumbrance, or other interest to attach to the Real Property other than a lien, encumbrance or interest of the Senior Lender. Optionor shall not incur any debt other than as permitted by the Senior Lender.

21. **Covenants Running With The Land; Term.** The Real Property shall be held, developed, conveyed, hypothecated, encumbered, leased, rented, used and occupied subject to the covenants, conditions, restrictions and other limitations set forth in this Instrument (the "**Restrictions**"). The Restrictions are intended and shall be construed as covenants and conditions running with the Real Property. Notwithstanding anything to the contrary herein, prior to the occurrence of an Option Event, the Option granted herein shall terminate upon the full payment and discharge of the Mez Loan.

22. **Notice of Contract.** Optionee and Option shall record a notice of the existence of this Instrument with the Recorder's Office of Clark County, Nevada concurrently with the execution of this Option, in the form attached as Schedule B.

23. **Assignment of Instrument.** Unless at the time of, or subsequent to, the full payment and discharge of the Senior Loan, this Instrument may not be assigned without the written consent of Senior Lender.

24. **AGREEMENT SUBJECT TO NEVADA GAMING LAWS.** For purposes of this Instrument, "Nevada Gaming Authorities" means, collectively, the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, or any governmental agency of the State of Nevada or its political subdivisions that succeeds to the functions of such agencies. Notwithstanding any term, condition, provision or requirement in this Instrument, the rights, obligations, remedies and effect of this Instrument shall be subject in all respects to the Nevada Gaming Authorities and their rules and regulations. The parties herein acknowledge that, among other things, before they can exercise any rights and remedies set forth in this Instrument, they may have to obtain the consent of the Nevada Gaming Authorities to take the actions they deem necessary under the terms of this Instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have executed this Instrument as of the date first above written.

OPTIONOR:                     OPTIONEE:

GIH-SPE II, LLC             ECALV I LLC,
a Delaware limited liability company    a Delaware limited liability company

By:_____     By:_____
Name:_____    Name:_____
Its:_____     Its:_____

STATE OF _____  )
                 ) ss.
County of _____    )

The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by _____, as _____ of GIH-SPE II, LLC, LLC.

_____
Notary Public

My Commission Expires:

STATE OF _____  )
                 ) ss.
County of _____    )

The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by _____, as _____ of ECALV I LLC.

_____
Notary Public
My Commission Expires:

# SCHEDULE A

## LEGAL DESCRIPTION OF "REAL PROPERTY"

PARCEL 1:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 04°39'10" WEST ALONG THE EAST LINE OF SAID SECTION 9, A DISTANCE OF 702.66 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT DEED" TO WALTER S. HUNSAKER, ET UX, RECORDED MARCH 24, 1949 IN BOOK 59 OF DEEDS, PAGE 504 AS INSTRUMENT NO. 308745 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 89°05'00" WEST ALONG THE NORTH LINE OF SAID PARCEL OF LAND, 258.90 FEET TO A SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO CLIFFORD A. JONES, ET AL, RECORDED DECEMBER 4, 1951 IN BOOK 65, PAGE 461 OF DEEDS AS INSTRUMENT NO. 378222 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 00°11'23" EAST, 234.86 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE (80.00 FEET WIDE); THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 1237.25 FEET TO THE POINT OF BEGINNING, WHICH BEARS SOUTH 89°24'14" EAST, 100.00 FEET FROM THE NORTHWEST CORNER OF SAID JONES PARCEL; THENCE SOUTH 02°53'34" EAST PARALLEL WITH THE WEST LINE OF SAID JONES PARCEL, 277.78 FEET TO A POINT ON THE SOUTH LINE OF SAID JONES PARCEL; THENCE SOUTH 88°58'00" EAST ALONG THE SOUTH LINE OF SAID JONES PARCEL, 237.25 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO T.M. GRISS, ET UX, RECORDED FEBRUARY 13, 1952 IN BOOK 66 OF DEEDS, PAGE 26, AS INSTRUMENT NO. 380912 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE CONTINUING SOUTH 88°58'00" EAST ALONG THE NORTH LINE OF SAID GRISS PARCEL, 219.18 FEET TO THE NORTHEAST CORNER OF "DESERT INN CONDOMINIUMS" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 26, PAGE 86, IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE SOUTH 03°51'05" EAST ALONG THE EAST LINE OF SAID TRACT, 601.57 FEET TO A POINT BEING 50.00 FEET NORTH OF THE SOUTH LINE OF SAID SECTION 9, AND BEING ON THE NORTHERLY RIGHT OF WAY LINE OF DESERT INN ROAD (90.00 FEET WIDE); THENCE SOUTH 89°06'04" EAST ALONG SAID RIGHT OF WAY LINE, 127.16 FEET; THENCE CURVING TO THE LEFT ALONG A 25.0 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 95°11'28", AN ARC LENGTH OF 41.53 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEBBIE REYNOLDS DRIVE, FORMERLY KNOWN AS MEL DRIVE (VARYING WIDTH); THENCE ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING THREE (3) COURSES, NORTH 04°17'32" WEST, 212.70 FEET TO AN ANGLE PONT IN

SAID RIGHT OF WAY LINE; THENCE NORTH 03°16'28" WEST, 361.01 FEET TO A POINT ON THE SOUTH LINE OF THE AFOREMENTIONED JONES PARCEL; THENCE NORTH 02°14'14" WEST, 268.01 FEET; THENCE CURVING TO THE LEFT ALONG A 15.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 87°10'00", AN ARC LENGTH OF 22.82 FEET TO A POINT ON THE AFOREMENTIONED SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE; THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 601.44 FEET TO THE POINT OF BEGINNING. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY IN A DEED RECORDED SEPTEMBER 2, 1993 IN BOOK 930902 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00213, AND DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTH QUARTER CORNER (S ¼ COR.) OF SAID SECTION 9; THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION, SOUTH 89°21'56" EAST, 1691.65 FEET; THENCE NORTH 03°51'05" WEST (RECORD NORTH 04°06'59" WEST) 50.17 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL, BEING THE TRUE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID PARCEL, NORTH 3°51'05" WEST (RECORD NORTH 4°06'59" WEST), 15.02 FEET, THENCE SOUTH 89°06'04" EAST A DISTANCE OF 127.04 FEET (RECORD SOUTH 89°21'56" EAST, 127.03 FEET) TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°12'00" AN ARC LENGTH OF 41.54 FEET (CHORD NORTH 43°02'04" EAST 36.92 FEET) TO A POINT OF TANGENCY ON THE WEST RIGHT OF WAY LINE OF MEL AVENUE; THENCE ALONG SAID LINE SOUTH 04°33'56" EAST, 15.06 FEET TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°21'00", AN ARC LENGTH OF 41.54 FEET (CHORD SOUTH 43°02'04" WEST, 36.92 FEET) TO A POINT OF TANGENCY ON THE NORTH RIGHT OF WAY LINE OF DESERT INN ROAD; THENCE ALONG SAID LINE NORTH 89°21'56" WEST, 127.14 FEET TO THE TRUE POINT OF BEGINNING. ALSO EXCEPTING THEREFROM THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M. CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE

SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING. THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75 FEET; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

# SCHEDULE B

## NOTICE OF OPTION

(Attached)

Assessor's Parcel Nos.:
162-09-805-015
162-09-805-016


When recorded, return to:

ECALV I LLC
c/o Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801


## NOTICE OF OPTION TO PURCHASE

THIS NOTICE OF OPTION TO PURCHASE ("Purchase Option") is made this ____ day of July, 2007, between **ECALV I LLC**, a Delaware limited liability company ("Optionee"), and **GIH-SPE II**, a Delaware limited liability company ("Optionor").

## WITNESSETH

WHEREAS, Optionee and Optionor have entered into an Option to Purchase Property ("Purchase Option") dated July ___, 2007, with respect to the property at 305 Convention Center Drive, Las Vegas, Nevada (the "Property"), which Property is legally described in Exhibit A attached hereto and made a part hereof.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants, and conditions hereinafter set forth and in the Purchase Option, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Optionee and Optionor hereby enter into this:

## NOTICE OF OPTION TO PURCHASE

1.      This Option to Purchase has been executed and delivered by Optionee and Optionor for the purpose of recording and giving notice that Optionee shall have the option to purchase the Property and all improvements thereon as more fully described in the Purchase Option.

2.      This Option to purchase shall be recorded immediately after the date first above written and is intended for notice purposes. References must be made to the Purchase Option for the full terms and provisions thereof.

IN WITNESS WHEREOF, Optionee and Optionor have caused this Option to Purchase to be executed as of the date and year first above written.

**OPTIONOR:**

GIH-SPE II, LLC
a Delaware limited liability company

By:_____
Name:_____
Its:_____

**OPTIONEE:**

ECALV I LLC,
a Delaware limited liability company

By:_____
Name:_____
Its:_____

STATE OF _____       )
                             ) SS:
COUNTY OF _____     )

     I, _____, a Notary Public in and for the above State and County, do hereby certify that _____, of GIH-SPE II, LLC, a Delaware limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____, appeared before me this day in person and executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the company, for the uses and purposes set forth in the instrument.

     **IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal on the day and year set forth above.

**My commission expires:**          _____
[SEAL]                             Notary Public


STATE OF _____       )
                             ) SS:
COUNTY OF _____     )

     I, _____, a Notary Public in and for the above State and County, do hereby certify that _____, of ECALV I LLC, a Delaware limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____, appeared before me this day in person and executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of the corporation, for the uses and purposes set forth in the instrument.

     **IN TESTIMONY WHEREOF,** I have subscribed my signature and affixed my official seal, on the day and year set forth above.

**My commission expires:**          _____
[SEAL]                             Notary Public

LEGAL DESCRIPTION

PARCEL 1:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 04°39'10" WEST ALONG THE EAST LINE OF SAID SECTION 9, A DISTANCE OF 702.66 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT DEED" TO WALTER S. HUNSAKER, ET UX, RECORDED MARCH 24, 1949 IN BOOK 59 OF DEEDS, PAGE 504 AS INSTRUMENT NO. 308745 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 89°05'00" WEST ALONG THE NORTH LINE OF SAID PARCEL OF LAND, 258.90 FEET TO A SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO CLIFFORD A. JONES, ET AL, RECORDED DECEMBER 4, 1951 IN BOOK 65, PAGE 461 OF DEEDS AS INSTRUMENT NO. 378222 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 00°11'23" EAST, 234.86 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE (80.00 FEET WIDE); THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 1237.25 FEET TO THE POINT OF BEGINNING, WHICH BEARS SOUTH 89°24'14" EAST, 100.00 FEET FROM THE NORTHWEST CORNER OF SAID JONES PARCEL; THENCE SOUTH 02°53'34" EAST PARALLEL WITH THE WEST LINE OF SAID JONES PARCEL, 277.78 FEET TO A POINT ON THE SOUTH LINE OF SAID JONES PARCEL; THENCE SOUTH 88°58'00" EAST ALONG THE SOUTH LINE OF SAID JONES PARCEL, 237.25 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO T.M. GRISS, ET UX, RECORDED FEBRUARY 13, 1952 IN BOOK 66 OF DEEDS, PAGE 26, AS INSTRUMENT NO. 380912 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE CONTINUING SOUTH 88°58'00" EAST ALONG THE NORTH LINE OF SAID GRISS PARCEL, 219.18 FEET TO THE NORTHEAST CORNER OF "DESERT INN CONDOMINIUMS" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 26, PAGE 86, IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE SOUTH 03°51'05" EAST ALONG THE EAST LINE OF SAID TRACT, 601.57 FEET TO A POINT BEING 50.00 FEET NORTH OF THE SOUTH LINE OF SAID SECTION 9, AND BEING ON THE NORTHERLY RIGHT OF WAY LINE OF DESERT INN ROAD (90.00 FEET WIDE); THENCE SOUTH 89°06'04" EAST ALONG SAID RIGHT OF WAY LINE, 127.16 FEET; THENCE CURVING TO THE LEFT ALONG A 25.0 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 95°11'28", AN ARC LENGTH OF 41.53 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEBBIE REYNOLDS DRIVE, FORMERLY KNOWN AS MEL DRIVE (VARYING WIDTH); THENCE ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING

THREE (3) COURSES, NORTH 04°17'32" WEST, 212.70 FEET TO AN ANGLE PONT IN SAID RIGHT OF WAY LINE; THENCE NORTH 03°16'28" WEST, 361.01 FEET TO A POINT ON THE SOUTH LINE OF THE AFOREMENTIONED JONES PARCEL; THENCE NORTH 02°14'14" WEST, 268.01 FEET; THENCE CURVING TO THE LEFT ALONG A 15.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 87°10'00", AN ARC LENGTH OF 22.82 FEET TO A POINT ON THE AFOREMENTIONED SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE; THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 601.44 FEET TO THE POINT OF BEGINNING. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY IN A DEED RECORDED SEPTEMBER 2, 1993 IN BOOK 930902 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00213, AND DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTH QUARTER CORNER (S ¼ COR.) OF SAID SECTION 9; THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION, SOUTH 89°21'56" EAST, 1691.65 FEET; THENCE NORTH 03°51'05" WEST (RECORD NORTH 04°06'59" WEST) 50.17 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL, BEING THE TRUE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID PARCEL, NORTH 3°51'05" WEST (RECORD NORTH 4°06'59" WEST), 15.02 FEET, THENCE SOUTH 89°06'04" EAST A DISTANCE OF 127.04 FEET (RECORD SOUTH 89°21'56" EAST, 127.03 FEET) TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°12'00" AN ARC LENGTH OF 41.54 FEET (CHORD NORTH 43°02'04" EAST 36.92 FEET) TO A POINT OF TANGENCY ON THE WEST RIGHT OF WAY LINE OF MEL AVENUE; THENCE ALONG SAID LINE SOUTH 04°33'56" EAST, 15.06 FEET TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°21'00", AN ARC LENGTH OF 41.54 FEET (CHORD SOUTH 43°02'04" WEST, 36.92 FEET) TO A POINT OF TANGENCY ON THE NORTH RIGHT OF WAY LINE OF DESERT INN ROAD; THENCE ALONG SAID LINE NORTH 89°21'56" WEST, 127.14 FEET TO THE TRUE POINT OF BEGINNING. ALSO EXCEPTING THEREFROM THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M. CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH

89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING. THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75 FEET; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

# SCHEDULE C

## NOTICE OF TERMINATION OF OPTION

(Attached)

Assessor's Parcel Nos.:
162-09-805-015
162-09-805-016


When recorded, return to:

Ivette P. Alvarado, Esq.
Gibbons P.C.
One Gateway Center
Newark, N.J. 07102-5310


## TERMINATION AND DISCHARGE OF PURCHASE OPTION
## AND NOTICE OF OPTION TO PURCHASE

THIS TERMINATION AND DISCHARGE OF PURCHASE OPTION
AND NOTICE OF OPTION TO PURCHASE (the "Agreement") is made this _____ day of
_____, 20____, by and between GIH-SPE II, LLC, a Delaware limited liability company
("Optionor"), and ECALV I LLC, a Delaware limited liability company ("Optionee").

R E C I T A L S:

A. On July _____, 2007, Optionor and Optionee entered into that certain Option to
Purchase Property (the "Purchase Option") for certain property located at 305 Convention Center
Drive, Las Vegas, Clark County, Nevada, as more particularly described on Exhibit A attached
hereto (the "Premises").

B. On July _____, 2007, Optionor and Optionee entered into a Notice of Option to
Purchase, which was recorded in the Office of the Clerk of Clark County, Nevada on
_____, in Book _____, Page _____.

C. Optionor and Optionee now wish to terminate the Purchase Option and discharge the
Notice of Option.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and
for other good and valuable consideration, the receipt and legal sufficiency of which are hereby
acknowledged by each party hereto, Optionor and Optionee agree as follows:

1. Both the Purchase Option and the Notice of Option shall be null and void and of
no further force and effect as of the date of this Agreement.

2.   Optionor and Optionee do hereby direct the Clerk of Clark County, Nevada to discharge the Purchase Option and Notice of Option, as they are now canceled and void.

3.   This Agreement shall inure to the benefit of and bind the successors and assigns of the respective parties.

4.   Each of the parties signing this Agreement warrant to the other that they have full power and authority to execute this Agreement and that the Optionor and Optionee, as the case may be, shall be bound by the terms hereof.

5.   This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same agreement. The signature of a party to any counterpart may be attached to any other counterpart.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

Witness/Attest:                                         **OPTIONOR:**

By:_____         GIH-SPE II, LLC
Name:
Title:

                                             By:_____
                                           Name:
                                           Title:

Witness/Attest:                                         **OPTIONEE:**

By:_____         ECALV I LLC
Name:
Title:

                                             By:_____
                                           Name:
                                           Title:

STATE OF _____ )
                              ) ss.
COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by _____, as _____ of GIH-SPE II, LLC.


_____
Notary Public

My Commission Expires:


STATE OF _____ )
                              ) ss.
COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by _____, as _____ of ECALV I LLC.


_____
Notary Public

My Commission Expires:

<u>EXHIBIT A</u>

<u>DESCRIPTION OF PREMISES</u>

PARCEL 1:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 04°39'10" WEST ALONG THE EAST LINE OF SAID SECTION 9, A DISTANCE OF 702.66 FEET TO THE NORTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT DEED" TO WALTER S. HUNSAKER, ET UX, RECORDED MARCH 24, 1949 IN BOOK 59 OF DEEDS, PAGE 504 AS INSTRUMENT NO. 308745 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 89°05'00" WEST ALONG THE NORTH LINE OF SAID PARCEL OF LAND, 258.90 FEET TO A SOUTHEAST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO CLIFFORD A. JONES, ET AL, RECORDED DECEMBER 4, 1951 IN BOOK 65, PAGE 461 OF DEEDS AS INSTRUMENT NO. 378222 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE NORTH 00°11'23" EAST, 234.86 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE (80.00 FEET WIDE); THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 1237.25 FEET TO THE POINT OF BEGINNING, WHICH BEARS SOUTH 89°24'14" EAST, 100.00 FEET FROM THE NORTHWEST CORNER OF SAID JONES PARCEL; THENCE SOUTH 02°53'34" EAST PARALLEL WITH THE WEST LINE OF SAID JONES PARCEL, 277.78 FEET TO A POINT ON THE SOUTH LINE OF SAID JONES PARCEL; THENCE SOUTH 88°58'00" EAST ALONG THE SOUTH LINE OF SAID JONES PARCEL, 237.25 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED BY "CORPORATION GRANT, BARGAIN, SALE DEED" TO T.M. GRISS, ET UX, RECORDED FEBRUARY 13, 1952 IN BOOK 66 OF DEEDS, PAGE 26, AS INSTRUMENT NO. 380912 IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE CONTINUING SOUTH 88°58'00" EAST ALONG THE NORTH LINE OF SAID GRISS PARCEL, 219.18 FEET TO THE NORTHEAST CORNER OF "DESERT INN CONDOMINIUMS" AS SHOWN BY MAP THEREOF ON FILE IN BOOK 26, PAGE 86, IN THE CLARK COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE SOUTH 03°51'05" EAST ALONG THE EAST LINE OF SAID TRACT, 601.57 FEET TO A POINT BEING 50.00 FEET NORTH OF THE SOUTH LINE OF SAID SECTION 9, AND BEING ON THE NORTHERLY RIGHT OF WAY LINE OF DESERT INN ROAD (90.00 FEET WIDE); THENCE SOUTH 89°06'04" EAST ALONG SAID RIGHT OF WAY LINE, 127.16 FEET; THENCE CURVING TO THE LEFT ALONG A 25.0 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 95°11'28", AN ARC LENGTH OF 41.53 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEBBIE REYNOLDS DRIVE, FORMERLY KNOWN AS MEL DRIVE (VARYING WIDTH); THENCE ALONG SAID RIGHT OF WAY LINE, THE FOLLOWING THREE (3) COURSES, NORTH 04°17'32" WEST, 212.70 FEET TO AN ANGLE PONT IN SAID RIGHT OF WAY LINE; THENCE NORTH 03°16'28" WEST, 361.01 FEET TO A POINT ON THE SOUTH LINE OF THE AFOREMENTIONED JONES PARCEL; THENCE

NORTH 02°14'14" WEST, 268.01 FEET; THENCE CURVING TO THE LEFT ALONG A 15.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 87°10'00", AN ARC LENGTH OF 22.82 FEET TO A POINT ON THE AFOREMENTIONED SOUTHERLY RIGHT OF WAY LINE OF CONVENTION CENTER DRIVE; THENCE NORTH 89°24'14" WEST ALONG SAID RIGHT OF WAY LINE 601.44 FEET TO THE POINT OF BEGINNING. EXCEPTING THEREFROM THAT PORTION AS CONVEYED TO CLARK COUNTY IN A DEED RECORDED SEPTEMBER 2, 1993 IN BOOK 930902 OF OFFICIAL RECORDS, CLARK COUNTY, NEVADA RECORDS AS DOCUMENT NO. 00213, AND DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTH QUARTER CORNER (S ¼ COR.) OF SAID SECTION 9; THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER (SE ¼) OF SAID SECTION, SOUTH 89°21'56" EAST, 1691.65 FEET; THENCE NORTH 03°51'05" WEST (RECORD NORTH 04°06'59" WEST) 50.17 FEET TO THE SOUTHWEST CORNER OF SAID PARCEL, BEING THE TRUE POINT OF BEGINNING; THENCE ALONG THE WEST LINE OF SAID PARCEL, NORTH 3°51'05" WEST (RECORD NORTH 4°06'59" WEST), 15.02 FEET, THENCE SOUTH 89°06'04" EAST A DISTANCE OF 127.04 FEET (RECORD SOUTH 89°21'56" EAST, 127.03 FEET) TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°12'00" AN ARC LENGTH OF 41.54 FEET (CHORD NORTH 43°02'04" EAST 36.92 FEET) TO A POINT OF TANGENCY ON THE WEST RIGHT OF WAY LINE OF MEL AVENUE; THENCE ALONG SAID LINE SOUTH 04°33'56" EAST, 15.06 FEET TO A POINT OF CURVATURE; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 25.00 FEET THROUGH A CENTRAL ANGLE OF 95°21'00", AN ARC LENGTH OF 41.54 FEET (CHORD SOUTH 43°02'04" WEST, 36.92 FEET) TO A POINT OF TANGENCY ON THE NORTH RIGHT OF WAY LINE OF DESERT INN ROAD; THENCE ALONG SAID LINE NORTH 89°21'56" WEST, 127.14 FEET TO THE TRUE POINT OF BEGINNING. ALSO EXCEPTING THEREFROM THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.M. CLARK COUNTY, NEVADA DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9; THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET; THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET; THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69 FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25 FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34" WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH 89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET; THENCE SOUTH 89°30'34" EAST, 4.75; THENCE NORTH 00°29'26" EAST, 7.60 FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST, 6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26" WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH 00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF THE SOUTHEAST QUARTER (SE ¼) OF SECTION 9, TOWNSHIP 21
SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA DESCRIBED AS
FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 9;
THENCE NORTH 89°06'04" WEST, ALONG THE SOUTH LINE THEREOF, 863.25 FEET;
THENCE NORTH 04°17'32" WEST, DEPARTING SAID SOUTH LINE, 651.78 FEET;
THENCE NORTH 88°58'00" WEST, 3.63 FEET; THENCE NORTH 02°14'14" WEST, 250.69
FEET; THENCE SOUTH 87°45'46" WEST, 152.35 FEET TO THE POINT OF BEGINNING.
THENCE SOUTH 00°29'26" WEST, 9.90 FEET; THENCE NORTH 89°30'34" WEST, 3.25
FEET; THENCE SOUTH 00°29'26" WEST, 84.00 FEET; THENCE SOUTH 89°30'34" EAST,
10.60 FEET; THENCE SOUTH 00°29'26" WEST, 19.85 FEET; THENCE NORTH 89°30'34"
WEST, 168.20 FEET; THENCE NORTH 00°29'26" EAST, 26.90 FEET; THENCE NORTH
89°30'34" WEST, 11.97 FEET; THENCE NORTH 00°29'26" EAST, 81.80 FEET; THENCE
SOUTH 89°30'34" EAST, 29.40 FEET; THENCE SOUTH 00°29'26" WEST, 8.50 FEET;
THENCE SOUTH 89°30'34" EAST, 4.75 FEET; THENCE NORTH 00°29'26" EAST, 7.60
FEET; THENCE SOUTH 89°30'34" EAST, 10.60 FEET; THENCE NORTH 00°29'26" EAST,
6.00 FEET; THENCE SOUTH 89°30'34" EAST, 91.22 FEET; THENCE SOUTH 00°29'26"
WEST, 15.10 FEET; THENCE SOUTH 89°30'34" EAST, 4.40 FEET; THENCE NORTH
00°29'26" EAST, 5.30 FEET; THENCE SOUTH 89°30'34" EAST, 13.65 FEET; THENCE
NORTH 00°29'26" EAST, 9.90 FEET; THENCE SOUTH 89°30'34" EAST, 18.80 FEET TO
THE TRUE POINT OF BEGINNING.

# EXHIBIT B

## ASSIGNMENT AND ASSUMPTION OF LEASES, MANAGEMENT AGREEMENT AND ASSIGNMENT OF INTELLECTUAL PROPERTY AND SERVICE AGREEMENTS

(Attached)

# ASSIGNMENT AND ASSUMPTION OF LEASES, MANAGEMENT AGREEMENT AND ASSIGNMENT OF INTELLECTUAL PROPERTY AND SERVICE AGREEMENTS

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND ASSIGNMENT OF INTELLECTUAL PROPERTY AND SERVICE AGREEMENTS (this "Assignment") dated as of the ____ day of _____, 2007 ("Transfer Date"), is made and entered into by and between **CONVENTION CENTER DRIVE, LLC**, a Nevada limited liability company ("Assignor"), and **GIH-SPE II, LLC**, a Delaware limited liability, ("Assignee").

## WITNESSETH:

WHEREAS, Assignor is the lessor under those certain leases executed with respect to the ownership and operation of that certain real property located in the County of Clark, State of Nevada (the "Property"), more particularly described on Schedule 1 attached hereto (the "Leases") and whereas Assignor has entered into certain service agreements in the ordinary course of Assignor's business ("Service Agreements").

WHEREAS, Assignor desires to assign its interest in and to the Leases to Assignee as of the date on which title to the Property is vested in Assignee (the "Transfer Date"), and Assignee desires to accept the assignment thereof and assume Assignor's obligations thereunder with respect to the period from and after the Transfer Date.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties hereby agree as follows:

1. <u>Assignment of Leases, Service Agreements and Management Agreement</u>. As of the Transfer Date, Assignor hereby assigns to Assignee all of its right, title and interest in and to the Leases, the Service Contracts and to the Management Agreement with Mark IV Hospitality, Inc..

2. <u>Representations and Warranties</u>. Assignor warrants and represents that as of the Transfer Date, the Leases are the only lease or occupancy agreements affecting the Property and there are no assignments of or agreements to assign the Leases to any other party.

3. <u>Assumption by Assignee of Leases, Service Contracts and Management Agreement and Indemnification of Assignor</u>. Assignee, as of the Transfer Date, hereby accepts the foregoing assignment and assumes all of the lessor's obligations under the Leases described in Schedule 1 and all obligations of Assignor under the Service Contracts and the Management Agreement with respect to the period from and after the Transfer Date. Assignee hereby agrees to indemnify, defend and hold harmless Assignor from and against any and all losses and liabilities arising out of the lessor's obligations under the Leases described in Schedule 1, and all obligations of Assignor relative to the Service Agreements and the Management Agreement with respect to the period from and after the Transfer Date, except for losses and liabilities on account of any fact or circumstance occurring or existing prior to the Transfer Date. Assignor hereby agrees to indemnify, defend and hold harmless Assignee from and against any and all losses and liabilities arising out of the lessor's obligations under the Leases described in Schedule 1, and all

obligations of Assignor relative to the Service Agreements and the Management Agreement with respect to the period prior to the Transfer Date.

4.    Disputes.  In the event of any litigation between Assignor and Assignee arising out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses in such litigation, including, without limitation, reasonable attorneys' fees and expenses.   In addition to the foregoing award of attorneys' fees and expenses to the prevailing party, the prevailing party in any lawsuit on this Agreement shall be entitled to its reasonable attorneys' fees and expenses incurred in any post judgment proceedings to collect or enforce the judgment.  This provision is separate and several and shall survive the merger of this Assignment into any judgment on this Assignment.

5.    Successors.  This Assignment shall be binding on and inure to the benefit of the parties herein, their heirs, executors, administrators, successors-in-interest and assigns.

6.    Counterparts.  This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same agreement.

7.    No Waiver.  Nothing contained herein shall be deemed or construed as relieving the Assignor or Assignee of their respective duties and obligations under any other agreements between them.

8.    Assignment of Intellectual Property.  Assignor hereby assigns all of Assignors right, title and interest, if any, in and to (a) the Service Contracts, and all books and records relating to the Real Property and/or the Personal Property and all right, title and interest to the website relating to the Property; (b) all transferable business licenses (other than gaming), architectural, site, landscaping or other permits, applications, approvals, authorizations and other entitlements affecting any portion of the Real and/or Personal Property; and (c) all transferable guarantees, warranties and utility contracts relating to all or any portion of the Real Property.  All capitalized terms will have the meaning set forth in that certain Amended and Restated Turn-Key Lease Agreement dated July ___ between Assignor and Assignee.

[EXECUTION PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

ASSIGNEE:                                    ASSIGNOR:
**GIH-SPE II, LLC,**                         **Convention Center Drive Hotel & Casino,**
a Delaware limited liability                 **LLC,**
                                             a Nevada Limited Liability Company

By:_____

   Its:_____        By:_____

                                                Its:_____


STATE OF _____ )
                 ) ss.
County of _____ )


      The foregoing instrument was acknowledged before me this ____ day of _____, 2007, by _____, as _____ of GIH-SPE II, LLC.

<div align="center">Notary Public</div>

My Commission Expires:


STATE OF _____ )
                 ) ss.
County of _____ )


      The foregoing instrument was acknowledged before me this ____ day of _____, 2007, by _____, as _____ of Convention Center Drive Hotel & Casino, LLC.

<div align="center">Notary Public</div>

My Commission Expires:

## SCHEDULE 1

## SPACE LEASES

1.  Hotel Accommodation Agreement dated October 29, 2004 by and between British Midland Airways Limited and Seller, as amended

2.  Hotel Room Agreement dated August 2, 2006 by and between Seller and Delta Air Lines, Inc. (Delta Air Lines, Inc. filed for Chapter 11 Bankruptcy)

3.  Space Lease dated September 2, 2005 by and between Seller and United Coin Machine Co.

4.  Agreement dated September 15, 2006 by and between Seller and Vegas Chapels LLC

5.  Housing Agreement dated September 1, 2006 by and between Seller and Continental Airlines, Inc. (pending)

6.  Entertainment/Showroom Agreement dated October 1, 2006 by and between Seller and TRP Entertainment, LLC

7.  Agreement for the Provision of Hotel Rooms last executed on March 27, 2007, between MyTravel Airline Services Limited and Greek Isles Hotel & Casino

8.  Other airline and occupancy agreements

EXHIBIT C

IP LICENSE

(Attached)

## SERVICE MARK AND DOMAIN NAME
## LICENSE AGREEMENT

This SERVICE MARK AND DOMAIN NAME LICENSE AGREEMENT ("Agreement") is made this _____ day of _____, 2007, by and between **Mark IV Realty Group, Inc.**, an Illinois corporation ("Licensor") and **GIH-SPE II, LLC**, a Delaware limited liability company ("Licensee").

## RECITALS

WHEREAS Licensor is the owner of certain service mark registrations and domain names set forth on **Schedule A** attached hereto and made a part hereof ("**Marks and Names**") that were orally licensed to its affiliate Convention Center Drive Hotel & Casino, LLC, a Nevada Limited Liability Company ("**Oral License**") and used in connection with the operation of Greek Isles Hotel and Casino, located in Las Vegas, Nevada (the "Hotel"); and

WHEREAS the Oral License will terminate upon the termination of that certain Amended and Restated Turn-Key Lease Agreement between Licensee and Convention Center Drive Hotel & Casino, LLC, and Licensor and Licensee have agreed to the terms and conditions set forth within this Agreement so as to permit Licensor to license the Marks and Names to Licensee; and

WHEREAS, Licensee desires to have the exclusive use of the Marks and Names in connection with the operation of the Hotel; and

WHEREAS, Licensor has agreed to license the Marks and Names exclusively to Licensee for use in hotel operations in Nevada;

NOW THEREFORE, for mutual consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, the parties covenant and agree as follows:

1. **Grant of License.**

A. **Grant.** Licensor hereby grants to Licensee, subject to the provisions hereof, a personal, non-transferable and exclusive license to use the Marks and Names as a trade, corporate, and service marks for the Licensee to use in connection with the operation of the Hotel (the "**Business**"). All common law, state and federal rights, including all service mark registrations relating to said Marks and Names shall be and remain the property of Licensor. Licensor warrants that to the best of its knowledge and belief Licensor owns all rights to the Marks and Names and that its prior Oral License has terminated. Nothing contained in this Agreement shall be construed as an assignment to Licensee of any right, title, or interest in or to the Names and Marks, it being understood and acknowledged by Licensee that all rights and goodwill relating thereto are reserved by Licensor except for the license granted hereunder to Licensee.

B.   **Reservation.**  Licensee reserves the right to use other trade names, trademarks, or service marks apart from the Marks and Names.  Nothing set forth in this Agreement shall be deemed to prevent or inhibit Licensee from exercising that right.  It is understood that the object of this Agreement is to allow Licensor to control the use of the Marks and Names.

2.   **Territory.**  The Agreement herein granted shall be for the geographic area of the State of Nevada..

3.   **Product and Service Promotion.**  Licensee shall be permitted to promote, advertise and otherwise publicly comment on the Marks and Names in connection with the Business, subject to the terms and conditions set forth herein.

4.   **Quality Standards.**  Licensee agrees to operate the Hotel at the same standards as have been set in each and every commercial agreement with any airline and otherwise on the same level of service as were applicable to operations of the Hotel prior to Licensee's purchase of the Hotel and Licensor may from time to time establish service standards consistent with past practice in the Hotel's operation and any applicable agreement with an airline, in order to maintain quality standards for the licensed use of its Marks and Names for the protection of the image projected by Licensee to the community.  Licensee agrees to maintain its future operations of the Hotel in accordance with such standards so long as the Hotel uses the Marks and Names. Licensor shall have the right to inspect and approve Licensee's use of the Marks and Names.

5.   **Identification of Marks.**  The Marks when used as a trademark or service mark (not as a corporate name) shall be appropriately identified in any print or writing as federal registered service marks.

6.   **Term.**  The initial term of this Agreement shall be for eighteen (18) months.  The Licensee shall have the right to renew this Agreement for an additional, one (1) year term in consideration of $100,000.00 by giving written notice, simultaneously with said consideration, to Licensor at least ninety (90) days prior to the expiration of the initial term.  Upon expiration of this Agreement, Licensee agrees, within ten (10) days after said expiration, at its sole cost and expense, to remove all signage or other public references from the Hotel which contains the Marks and Names.

7.   **Termination.**  Licensor shall have the right to terminate this Agreement at any time prior to its expiration upon written notice to Licensee if Licensee shall (1) fail to uphold Licensor's quality standards for the licensed use of its, (2) use the Marks and Names in an illegal manner, or (3) otherwise fail to perform or comply with any term, condition, or standard set forth in this Agreement and if such failure shall continue for a period of ten (10) days after written notice of such failure is sent by Licensor to Licensee.  In addition, this Agreement shall terminate on the 30th day following the date upon which Licensee ceases operations of the Hotel except if such Hotel operations cease as a result of a casualty or act of force majeure and Licensee serves notice to Licensor within 30 days of such event of Licensee's intent to reopen and diligently pursues repair and reopening of the Hotel within 120 days.

8.    **Indemnification**.    Licensee shall be solely responsible for and defend and indemnify Licensor, its affiliates, and the officers, directors and employees of the foregoing ("Indemnitees") and hold Indemnitees harmless from any and all claims, demands, causes of action, damages, costs, and expenses whatsoever arising directly or indirectly from or out of Licensee's use of the Licensed Marks and Names, advertising, promotion, use or misuse of the Marks or Names or otherwise arising directly or indirectly from or out of any alleged action or omission of Licensee, its agents, or its customers.

9.    **Notices**.    Any notice or communication required or permitted to be given to or served on either party hereto pursuant to this Agreement shall be sufficiently given or served as of the date of mailing if sent to such party by certified mail, return receipt requested, addressed to it at the address set forth below (or to such other address as it shall designate by written notice given to the other party in accordance with this paragraph):

to Licensor:

Mr. John Marks
Mark IV Realty Services, Inc.
1 E. Wacker Dr., Suite 3600
Chicago, IL 60601
TEL: 312-823-9100
FAX: 312-823-9111

with a copy to:

Elias N. Matsakis, Esq.
Holland & Knight LLP
131 S. Dearborn St., 30th Floor
Chicago, IL 60603
FAX: (312) 578 -6666
TEL: (312) -5731

to Licensee:

GIH-SPE II, LLC
260 W 54th Street
29J
New York, NY 10019
Attention: Harold Rothstein
Telephone: 646-468-9801
Facsimile: 412-279-2870

10.    **Binding Agreement**.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The license granted herein shall not be assignable or transferable by Licensee or by operation of law, or otherwise, in whole or in party, except upon written consent of Licensor.

11.    **Entire Agreement**.    This is the entire agreement between the parties and relates only to the Marks and Names.

12.    **Modifications**.    This Agreement may not be changed or altered except in a written amendment signed by the parties.

13.    <u>Confidentiality</u>.  This Agreement is to be maintained as confidential between the parties although it is currently understood that Licensor and Licensee's affiliates have knowledge of the existence of this Agreement.

14.    <u>Joint Venture</u>.  Nothing in this Agreement shall be construed to create a joint venture, partnership or agency relationship between the parties.   The only purpose of this Agreement is for the license of the Marks and Names.

15.    <u>Controlling Law</u>.  This Agreement shall be construed according to the internal laws, and not the conflict of laws rules, of the State of Illinois.

[EXECUTION PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first indicated above.

LICENSEE:

GIH-SPE II, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

LICENSOR:

Mark IV Realty Group, Inc.
an Illinois corporation

By:_____
Name:_____
Title:_____

## Federal Service Mark Registrations

| Registration No. | Mark | Design Mark |
|---|---|---|
| 2650737 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2607663 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2679059 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2775427 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2667321 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2639617 | GREEK ISLES HOTEL & CASINO | GREEK ISLES HOTEL & CASINO |
| 2608309 | GREEK ISLES HOTEL & CASINO | Word Mark |

## Domain Names

greekislesvegas.com/

# EXHIBIT D

## PERSONAL PROPERTY LISTING

All personal property located on the Premises, other than: (i) trade fixtures, inventory, equipment, business records, documents owned or used by any sublessee or licensee under any sublease agreement applicable to the Premises; (ii) the books and records of the Lessee and any of Lessee's sublessees, and any other documents of Lessee relative to Lessee's operation of the business; (iii) the personal effects of Lessee's employees or employees of any sublessee; (iv) leased equipment financed by Lessee having an aggregate fair market value of less than $100,000; (v) Lessee's right, title and interest in and to trademarks, service marks, service names, trade names, fictitious names, marks, designs, logos, domain names, web sites and customer lists used in the operation of the Premises, improvements or Personal Property as listed and described on Schedule A to Exhibit D above; (vi) all first floor and corridor artwork located on the Premises; and (vii) personal property of guests and airline employees.

EXHIBIT E

MEMORANDUM OF LEASE

(Attached)

# EXHIBIT 10

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Cynda Handershot                                    7022515000

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

NEVADA TITLE COMPANY

2500 N. BUFFALO DRIVE

SUITE 150

LAS VEGAS NV 89128

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 07:50 PM 07/20/2007
INITIAL FILING # 2007 2753837

SRV: 070838635

## 1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GIR-SPE I, LLC | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 260 W. 54TH STREET, 29J | NEW YORK | NY | 10019 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | LTD LIABILITY COMPANY | DE | |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | | | |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CANPARTNERS REALTY HOLDING COMPANY IV LLC | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9665 WILSHIRE BLVD. SUITE 200 | BEVERLY HILLS | CA | 90212 | US |

Collateral Description - please see attachment

| 6. | The FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

07-04-0843-BB

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Sidley Austin LLP
555 West Fifth Street, 40th Floor
Los Angeles, California 90013
Attention: Bruce W. Fraser, Esq.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| GIH-SPE I, LLC | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 260 W. 54th Street, 29J | New York | | NY | 10019 | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
| | | LLC | Delaware | 4381956 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| CANPARTNERS REALTY HOLDING COMPANY IV LLC | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 9665 Wilshire Boulevard, Suite 200 | Beverly Hills | | CA | 90212 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Schedule I attached.

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

07-04-0843-BB

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

DEUCCFNAT - 12/17/2002 C T System Online

## SCHEDULE 1
## TO UCC-1 FINANCING STATEMENT WITH:

DEBTOR:         GIH-SPE I, LLC, a Delaware limited liability company

SECURED PARTY:  CANPARTNERS REALTY HOLDING COMPANY IV LLC, a Delaware limited liability company

This UCC Financing Statement covers all right, title and interest of the Debtor in, to and under the following collateral whether now owned or hereafter acquired, now existing or hereafter created and wherever located:

     1.    the Collateral, including all additional Collateral acquired at any time; and

     2.    all Proceeds of the foregoing.

### DEFINITIONS:

(a). "**Collateral**" means all of such Debtor's right, title and interest, whether now owned or hereafter acquired, whether legal, beneficial or economic, whether fixed or contingent, whether arising under the Borrower Organizational Documents (as hereinafter defined), under applicable law or otherwise: (a) as a member (and manager, if applicable) of Borrower (as hereinafter defined), including all right, title and interest of Debtor in Debtor's current membership interest in Borrower and in any additional membership interest in Borrower acquired hereafter by Debtor; Debtor's interest in any other rights to participate in the equity of Borrower, including any purchase option, right of first refusal, right of first offer or buy/sell right; Debtor's share of the profits, losses and capital of Borrower; Debtor's related voting rights in respect of its membership interest(s) in Borrower; and all other rights of Debtor in, to and under the Borrower Organizational Documents; (b) in all monies, securities, rights and property, of any nature whatsoever (whether in respect of contractual obligations, damages, insurance proceeds or otherwise), to which Debtor at any time is or becomes entitled in respect of Debtor's interest in Borrower, including, but not limited to, any cash dividends or distributions, rights or other property that Debtor may hereafter receive or be entitled to receive in exchange therefor or in respect thereof, whether upon a merger, reorganization, consolidation, dissolution, recapitalization, redemption, repurchase or otherwise (collectively, the "**Distributions**"); (c) in all contributions to the capital of Borrower, whether mandatory or discretionary (the "**Capital Contributions**"); (d) in all rights of Debtor, if any, as creditor of Borrower; (e) in all supporting obligations with respect to any other property constituting "Collateral" hereunder; (f) in all books and records (in whatever form or media, whether tangible or electronic, together with related software, and including all "records", as such term is defined in the Uniform Commercial Code as enacted in the State of Nevada, as amended from time to time relating to or evidencing any of the foregoing; and (g) to the extent not included in any of the foregoing, in any and all additions and substitutions for, proceeds of, and claims against third parties with respect to, any of the foregoing, including without limitation proceeds of proceeds.

(b) "**Borrower**" means GIH-SPE II, LLC, a Delaware limited liability company.

(c) **"Borrower Organizational Documents"** means, collectively, (a) the Certificate of Formation of Borrower, certified as of a recent date by the Delaware Secretary of State, and (b) a copy of Borrower's Operating Agreement, certified by an authorized officer/member of Borrower as being a true and correct copy thereof, as currently in full force and effect.

(d) **"Proceeds"** has the meaning set forth in the Uniform Commercial Code as now or at any time hereafter in effect in the State of Nevada, without giving effect to any limitation hereafter taking effect that would exclude from the definition of "Proceeds" any property included therein as of the date of this UCC Financing Statement.

# EXHIBIT 11

# kas

**Accounts UCC.pdf**
**06/15/09   03:23 PM**



# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

Cynda Hendershot                    7022515000

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

NEVADA TITLE COMPANY

2500 N. BUFFALO DRIVE

SUITE 150

LAS VEGAS NV 89128

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 08:00 PM 07/20/2007
INITIAL FILING # 2007 2753852

SRV: 070838647

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | ECALV II LLC | | | |
| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| ONE EAST WACKER DRIVE, SUITE 3600 | CHICAGO | IL | 60601 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | L/D LIABILITY COMPANY | DE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | | | | |
| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | CAMPARTNERS REALTY HOLDING COMPANY IV LLC | | | |
| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9665 WILSHIRE BLVD. SUITE 200 | BEVERLY HILLS | CA | 90212 | US |

Collateral Description - please see attachment

**6.** This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable] | **7.** Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | All Debtors | Debtor 1 | Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**

07-04-0843-BB

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

> Sidley Austin LLP
> 555 West Fifth Street, 40th Floor
> Los Angeles, California 90013
> Attention: Bruce W. Fraser, Esq.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME |
|---|
| ECALV II LLC |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| One East Wacker Drive, Suite 3600 | Chicago | IL | 60601 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | Delaware | 4383222 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| CANPARTNERS REALTY HOLDING COMPANY IV LLC |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9665 Wilshire Boulevard, Suite 200 | Beverly Hills | CA | 90212 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Schedule 1 attached.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

07-04-0843-BB

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)
DEUCCUFNAT - 12/17/2002 C T System Online

# SCHEDULE 1
## TO UCC-1 FINANCING STATEMENT WITH:

DEBTOR:         ECALV II LLC, a Delaware limited liability company

SECURED PARTY:  CANPARTNERS REALTY HOLDING COMPANY IV LLC, a Delaware limited liability company

This UCC Financing Statement covers all right, title and interest of the Debtor in, to and under the following collateral whether now owned or hereafter acquired, now existing or hereafter created and wherever located:

    1.     the Collateral, including all additional Collateral acquired at any time; and

    2.     all Proceeds of the foregoing.

## DEFINITIONS:

(a) "**Collateral**" means all of such Debtor's right, title and interest, whether now owned or hereafter acquired, whether legal, beneficial or economic, whether fixed or contingent, whether arising under the Borrower Organizational Documents (as hereinafter defined), under applicable law or otherwise: (a) as a member (and manager, if applicable) of Borrower (as hereinafter defined), including all right, title and interest of Debtor in Debtor's current membership interest in Borrower and in any additional membership interest in Borrower acquired hereafter by Debtor; Debtor's interest in any other rights to participate in the equity of Borrower, including any purchase option, right of first refusal, right of first offer or buy/sell right; Debtor's share of the profits, losses and capital of Borrower; Debtor's related voting rights in respect of its membership interest(s) in Borrower; and all other rights of Debtor in, to and under the Borrower Organizational Documents; (b) in all monies, securities, rights and property, of any nature whatsoever (whether in respect of contractual obligations, damages, insurance proceeds or otherwise), to which Debtor at any time is or becomes entitled in respect of Debtor's interest in Borrower, including, but not limited to, any cash dividends or distributions, rights or other property that Debtor may hereafter receive or be entitled to receive in exchange therefor or in respect thereof, whether upon a merger, reorganization, consolidation, dissolution, recapitalization, redemption, repurchase or otherwise (collectively, the "**Distributions**"); (c) in all contributions to the capital of Borrower, whether mandatory or discretionary (the "**Capital Contributions**"); (d) in all rights of Debtor, if any, as creditor of Borrower; (e) in all supporting obligations with respect to any other property constituting "Collateral" hereunder; (f) in all books and records (in whatever form or media, whether tangible or electronic, together with related software, and including all "records", as such term is defined in the Uniform Commercial Code as enacted in the State of Nevada, as amended from time to time relating to or evidencing any of the foregoing; and (g) to the extent not included in any of the foregoing, in any and all additions and substitutions for, proceeds of, and claims against third parties with respect to, any of the foregoing, including without limitation proceeds of proceeds.

(b) "**Borrower**" means GIH-SPE II, LLC, a Delaware limited liability company.

        

(c) "**Borrower Organizational Documents**" means, collectively, (a) the Certificate of Formation of Borrower, certified as of a recent date by the Delaware Secretary of State, and (b) a copy of Borrower's Operating Agreement, certified by an authorized officer/member of Borrower as being a true and correct copy thereof, as currently in full force and effect.

(d) "**Proceeds**" has the meaning set forth in the Uniform Commercial Code as now or at any time hereafter in effect in the State of Nevada, without giving effect to any limitation hereafter taking effect that would exclude from the definition of "Proceeds" any property included therein as of the date of this UCC Financing Statement.

# EXHIBIT 12

## AMENDED AND RESTATED
## TURN-KEY LEASE AGREEMENT

This AMENDED AND RESTATED TURN-KEY LEASE AGREEMENT ("Lease") made and entered into this _____ day of _____, 2007, between GIH-SPE II, LLC, a Delaware limited liability company ("LESSOR"), and CONVENTION CENTER DRIVE HOTEL & CASINO, LLC, a Nevada limited liability company ("LESSEE").

### WITNESSETH:

WHEREAS, Convention Center Drive, LLC, predecessor in interest to Lessor, and Lessee entered into that certain Turn-Key Lease Agreement dated December, 2000 ("Original Lease");

WHEREAS, Convention Center Drive, LLC, a Nevada limited liability company ("Seller"), an affiliate of Lessee and, DI Development Group, LLC, a Delaware limited liability company ("Buyer"), an affiliate of Lessor, are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of April 24, 2007 (as amended, the "Purchase Agreement"). Pursuant to the Purchase Agreement, Seller has concurrently herewith conveyed to Lessor the Premises (as defined below) via deed recorded concurrently herewith in the Recorder's Office of Clark County, Nevada

WHEREAS, Buyer formed Lessor to take title to the Premises pursuant to the Purchase Agreement and to enter into this Lease and the Senior Loan (as defined in Section 20.1), and Buyer has formed GIH-SPE I, LLC, a Delaware limited liability company, to enter into the Mez Loan (as defined in Section 14.2), and Seller has consented to the financing and the assignment of Buyer's interest in the Purchase Agreement to Lessor in consideration of Lessor's entry into and performance of its obligations under this Lease, including its granting of the Purchase Option described in Section 22.1 to an affiliate of Lessee.

1

WHEREAS, Lessor and Lessee wish to amend and fully restate herein all the terms and conditions of the Original Lease.

NOW THEREFORE, in consideration of the covenants and agreements hereinafter contained, Lessor hereby leases to Lessee the following described property situated in Clark County, Nevada, on the following terms:

1. **DEMISED PREMISES:** The demised Premises shall consist of those buildings, improvements and areas with a post office address of 305 Convention Center Drive, Las Vegas, Nevada, together with all rights of easement, contiguous parking agreements and ingress and egress agreements over driveways and sidewalks which may be given of record to said property, and with all furniture, fixtures and equipment and other personal property necessary to take over and conduct business operations (the "Premises") other than food and beverage inventory and other perishable items (the "Inventory"). The Inventory on the property is currently owned by Lessee, pursuant to the terms of the sale of the Premises to Lessor. Lessor will repurchase the useable Inventory from Lessee at cost upon termination of this Lease.

2. **TERM OF LEASE:** This Lease shall commence on the date of closing of the sale of the Premises to Lessor (the "Commencement Date").

       **2.1.** Unless terminated earlier as elsewhere herein provided, the term of this Lease shall be for a period commencing on the Commencement Date and terminating on the earlier of: (a) ten (10) days after the maturity of the Senior Loan (as defined in Section 20.1) (which loan currently matures on July 10, 2008) or (b) if the Senior Loan is accelerated prior to maturity thereof, (i) ninety (90) days after the acceleration of the Senior Loan if such acceleration occurs on or prior to April 6, 2008, or (ii) ten (10) days after the acceleration of the Senior Loan if such acceleration occurs after April 6, 2008. The foregoing automatic

2

terminations can be waived without the consent of Lessor by a writing signed by the Senior Lender in its sole discretion.

2.2.    Unless terminated earlier as elsewhere herein provided, Lessee shall have the right, but not the obligation to extend the term of this Lease upon expiration of the term under Section 2.1(a) or (b)(ii) for a period of eighty (80) days ("Eighty Day Extension") upon the delivery during the ten (10) day period prior to the expiration of such term of (a) written notice to Lessor and Senior Lender (as defined in Section 8.1) exercising Lessee's right to such Eighty Day Extension and (b) unless waived in Senior Lender's sole and absolute discretion, a deposit into the Interest Reserve established by Lessor with Senior Lender of funds equal to the amount of interest that is projected to accrue under the Senior Loan from the maturity of the Senior Loan through and including the expiration of the Eighty Day Extension (the "Interest Reserve Deposit"). In no event shall Lessee have any option to extend the term of the Lease if the term expires pursuant to Section 2.1(b)(i) except with the written consent of the Senior Lender which may withheld in its sole discretion. The Interest Reserve Deposit shall be deemed funds advanced by Lessee to Lessor, to be repaid by Lessor to Lessee upon demand (or sooner, at option of Lessor) with interest thereon at the rate of fourteen and one-half percent (14.5%) per annum and may be used by Senior Lender to pay accrued interest under the Senior Loan.

2.3.    Unless terminated earlier as elsewhere provided, if the term of the Senior Loan is extended by the Senior Lender (as defined in Section 8.1) pursuant to any of the extension options set forth in the promissory note evidencing the Senior Loan, the term of this Lease shall be automatically extended without further action by Lessor or Lessee by the same number of days that the term of the Senior Loan is extended.

**2.4.** Unless terminated earlier as elsewhere herein provided, with the prior written consent of Senior Lender, which consent may be withheld in Senior Lender's sole and absolute discretion, Lessee shall have the right upon written notice to Lessor delivered to prior to the expiration of the then existing term of this Lease to extend the term of this Lease for a period of an additional fifteen (15) years; provided that if the first day of such extension term is not the first day of a calendar month, such extension term hereof shall instead continue for a period of fifteen (15) years plus the period until the first day of the next succeeding calendar month.

**2.5.** Lessee shall be liable for rent due for any partial months on a prorated basis based upon a thirty (30) day month. If Lessee shall hold the Premises beyond the term herein specified or any renewal thereof, with the consent, express or implied, of Lessor, such holding over shall be construed to be a month-to-month tenancy, on the same rental terms as provided herein, unless otherwise mutually agreed upon.

**3.** **BASIC RENT AND LESSEE'S EXPENSE OBLIGATIONS:** Lessee shall pay monthly rent in an amount equal to one-twelfth (1/12) of the annual real estate taxes for the Property ("Basic Rent"). In addition, Lessee shall cause to be paid all operating expenses of the Premises or in connection with Lessee's operations at the Premises, including, without limitation, the rent under the Master Lease (as defined in Section 23). Basic Rent shall be paid directly into a tax impound reserve established by Senior Lender so long as the Senior Loan has not been fully paid and discharged. Notwithstanding the foregoing, Lessee's obligations under this Section 3 with respect to the payment of the operating expenses of the Premises shall be suspended (in part, or in whole, as the case may be) if at any time Senior Lender exercises its rights under the Senior Lender Pledge Agreement (defined in Section 4) upon an event of default under the Senior Loan to cease funding disbursements from the Managed Account (defined in Section 5.1) to pay

Lessee's operating expenses, but only to the extent that such funds exist in the Managed Account and would otherwise be available to pay such operating expenses in accordance with the distribution priorities of the Senior Lender Pledge Agreement.

**4.** **USE:** Lessee will use and occupy the leased Premises for the purposes of operating a "grandfathered resort hotel casino", with all attendant functions to said enterprise. Lessee and Lessor each agree to conform to constituted public agencies, regarding the use, occupancy and/or condition of the Premises and to indemnify and save and hold the other party harmless from all loss, cost and expenses, including attorney's fees, which may result from a failure to do so. Lessee expressly covenants that Lessee will operate the business on the Premises in such a manner so as to protect the "grandfathered resort hotel casino" (nonconforming use) status of the premises and Lessee understands that failure to do so will damage the Premises. Lessor will take no action to affect the licensing adversely. Lessee will comply with the cash management requirements described in that certain Pledge Agreement (Accounts – Lessee) ("Senior Lender Pledge Agreement") between Lessee and Senior Lender.

**5.** **IMPROVEMENTS. MAINTENANCE. REPAIR AND RESTORATION OF DAMAGE:** By entry, Lessee accepts the Premises AS IS. Except as provided for elsewhere herein, Lessee shall take reasonable steps to maintain in reasonable condition and repair the Premises and every part thereof and any and all appurtenances thereto wherever located, at Lessee's sole cost and expense, it being understood that Lessee has no duty to make any capital investments other than to prevent damage or waste on the Premises.

    **5.1.** All alterations or improvements shall be the property of Lessor and shall be surrendered at the termination of the Lease, along with all furniture, fixtures, equipment, and operating Inventory (subject to receipt of payment for such Inventory by Lessee from Lessor,

pursuant to Paragraph 1 of this Lease), unless otherwise agreed to by the parties in writing. All alterations or improvements made by Lessee shall be at Lessee's sole expense. Any improvements or alterations must be performed by licensed and bonded contractors pursuant to Nevada law and Lessee shall insure that no mechanic's liens or other encumbrances will be placed upon the Premises. Lessee shall cause the removal of any such liens within a reasonable time after their recordation. Lessee may make alterations to the Premises costing up to Two Hundred Thousand Dollars ($200,000.00) in the aggregate during any calendar year without the consent of any party, provided however that the costs for such alterations (i) shall not be a budgeted item in the Approved Budget (as defined in the loan agreement ("Loan Agreement") by and between Lessee and Senior Lender), (ii) shall be funded solely by additional equity contributions by the owners of Lessee or by the funds delivered by Senior Lender to Lessee pursuant to Section 8.5(a)(v) of the Loan Agreement, and (iii) shall not otherwise reduce the amount of funds to be deposited and remain in the Managed Account (as defined in the Loan Agreement) pursuant to Section 8.5(b) of the Loan Agreement. If Lessee wishes to make alterations beyond such threshold, it must first obtain the written consent of Lessor and Senior Lender (as defined in Section 8.1).

6. WASTE: Lessee shall not commit waste or permit waste to be committed in or upon the Premises or allow the Premises to deteriorate in any way and at the termination of this Lease shall surrender and deliver the Premises to Lessor in as good condition as the same were at the commencement of the term, subject to reasonable wear and tear.

7. RIGHT TO ENTER: Lessor and its authorized agents and representatives shall be entitled to enter the Premises at any reasonable time for the purpose of inspecting the Premises or any portion thereof, or as necessary to comply with any laws, ordinances, rules, regulations or

requirements of any public authority, or to take any action which Lessor may deem necessary or appropriate to prevent waste, loss, damage or deterioration to or in connection with the Premises. Lessor shall have the right to use any means which Lessor may deem proper to open all doors in and to the Premises in an emergency. Entry in and to the Premises obtained by Lessor by any such means shall not be deemed to be forcible or unlawful entry into, or a detainer of, the Premises, or an eviction of Lessee from the Premises or any portion thereof. Nothing contained herein shall impose or be deemed to impose any duty on the part of Lessor to do any work or repair, maintenance, reconstruction or restoration, which under any provision of this Lease is required to be done by Lessee and the performance thereof by Lessor shall not constitute a waiver of Lessee's default in failing to do the same.

## 8. INSURANCE:

8.1. Lessor shall, at all times during the term hereof, at its sole cost and expense, procure and maintain in full force and effect a policy or policies of comprehensive public liability insurance issued by an insurance carrier approved by Lessor's senior lender (Canpartners Realty Holding Company IV LLC, a Delaware limited liability company, together with its successors and assigns, "Senior Lender") assuring against loss, damage or liability for injury or death to persons and loss or damage to property occurring from any cause whatsoever in connection with the Premises or Lessee's use thereof. Lessee shall be an additionally named insured under each such policy of insurance.

8.2. Lessor shall, at all times during the term hereof, at its sole cost and expense, procure and maintain in full force and effect standard form of fire with extended coverage insurance covering the Premises and Lessor's and Lessee's property and merchandise, and the personal property of others in Lessor's or Lessee's possession in, upon or about the

Premises. Such insurance shall be in an amount equal to the current replacement value of the property required to be insured. Lessee and Lessor, as their interests may appear, shall be the named insureds under each such policy of insurance. The property insurance shall include coverage for loss of income and additional expense exposure for hotel operations and all interested parties, including, without limitation, Lessor, Lessee and Lessee's management company.

      **8.3.** Lessee shall cause its manager to maintain all statutory coverage including, without limitation, worker's compensation and employer's liability insurance, benefits, employment practices liability, including third party coverage, managing agent liability, crime coverage, and general liability and auto liability for offsite exposure in amounts required by Section 6.7 of the loan agreement for the Senior Loan (defined in Section 20.1).

## 9. INDEMNIFICATION:

      **9.1.** Lessee, only to the extent of its insurance coverage, shall defend, indemnify and save and hold Lessor and Senior Lender harmless from legal action, damages, loss, liability and any other expense (including reasonable attorneys' fees) in connection with loss of life, bodily or personal injury or property damage arising from or out of all acts, failures, omissions or negligence of Lessee, its agents, employees or contractors which occur in or upon the demised Premises and the buildings and improvements thereon, or in or upon the sidewalks or curbs in front or appurtenants thereto, unless such legal action, damages, loss, liability or other expense (including reasonable attorneys' fees) results from any sole act, omission or neglect of Lessor, its respective agents, contractors, employees or persons claiming through it.

      **9.2.** Lessor, only to the extent of its insurance coverage, shall indemnify and save and hold Lessee harmless from legal action, damages, loss, liability and any other expense

(including reasonable attorney fees) in connection with loss of life, bodily or personal injury or property damage, arising from or out of all acts, failures, omissions or negligence of Lessor, its agents, employees or contractors which occur in or upon the Premises and the buildings and improvements thereon, or in or upon the sidewalks or curbs in front or appurtenants thereto, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or neglect of Lessee, its respective agents, contractors, employees or persons claiming through it.

**10.** **UTILITIES. TAXES AND OTHER CHARGES AGAINST THE LAND:** Lessee shall be responsible for all the charges for gas, electricity, garbage, sewer, water and any other service or utility provided to the Premises during the term of this Lease. In addition, Lessee shall pay all personal, real property, and other taxes and assessments arising in connection with the Premises. Lessor shall be responsible for satisfying all indebtedness incurred under any and all deeds of trust, mortgages, or other similar liens or encumbrances upon the property.

**11.** **ASSIGNMENT AND SUBLETTING OF LEASE:** Lessee may enter into subleases for occupants of the premises or any part thereof so long as (i) such agreements are terminable upon not more than 120 days written notice, (ii) such subleases are subordinate to the Senior Loan, and (iii) such subleases are not subject to any non-disturbance agreements from Lessor or Senior Lender (unless requested by Senior Lender), and (iv) such subleases are written on a form of sublease reasonably approved by Senior Lender.

**12. DEFAULT BY LESSEE:**

    **12.1.** Each of the following shall be considered an "Event of Default" and shall give rise to and entitle Lessor to the remedies provided for in Section 12.2, as well as any and all other remedies, whether at law or in equity, provided for or otherwise available to Lessor or as

otherwise provided for in this Lease:

      (a)    Lessee shall default in the payment of any Rents or charges, or in the payment of any other sums of money required to be paid by Lessee to Lessor under this Lease, or as reimbursement to Lessor for sums paid by Lessor on behalf of Lessee in the performance of the covenants of this Lease, and said default is not cured within thirty (30) days after receipt of written notice thereof from Lessor.

      (b)    Lessee shall default in the performance of any other covenants, terms, conditions, provisions, rules or regulations of this Lease excepting those items listed in the above section (a) and such default is not cured within thirty (30) days after written notice thereof given by Lessor, excepting such defaults that cannot be cured completely within such thirty (30) day period providing Lessee, within said thirty (30) day period, has promptly commenced to proceed with diligence and in good faith to remedy such default.

      (c)    Lessee shall make a general assignment for the benefit of creditors or file a voluntary petition in bankruptcy or be adjudicated bankrupt insolvent under the Federal Bankruptcy Act, or permit a receiver to be appointed to take possession of a substantial portion of his assets or of this leasehold, and such bankruptcy, insolvency or receivership is not dismissed within one hundred-twenty (120) days of such date.

      (d)    Lessee should vacate or abandon the Premises.

      (e)    Lessee shall violate the cash management requirements of the Senior Lender Pledge Agreement

      **12.2.**    If any Event of Default occurs, Lessor may, at its option and in addition to

any and all other rights or remedies provided Lessor in this Lease or at law or equity, immediately, or at any time thereafter, and without demand or notice (except as provided herein):

(i)     without waiving such Event of Default, apply thereto any overpayment of rents to curing the Event of Default in lieu of refunding or crediting the same to Lessee;

(ii)     if the Event of Default pertains to work or other obligations (other than the payment of Basic Rent) to be performed by Lessee, without waiving such Event of Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Lessee; and Lessee shall on demand pay to Lessor the cost of performing such work or other obligation plus fifteen percent (15%) thereof as administrative costs; or

(iii)     declare the term of this Lease ended and re-enter the Premises and take possession thereof, terminate all of the rights of Lessee in and to the Premises and accelerate all rents and other charges owing during the remaining portion of the Lease term.

     **12.3.**   Notwithstanding any termination of this Lease or termination of Lessee's rights to possession, whether by summary proceedings or otherwise, Lessee shall pay and be liable for (on the days originally fixed herein for the payment thereof) the several installments of Basic Rent as if this Lease had not been terminated and as if Lessor had not entered and whether the Premises are relet or remain vacant in whole or in part, but in the event the Premises are relet by Lessor, Lessee shall be entitled to a credit in the net sum of total rents received by Lessor in reletting after deduction of all reasonable actual expenses incurred in reletting the Premises, and in collecting such rents.

**13. ATTORNEY'S FEES:** In the event of litigation, including all bankruptcy and/or appellate proceedings, arising from default in performance of any of the provisions of this Lease by either Lessor or Lessee, the prevailing party in such litigation shall be entitled to receive from the other party reasonable attorney's fees and costs of action incurred in connection with said litigation. In the event that either Lessor or Lessee shall, by reason of acts of omission or commission in violation of the terms of this Lease, or by any other reason arising out of Lessor-Lessee relationship, be made a party to such litigation commenced by a person other than the parties hereto, then such party performing said act or suffering the omission shall pay all costs, expenses and reasonable attorney's fees incurred by the other party which arise from or are in connection with such litigation.

**14. TERMINATION OF LEASE:**

**14.1.** Lessee has the option to terminate this Lease at any time during the term by giving ninety (90) days notice to Lessor, provided one of the following has occurred or occurs within ninety (90) days after the effective date of termination: (i) Lessee has received written consent from Senior Lender to terminate the Lease, which consent may be withheld in Senior Lender's sole and absolute discretion; (ii) all amounts due under the Mez Loan (defined below) have been fully satisfied and the Mez Loan has been discharged; or (iii) all amounts due under the Senior Loan have been fully satisfied and the Senior Loan has been discharged.

**14.2.** Lessor may terminate this Lease through written notice to Lessee at any time after all amounts due to Lessee's affiliate under that certain Note in the amount of $24,000,000.00 have been fully satisfied (or the Note was repurchased at par) ("Mez Loan"); provided that Senior Lender consents to such termination if the Senior Loan has not been repaid or is not being repaid simultaneously with the Mez Loan. This Lease may also terminate

12

pursuant to the terms of that certain Lease Subordination Agreement ("Subordination Agreement") by and between Lessee and Senior Lender of even date herewith.

14.3. Upon the expiration or sooner termination of the term of this Lease ("Termination Date"), the possession and ownership of all improvements and buildings located upon the Premises as of such date of termination shall pass to Lessor; provided, however, that Lessee may, within fifteen (15) calendar days after the effective date of such termination, remove any and all of Lessee's personal property (only personal property owned by Lessee, and not personal property leased by Lessee under this Lease), provided further that the Lessee shall repair any damage caused to the improvements on the Premises or the Premises itself by such removal. If this Lease terminates except pursuant to the termination under the Subordination Agreement or due to a foreclosure under Senior Lender's deed of trust, Lessor shall pay Lessee, Lessee's actual out-of-pocket costs for Lessee's useable Inventory. In addition, Lessee shall receive all deposits made by Lessee with Senior Lender pursuant to the Subordination Agreement, or be reimbursed for any such deposits applied by Senior Lender against indebtedness or other obligations of Lessor. Revenues, and other income, if any, from the operation of the Premises, taxes, assessments, service contract fees, utility costs, and other expenses affecting the Premises shall be prorated between Lessor and Lessee as of the Termination Date based on a 365-day year. Lessee will receive credit for all room payments with respect to guests who register before 12:00 a.m. on the Termination Date with respect to their payments due as of check-out on the Termination Date. Current invoices to airline tenants and the accrued charges for airline guests up to the Termination Date shall be prorated and paid to Lessee. Delinquent rentals (more than 30 days past due) as of the Termination Date shall not be prorated, but when paid shall be delivered by Lessor to Lessee. Lessee shall receive a credit

for all useable Inventory existing and located at the Premises on the Termination Date and for Lessee's portion or any receipts from other operations at the Premises as of the Termination Date. After the Termination Date, Lessor shall use commercially reasonable efforts to collect delinquent rentals or assessments on behalf of Lessee. All non-delinquent real estate taxes or assessments on the Premises shall be prorated, on an accrual basis, based on the actual current tax bill, but if such tax bill has not yet been received by Lessee by the Termination Date or supplemental taxes are assessed after the Termination Date for the period prior thereto, the parties shall make any necessary adjustment after the Termination Date by cash payment to the party entitled thereto so that Lessee shall have borne all real property taxes, including all supplemental taxes, allocable to the period prior to the Termination Date. If any expenses attributable to the Premises and allocable to the period through the day prior to the Termination Date are discovered or billed after the Termination Date, the parties shall make any necessary adjustment after the Termination Date by cash payment to the party entitled thereto so that Lessee shall be entitled to all income and have borne all expenses allocable to the period prior to the Termination Date and Lessor shall be entitled to income and bear all expenses allocable to the period from and after the Termination Date. Any expenses which accrued and have been paid prior to the Termination Date that are reimbursed by tenants under any subleases will not be prorated and will be collected by Lessor. Lessee's accountant shall prepare the prorations based on the books and records of Lessee which shall be reviewed and approved by Lessor and subject to reproration based on final statements and invoices within sixty (60) days from the Termination Date. The provisions of this Paragraph 14 shall survive the termination of this Lease.

    **14.4.** Immediately upon termination of this Lease, Lessor and Lessee shall enter into a Discharge of Memorandum of Lease in the form set forth in Exhibit F attached hereto (the

"Discharge of MOL") and shall record same with the Office of the Clerk of Clark County, Nevada. If Lessee has failed to execute the Discharge of·MOL within ten (10) days of the Termination Date, Lessor may (provided there is no uncured default by Lessor under the Lease) execute the Discharge of MOL for and on behalf of Lessee as its attorney-in-fact. In acknowledgement thereof, Lessee hereby appoints Lessor as its irrevocable attorney-in-fact coupled with an interest solely to execute and deliver the Discharge of MOL on behalf of Lessee.

**15.** **LIENS:** Lessee shall at all times indemnify, save and hold Lessor and the Premises free, clear and harmless from any claims, liens, demands, charges, encumbrances, litigation and judgments arising directly or indirectly out of any use, occupancy or activity of Lessee, or out of any work performed by or on behalf of Lessee in or upon the Premises. Lessor shall at all times indemnify, save and hold Lessee, the Premises and the leasehold created by this Lease free, clear and harmless from any claims, liens, demands, charges, encumbrances, litigation and judgments arising directly or indirectly out of any use or activity of Lessor, or out of any work performed, material furnished, or obligations incurred by Lessor in, upon or otherwise in connection with the Premises except for those liens which were incurred at the time the Premises were purchased. Lessor shall not enter into any contract or agreement with any party that is not expressly subject to the rights of Lessee under the Lease and Purchase Option (as defined in Section 22.1).

**16.** **QUIET ENJOYMENT:** Subject to the terms and conditions of this Lease and the rights of the Senior Lender under the Subordination Agreement, Lessor hereby covenants and agrees that if Lessee shall perform all of the covenants and agreements herein stipulated to be performed on Lessee's part, Lessee shall at all times during the continuance hereof have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Lessor or any person or persons lawfully claiming the Premises, save and except in the

event of the taking of the Premises by public or quasi-public authority as hereinbefore provided. Lessor shall indemnify and save and hold Lessee harmless from any legal action, damages, loss, and any other expenses (including reasonable attorney fees) incurred in connection with Lessee asserting its right to quiet enjoyment of the Premises under this Section 16 against Lessor or third parties.

## 17. DESTRUCTION OF PREMISES:

17.1. In the case of the total destruction of the Premises, whether by fire or other casualty, Lessor or Lessee may elect to terminate this Lease upon giving notice of such election in writing to the other party within thirty (30) days after such damage. Nothing herein shall adversely affect the Purchase Option (as defined in Section 22.1). Upon partial destruction of the Premises, Lessor shall repair such damage at Lessor's expense (using insurance funds, and/or any other funds necessary, but in no event those funds designated for payment of the Mez Loan), and this Lease shall continue in full force and effect.

17.2. If the Premises are partially destroyed or damaged, Lessee shall continue the operation of its business in the Premises to the extent reasonably practicable during the repair period and the Basic Rent payable hereunder for the period during which such damage, repair or restoration continues shall not be abated, however Lessee shall have the benefit of the business interruption or similar insurance maintained by Lessor.

## 18. CONDEMNATION:

18.1. Should the whole of the Premises be condemned or taken by a competent authority for any public or quasi public purpose, all awards payable on account of such condemnation and taking shall be payable to Lessor, and Lessee hereby waives any and all interest therein. For the purposes of this Section 18 a deed granted in lieu of condemnation shall

16

be deemed a taking.

18.2. If the whole of the Premises shall be so condemned and taken, then this Lease shall terminate upon such taking. If only part of the Premises is condemned or taken, this Lease shall continue in full force and effect, and the Basic Rent shall not be abated (Basic Rent shall, however, be adjusted due to the change in the amount of real property tax due resulting from the change in the size of the Premises).

18.3. All compensation awarded or paid upon such a total or partial taking of the Premises shall belong to and be the property of Lessor without any participation by Lessee; provided, however, that nothing contained herein shall be construed to preclude Lessee from prosecuting any claim directly against the condemning authority in such condemnation proceedings for relocation costs, if available, or for depreciation to, damage to, or cost of removal of, or for the value of stock, trade fixtures, furniture, and other personal property belonging to Lessee.

18.4. If this Lease is terminated pursuant to this Section 18 and Lessee is not in default hereunder, Basic Rent shall be prorated as of the date of termination, and all rights and obligations hereunder shall cease and terminate. Except to the extent provided for in this Section 18, neither the Basic Rent payable by Lessee nor any of Lessee's other obligations under any provision of this Lease shall be affected by any condemnation or taking of the Premises or any portion thereof.

19. **RECORDING OF MEMORANDUM OF LEASE:** Lessor and Lessee shall, promptly after full execution of this Lease, execute and record in the Recorder's Office of Clark County, Nevada, the Memorandum of Lease attached hereto as Exhibit E.

20. **SUBORDINATION:**

17

**20.1.** As set forth in the Subordination Agreement, this Lease and Lessee's rights hereunder shall be subordinate to that certain Deed of Trust (or to any documents or instruments associated therewith) granted by Lessor to Senior Lender dated of even date herewith (such indebtedness is referred to herein as the "Senior Loan").

**20.2.** In the event any foreclosure proceedings are completed or in the event of the exercise of the power of sale under any deed of trust made by Lessor covering the lease property, this Lease shall terminate.

**20.3.** Lessee shall maintain and operate the Premises pursuant to the conditions described in Exhibit G attached hereto.

**21. NOTICES:** Notices and demands shall be forwarded by certified or registered mail, postage prepaid to:

<div style="margin-left:2em">

LESSOR AT:          GIH-SPE II, LLC
c/o DI Development Group, LLC
9811 W. Charleston #2783
Las Vegas, Nevada 89117
Attn: Mr. Harold Rothstein

LESSEE AT:         Convention Center Drive Hotel & Casino, LLC
305 Convention Center Drive
Las Vegas, Nevada 89109

</div>

subject to the right of either party to designate by notice in writing any new address to which notices, demands and installments of rental may be sent. Notice shall be deemed received seven (7) days after posting.

**22. OPTION TO PURCHASE THE PREMISES:**

**22.1.** Lessor has granted to ECALV I LLC the irrevocable option and right to purchase the Premises ("Purchase Option") from Lessor on the terms described in the Purchase Option attached hereto as Exhibit A.

18

**23. ASSIGNMENT OF SUBLEASES FROM LESSEE TO LESSOR.** Upon termination of this Lease, Lessee shall assign to Lessor or its successor in interest (including Senior Lender if Senior Lender has succeeded to the interest of Lessor in the Premises) all of its right, title and interest under any of the subleases (including, without limitation, its right to any security deposits and prepaid rent) then in effect at the Premises and Lessor shall assume the obligations of Lessee with respect thereto, pursuant to an Assignment and Assumption of Leases, Management Agreement and Assignment of Intellectual Property and Service Agreements in the form set forth in Exhibit B attached hereto, subject to modification of Schedule 1 to said Exhibit B by Lessee for lease modifications, renewals, terminations, and expirations from the date of execution hereof to the Termination Date. Notwithstanding the foregoing, Lessee shall obtain Lessor's prior written consent for any lease modifications, renewals or terminations, such consent not to be unreasonably withheld, conditioned or delayed. Lessee, upon termination of this Lease, shall also obtain any necessary consent under the Master Lease Agreement between Codorus Acceptance Corporation (or its successor or assign) and CCD Hotel & Casino dated June 26, 2002 (the "Master Lease") to assign the same to Lessor.

**24. INTELLECTUAL PROPERTY.** The name Greek Isles, Greek Isles Hotel and Casino, Greek Isles Hotel and Casino and any related service marks and/or domain name licenses shall remain the sole and exclusive property of Lessee; provided, however, Lessee agrees, at Lessor's election upon written notice prior to the termination of the Lease (unless such termination is due to Lessor's default), to enter into that certain service mark and domain name license (the "IP License") in the form attached as Exhibit C. If Lessor fails to execute the IP License on or prior to the termination of the Lease, Lessor agrees, within ten (10) days after the termination of the Lease, at its sole cost and expense, to remove or otherwise cover all signage or other public

references from the Premises which contain the name Greek Isles, Greek Isles Hotel and Casino, Greek Isles Hotel and Casino and any related service marks and/or domain name licenses. In addition, Lessee will retain the name "Yiannis" and will license the name to Lessor without consideration for a period not to exceed two years. Lessee will retain the names Convention Center Drive, LLC and Convention Center Drive Hotel and Casino LLC.

## 25. OTHER DELIVERIES FROM LESSEE TO LESSOR UPON TERMINATION.

Lessee hereby covenants and agrees to deliver to Lessor, upon or immediately following termination of the Lease (unless such termination is due to a default by Lessor), the following items:

25.1.   Intangible Property.  Documents compromising the "Intangible Property", which is defined as: all of Lessee's right, title and interest in and to that certain intangible property owned by Lessee and used by Lessee exclusively in connection with all or any portion of the Premises and/or Personal Property (the term "Personal Property" shall mean all of Lessee's right, title and interest in and to the Inventory and any other tangible personal property owned by Lessee and located at the Premises or used by Lessee exclusively in connection with the use, operation, maintenance or repair of all or any portion of the Premises as of the date of termination of this Lease, but will exclude all first floor and corridor artwork and the exceptions listed on Exhibit D), including, without limitation, all of Lessee's right, title and interest, if any, in and to: (a) any service, management, maintenance, utility and operating contracts and warranties pertaining to the Premises and any licenses and other agreements pertaining to or affecting the Premises (the "Service Contracts"), and all books and records relating to the Premises and/or the Personal Property and all right, title and interest to the website relating to the Premises; (b) all transferable business licenses, architectural, site, landscaping or other permits,

applications, approvals, authorizations and other entitlements affecting any portion of the Premises and/or Personal Property but only to the extent assignable; (c) all transferable guarantees, warranties and utility contracts relating to all or any portion of the Premises; and (d) all subleases and rents, additional rents, reimbursements, profits, income, receipts from and after the termination of the Lease and the amount deposited under any sublease in the nature of security for the performance of the obligations of the tenant or user under any subleases, and, subject to the IP License, access to the website applicable to the hotel operations at the Premises.

25.2. Personal Property. The Personal Property, including, without limitation, the books and records and other documents necessary to operate the property, any and all keys, pass cards, remote controls, security codes, unlicensed computer software and other devices relating to access to the Premises; provided, however Lessee shall retain the first floor art work together with any personal property belonging to Lessee's individual members.

25.3. Service Contracts Notice. A letter to all of the vendors of the Service Contracts, duly executed by Lessee, dated as of the termination date of the Lease and addressed to the Service Contract vendors, informing such vendors of the assignment of the Service Contracts to Lessor.

25.4. Liquor Licenses. To the extent permitted under applicable law, Lessee shall assign its liquor and alcoholic beverage licenses (together, the "Liquor Licenses") with respect to the Premises to Lessor or its designee. Lessor or its designee shall execute and file at its sole cost and expense all necessary forms, applications and other documents (and Lessee shall reasonably cooperate with Lessor or its designee in filing such forms, applications and other documents) with the appropriate liquor and alcoholic beverage authorities, prior to termination of the Lease, so that such acquisition of the Liquor Licenses shall take effect, if possible,

simultaneously with or upon the termination of the Lease. If not so permitted, Lessor or its designee agrees that it will promptly execute all forms, applications and other documents required to effect such acquisition of the Liquor Licenses at the earliest reasonably practicable time after termination of the Lease. Lessor's attempts to obtain the Liquor Licenses shall not diminish, prior to the termination of the Lease, the full force and effect of the Liquor Licenses. If the Liquor Licenses cannot be transferred to Lessee or its designee until after the termination of the Lease, then Lessee shall cooperate reasonably with Lessor and/or its designee in keeping open the bars, restaurants, lounges and liquor facilities located at the hotels between the termination of the Lease and the time when the Liquor Licenses are transferred to Lessor or its designee or a period not to exceed ninety (90) days following the termination of the Lease, whichever is less, provided that Lessor shall (i) indemnify, defend and hold harmless Lessee against all losses encountered in connection with, arising out of, or growing from such operations, the Liquor Licenses and the sale of alcoholic beverages at and from the bars, restaurants, lounges and liquor facilities located at the Premises during said period of time, and (ii) Lessor or its designee shall reimburse Lessee for Lessee's costs and expenses in maintaining the Liquor Licenses in full force and effect. In no event shall Lessee be required to obtain any additional liquor licenses or alcoholic beverage licenses which Lessee does not possess at the time of termination of the Lease. Any cooperation by Lessee under this paragraph shall be expressly subject to all rules and regulations applicable to the Liquor Licenses and specifically nothing herein shall grant Lessor any right or interest in such Liquor Licenses until such time as all applicable regulatory bodies have approved Lessor's or its designee's applications.

     25.5. <u>Exceptions</u>. Lessee will retain its business and tax records and all litigation and legal files, and will not deliver these items to Lessor upon termination of the Lease.

**26.** **JOINT DELIVERIES:** Upon or immediately following termination of the Lease, the parties shall perform the following:

**26.1.** **Baggage.** Authorized representatives of Lessor and Lessee shall take inventory of (i) all baggage, suitcases, luggage, valises and trunks of hotel guests checked or left in the care of Lessee, (ii) all luggage or other property of guests retained by Lessee as security for unpaid accounts receivable, and (iii) the contents of the storage room; provided, however, that no such baggage, suitcases, luggage, valises or trunks shall be opened. Except for such of the property referred to in (ii) above, which shall be removed from the Premises by Lessee on the Closing Date, all such baggage and other items shall be sealed in a manner to be agreed upon by the parties and listed in an inventory prepared and signed jointly by representatives of Lessor and Lessee on the Termination Date. Lessor shall be responsible from and after said date for all baggage and other items listed in such inventory and, where the seals have been broken, for the contents thereof. Lessee shall be responsible for said contents if the seals have not been broken and for all luggage or other property of guests not listed on such inventory or retained by Lessee as security for unpaid accounts receivable. On the Termination Date, Lessee shall be deemed, without further action, to have assigned any storage, warehouse or innkeepers liens it may have under applicable law.

**26.2.** **Safe Deposit Boxes.** Safe deposit boxes in use by customers on the Termination Date will be sealed in a reasonable manner mutually agreeable to Lessor and Lessee. Representatives of both Lessor and Lessee shall be given notice and an opportunity to be present when a seal is broken. Lessee will have no further responsibility for seals broken without the presence of Lessee's representative unless such representative fails to be present after being provided notice pursuant to this Section. Lessor will have no responsibility for loss

23

or theft from a safe deposit box whose seal was broken in the presence of Lessee's representative or without the presence of such representative but after giving such representative notice as provided below. Lessee will make a representative available within one (1) hour after Lessor notifies the person whom Lessee will from time to time designate. On the Termination Date, Lessee shall designate in writing its initial safe deposit representative. All safe deposit keys, combinations and records shall be delivered to Lessor on the Termination Date.

    26.3.  Motor Vehicles.  Lessor and Lessee shall perform the following functions for all motor vehicles that were checked and placed in the care of Lessee: (i) mark all motor vehicles with a sticker or tape; and (ii) prepare an inventory of such items ("Inventoried Vehicles") indicating the check number applicable thereto and any damage thereto. Thereafter, Lessor shall be responsible for the Inventoried Vehicles except for damage indicated in the inventory and Lessee shall be liable for claims with respect to any other vehicles.

27. MISCELLANEOUS:

    27.1.  The waiver by either party of any of the covenants contained herein shall not be deemed a waiver of such party's rights to enforce the same of any other covenant contained herein. The rights and remedies given to the parties hereunder shall be in addition to, and not in lieu of, any rights or remedies as provided by law.

    27.2.  The terms of "Lessor" and "Lessee" shall include the plural, if necessary. All terms used in the singular or in the masculine gender shall apply to the plural or to the feminine or neuter gender as the context requires. If there is more than one Lessee named herein, their obligations hereunder shall be joint and several.

    27.3.  Time is of the essence of this Lease and all of the terms, covenants and conditions hereof.

**27.4.** The laws of the State of Nevada shall govern the validity, construction, performance and effect of this Lease.

**27.5.** This Lease shall not, nor shall any part thereof be construed as a joint enterprise, a partnership or any other relationship except that of Lessor and Lessee.

**27.6.** The terms, provisions, covenants and conditions contained in this Lease shall apply to, bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns (where assignment is permitted) of Lessor and Lessee, respectively.

**27.7.** If any term, covenant or condition of this Lease, or any application thereof, should be held by a court of competent jurisdiction to be invalid, void or unenforceable, all terms, covenants and conditions of this Lease, and all applications thereof, not held invalid, void or unenforceable, shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby.

**27.8.** Whenever in this Lease any words of obligation or duty are used in connection with either party, such words shall have the same force and effect as though framed in the form of express covenants on the part of the party obligated.

**27.9.** This Lease may be executed in multiple counterparts, which together shall constitute one and the same document. Facsimile copies hereof and facsimile signatures hereon shall have the force and effect of originals.

**27.10.** This Lease constitutes the entire understanding between the parties and any oral promises or representations made by either party unless contained in this document shall have no force and effect.

**27.11.** The various styles, options, elections and remedies of the parties hereunder shall be cumulative and no one of them shall be construed as exclusive of any other, or of any right, priority or remedy allowed or provided for by law and not expressly waived in this Lease.

**27.12.** Lessor waives any right of set off against Lessee arising from or related to any agreement , claim, cause of action arising from or related to the sale of the Property to Lessor or any agreement or transaction between any person or entity holding a membership interest in Lessor and any affiliate of Lessee, including claims against Convention Center Drive, LLC or the holder of the Mez Loan.

**27.13. AGREEMENT SUBJECT TO NEVADA GAMING LAWS.** For purposes of this Lease, "Nevada Gaming Authorities" means, collectively, the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, or any governmental agency of the State of Nevada or its political subdivisions that succeeds to the functions of such agencies. Notwithstanding any term, condition, provision or requirement in this Lease, the rights, obligations, remedies and effect of this Lease shall be subject in all respects to the Nevada Gaming Authorities and their rules and regulations. The parties herein acknowledge that, among other things, before they can exercise any rights and remedies set forth in this Lease, they may have to obtain the consent of the Nevada Gaming Authorities to take the actions they deem necessary under the terms of this Lease.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF the parties hereto have executed this Lease Agreement the day and year first above written.

LESSOR:

GIH-SPE II, LLC, a Delaware limited liability company

By:_____
Name: _____
Its:    _____

LESSEE:

CONVENTION CENTER DRIVE HOTEL & CASINO, LLC, a Nevada limited liability company

By:_____
Name:  John Marks
Its:     Managing Member

# EXHIBIT 13

# OPTION TO PURCHASE PROPERTY

This Option to Purchase Property ("Instrument") is entered into this _____ day of _____, 2007, by and between GIH-SPE II, LLC, a Delaware limited liability company ("Optionor"), and ECALV I LLC, a Delaware limited liability company ("Optionee") for valuable consideration, the receipt of which is hereby acknowledged, including, without limitation, the recent conveyance to Optionor of the Real Property (defined below).

## RECITALS

A.      Convention Center Drive, LLC, a Nevada limited liability company ("Seller"), an affiliate of Optionee and, DI Development Group, LLC, a Delaware limited liability company ("Buyer"), an affiliate of Optionor, are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of April 24, 2007 (as amended, the "**Purchase Agreement**"), and Optionor and an affiliate of Optionee are parties to that certain Amended and Restated Turn-Key Lease Agreement dated _____, 2007 (the "Lease"). Pursuant to the Purchase Agreement, Seller has concurrently herewith conveyed to Optionor the real property described on Schedule A attached hereto and incorporated herein by this reference (the "**Real Property**") via deed recorded concurrently herewith in the Recorder's Office of Clark County, Nevada;

B.      The term "Optionor", as used herein, shall mean Optionor, its designees, successors in interest by way of merger, consolidation, business combination, recapitalization or similar transaction and shall include any entity which acquires substantially all of the assets of Optionor;

C.      Optionor has entered into a certain Loan Agreement dated July ___, 2007 ("**Senior Loan**"), with Canpartners Realty Holding Company IV, LLC (together with its successors and assigns, the "**Senior Lender**"), pursuant to which Optionor borrowed certain funds to purchase the Real Property; and

D.      Buyer formed Optionor to take title to the Real Property pursuant to the Purchase Agreement and to enter into this Instrument and the Senior Loan, and Buyer has formed GIH-SPE I, LLC, a Delaware limited liability company, to enter into the Mez Loan (as defined below); and Seller has consented to the financing and the assignment of Buyer's interest in the Purchase Agreement to Optionor in consideration of Optionor's entry into and performance of its obligations under this Instrument.

NOW, THEREFORE, the parties hereto agree as follows:

## AGREEMENT

1.      <u>Grant of Option</u>. Optionor hereby grants to Optionee an exclusive option (the "**Option**") to purchase the Real Property SUBJECT ONLY TO:

(a)      Current taxes and assessments.

(b)     Matters affecting title existing at the time the Option is granted.

(c)     Matters affecting title which are created, made, assumed, consented to or requested by Optionee, its successors or assigns, including but not necessarily limited to the Senior Loan.

(d)     Matters suffered, permitted or arising through the act of lessee or any sublessee under the Lease, or arising from a breach by the lessee of a covenant under the Lease.

2.     <u>Conditions to Exercise.</u>  Subject to the earlier termination of the Option pursuant to Section 5 hereof, Optionee may exercise the Option upon the earlier of (either of the below being an "**Option Event**"):

(a)     The date Optionee receives written notice from Senior Lender of the acceleration or maturity of the Senior Loan, unless, in the case of acceleration, such acceleration arises from a breach or default of or by Optionee or any of its affiliates under the Lease, any management agreement for the Real Property, or the intercreditor agreement with Senior Lender; or

(b)     January 5, 2008 (time is of the essence as to both such dates in this Section 2).

Notwithstanding subsection (a) above, in the event the acceleration of the Senior Loan arises from a breach or default of or by Optionor, the lender under the Mez Loan (as defined in Section 3(a)) shall have the right to cure such breach or default pursuant to the provisions of its inter-creditor agreement with Senior Lender.  In such event, if Optionor fails to reimburse the lender under the Mez Loan within three (3) business days from such lender's demand, an Option Event shall be deemed to have occurred.

3.     <u>Exercise of Option.</u>  The Option shall be exercised by Optionee (if at all) by Optionee's written notice to Optionor at any time after the occurrence of an Option Event (but in any event prior to the termination of this Option pursuant to the terms herein), on the following terms:

(a)     Optionee shall assign to Optionor, without recourse, the promissory note (and all associated documents) under that certain mezzanine loan ("Mez Loan") entered into by Optionor in connection with, and at the time of, its purchase of the Real Property;

(b)     Optionee shall assign to Optionor the Class Z membership interests in Optionor (and all affiliates of Optionor), but such assignment is subject to the rights of Senior Lender under the Senior Loan and all related agreements between Optionor, its affiliates and Senior Lender;

(c)     Optionee shall cause the repayment or assumption of the Senior Loan, which amount of repayment or the outstanding amount of the Senior Loan, plus the outstanding balance under the Mez Loan, shall be deemed the "Purchase Price"; and

(d)     Optionor shall convey, by warranty deed, good and marketable and insurable title to the Real Property to Optionee.

Each of the actions described in the foregoing clauses (a) through (d) shall be completed by Optionee and Optionor on the Closing (as defined below).

4.     Repurchase Process.

(a)     Opening of Escrow. Concurrently with the exercise of the Option, Optionee shall deliver a copy of the written notice of exercise of the Option, together with a copy of this Instrument, to Nevada Title Company ("Escrow Holder"). Upon delivery of such documents to Escrow Holder, an escrow ("Escrow") for the repurchase of the Real Property shall be deemed to be opened. Upon exercise of the Option, Optionee shall cause the deposit of earnest money in an amount no less than Three Million Dollars US ($3,000,000.00) into a reserve with the Senior Lender if the Senior Loan is to be repaid in connection with the purchase, and otherwise such deposit shall be made with the Escrow Holder. Optionee and Optionor agree to be bound by the standard escrow General Provisions of Escrow Holder as in effect at such time and to execute and deliver to Escrow Holder the same. In the event of any discrepancy between this Instrument and such further instructions, the provisions of this Instrument shall prevail.

(b)     Close of Escrow. If Optionee timely notifies Optionor of Optionee's election to exercise the Option, then the closing of such repurchase transaction (the "Closing") shall take place within sixty (60) days after Optionee provides notice of that election, or within an additional sixty (60) days thereafter as may be required in the sole and reasonable discretion of Optionee. If Optionee exercises the Option, then Optionor agrees to convey the Real Property to Optionee or other party as provided herein in substantially the same physical condition as of the date of closing of the Real Property, except for improvements made thereto.

(c)     If Optionee gives written notice to Optionor that it does not elect to exercise the Option after an Option Event, or if Optionee fails to give written notice to Optionor within the time period(s) provided herein, then the Option shall nonetheless continue to be available to Optionee upon the occurrence of another Option Event, except as provided in Section 5 hereof.

(d)     The Closing shall be subject only to Escrow Holder's delivering to Optionee through Escrow an ALTA Standard Coverage Owner's Policy of Title Insurance (the "Title Policy") issued by Nevada Title Company (the "Title Company"), dated as of the Closing, insuring Optionee in an amount equal to the Purchase Price, showing title vested in Optionee as set forth in Section 1 above, and subject only to the same exceptions to title contained in the title policy received by Optionor upon its purchase of

the Real Property (Optionee may choose to accept additional exceptions to title in its sole discretion). Upon receipt of the Warranty Deed (as defined below) and the Purchase Price and provided Escrow Holder is then ready to deliver the Title Policy to Optionee and all other conditions contained herein have either been satisfied or waived, Escrow Holder shall cause the Warranty Deed to be recorded and shall deliver the Purchase Price (less appropriate charges) to Optionor. At the Closing, Optionor shall assign and/or deliver to Optionee at Closing the same items instruments (subject to commercially reasonable changes to such items over time) that were assigned and/or delivered from Optionee to Optionor related to the Real Property, including but not limited to the "Personal Property" and the "Intangible Property", as such terms are defined in the Purchase Agreement.

(e) <u>Escrow and Title Fees</u>. Optionee and Optionor shall each pay one-half (1/2) of the Escrow fees. Optionor shall bear the cost of (i) all documentary transfer taxes, (ii) the premium which would be required for the Title Policy if issued by Title Company insuring Optionee in the amount of the Purchase Price and (iii) the cost of recording the warranty deed for the Real Property and the Improvements thereon (the "Warranty Deed"). Optionor shall deposit the Warranty Deed into Escrow prior to the Closing. The Warranty Deed shall be in a form acceptable to Optionee, sufficient to convey good title to Optionee as required herein and adequate for the Title Company to deliver the Title Policy. All other costs or expenses not otherwise provided for in this Instrument shall be apportioned or allocated between Optionee and Optionor in the manner customary in Clark County, Nevada. If the Real Property is encumbered by a mortgage, deed of trust or other monetary encumbrance to which the Option is subordinate, Optionee shall instruct Escrow Holder to satisfy the indebtedness secured by such mortgage, deed of trust or other monetary encumbrance out of the proceeds payable to Optionor through Escrow.

(f) <u>Assumption of Mortgage or Deed of Trust</u>. With the consent of Senior Lender, Optionee may elect to assume rather than pay the Senior Loan debt secured by a mortgage or deed of trust on the Real Property, so long as Senior Lender releases Optionor and any pledgors of collateral for and any guarantors of the Senior Loan.

5. <u>Termination of Option</u>.

(a) Notwithstanding anything to the contrary set forth herein, the Option shall permanently cease to be available to Optionee upon the earlier of the following, each being a **"Termination Event"**:

(i) May 31, 2017; or

(ii) the full payment and discharge of the Mez Loan.

(b) Upon the occurrence of a Termination Event, Optionor and Optionee shall immediately enter into a Notice of Termination of Option to Purchase ("Notice of Termination") in substantially the same form as Schedule C attached hereto, and shall record

same with the Office of the Clerk of Clark County, Nevada. If Optionee has failed to execute the Notice of Termination within ten (10) days of the Termination Event, Optionor may execute the Notice of Termination for and on behalf of Optionee as its attorney-in-fact. In acknowledgement thereof, Optionee hereby appoints Optionor as its irrevocable attorney-in-fact coupled with an interest solely to execute and deliver the Notice of Termination on behalf of Optionee.

6. _Insolvency or Bankruptcy._ If at any time prior to expiration of the Option, Optionor shall become insolvent or generally fail to pay, or admit in writing its inability to pay, its debts as they become due or apply for, consent to, or acquiesce in the appointment of, a trustee, receiver or other custodian for any of its Real Property, or make a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Optionor, or for a substantial part of any of Optionor's Real Property and is not discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of Optionor, or any event shall occur similar to any of the foregoing under the laws of any jurisdiction, and if such case or proceeding is not commenced by Optionor, it is consented to or acquiesced in by Optionor or remains for thirty (30) days undismissed, then the Option may, in the sole discretion of Optionee, be treated as automatically exercised.

7. _Successors and Assigns._ This Instrument shall be binding upon the successors in interest of Optionor.

8. _Waiver, Consent and Remedies._ Either party may specifically and expressly waive in writing any portion of this Instrument or any breach hereof, but no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach of the same or any other provision. A waiving party may at any time thereafter require further compliance by the other party with any breach or provision so waived. The consent by one party to any act by the other for which such consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or any similar acts in the future. No waiver or consent shall be implied from silence or any failure of a party to act, except as otherwise specified in this Instrument. All rights, remedies, undertakings, obligations, options, covenants, conditions and agreements contained in this Instrument shall be cumulative and no one of them shall be exclusive of any other. Except as otherwise specified herein, Optionee may pursue any one or more of its rights, options or remedies hereunder or may seek damages or specific performance in the event of Optionor's breach hereunder, or may pursue any other remedy at law or equity, whether or not stated in this Instrument.

9. _Attorneys' Fees._ In the event of any action or proceeding instituted between Optionee, Optionor and/or Escrow Holder in connection with this Instrument, then as between Optionor and Optionee the prevailing party shall be entitled to recover from the losing party all of its costs and expenses, including, without limitation, court costs, all costs of appeals and reasonable attorneys' fees.

10. _Notices._ Any notices or other communications to be given or other documents to be delivered by any party to the other under this Instrument shall be delivered in the same

manner as provided in the Purchase Agreement. Any party hereto may from time to time, by written notice to the other, designate a different address that shall be substituted for the one above specified.

    11.    <u>Gender and Number</u>. In this Instrument (unless the context requires otherwise), the masculine, feminine and neuter genders and the singular and the plural shall be deemed to include one another, as appropriate.

    12.    <u>Entire Agreement</u>. This Instrument and its exhibits, together with that certain Option Subordination Agreement of even date herewith, by and among Senior Lender, Optionee and Optionor, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and the final, complete and exclusive expression of the terms and conditions thereof. All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written, express or implied, are hereby superseded and merged herein.

    13.    <u>Captions</u>. The captions used herein are for convenience only and are not apart of this Instrument and do not in any way limit or amplify the terms and provisions hereof.

    14.    <u>Governing Law</u>. This Instrument and the exhibits attached hereto have been negotiated and executed in the State of Nevada and shall be governed by and construed under the laws of the State of Nevada.

    15.    <u>Invalidity of Provision</u>. If any provision of this Instrument as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Instrument, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Instrument as a whole.

    16.    <u>Amendments</u>. No addition to or modification of any provision contained in this Instrument shall be effective unless fully set forth in writing by both Optionee and Optionor.

    17.    <u>Counterparts</u>. This Instrument may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

    18.    <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed and approved this Instrument and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Instrument or any amendments or exhibits hereto.

    19.    <u>Sale of Real Property by Optionee</u>. Notwithstanding anything to the contrary herein, the Option may be exercised directly by Optionee or in connection with a sale of the Real Property by Optionee to a third party with the net proceeds after payment of the Senior Loan (or its assumption by the Optionee with the consent of the Senior Lender) to be paid to Optionee.

20. <u>Actions by Optionor</u>. Except for the Senior Loan, any and all other agreements relative to the sale or development of the Real Property shall be subordinate to the Option described herein, and Optionor shall not take any action to affect the zoning or licensure of the Real Property without the written consent of Optionee. Optionor shall not take any action to circumvent the exercise of the Option upon or after the occurrence of an Option Event, and will indemnify and hold Optionee harmless from all loss, cost or expense, including attorneys' fees, relating to a breach of this covenant or a breach by Optionor of its obligations under this Instrument. Optionor shall not cause or permit any lien, encumbrance, or other interest to attach to the Real Property other than a lien, encumbrance or interest of the Senior Lender. Optionor shall not incur any debt other than as permitted by the Senior Lender.

21. <u>Covenants Running With The Land; Term</u>. The Real Property shall be held, developed, conveyed, hypothecated, encumbered, leased, rented, used and occupied subject to the covenants, conditions, restrictions and other limitations set forth in this Instrument (the "**Restrictions**"). The Restrictions are intended and shall be construed as covenants and conditions running with the Real Property. Notwithstanding anything to the contrary herein, prior to the occurrence of an Option Event, the Option granted herein shall terminate upon the full payment and discharge of the Mez Loan.

22. <u>Notice of Contract</u>. Optionee and Option shall record a notice of the existence of this Instrument with the Recorder's Office of Clark County, Nevada concurrently with the execution of this Option, in the form attached as Schedule B.

23. <u>Assignment of Instrument</u>. Unless at the time of, or subsequent to, the full payment and discharge of the Senior Loan, this Instrument may not be assigned without the written consent of Senior Lender.

24. <u>AGREEMENT SUBJECT TO NEVADA GAMING LAWS</u>. For purposes of this Instrument, "Nevada Gaming Authorities" means, collectively, the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board, or any governmental agency of the State of Nevada or its political subdivisions that succeeds to the functions of such agencies. Notwithstanding any term, condition, provision or requirement in this Instrument, the rights, obligations, remedies and effect of this Instrument shall be subject in all respects to the Nevada Gaming Authorities and their rules and regulations. The parties herein acknowledge that, among other things, before they can exercise any rights and remedies set forth in this Instrument, they may have to obtain the consent of the Nevada Gaming Authorities to take the actions they deem necessary under the terms of this Instrument.

<p style="text-align:center">[SIGNATURE PAGE FOLLOWS]</p>

IN WITNESS WHEREOF, the undersigned have executed this Instrument as of the date first above written.

**OPTIONOR:**                                    **OPTIONEE:**

GIH-SPE II, LLC                                  ECALV I LLC,
a Delaware limited liability company             a Delaware limited liability company


By:_____                     By:_____
Name:_____                     Name:_____
Its:_____                    Its:_____


STATE OF _____         )
                           ) ss.
County of _____          )

The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by
_____, as _____ of GIH-SPE II, LLC, LLC.


_____
Notary Public

My Commission Expires:


STATE OF _____         )
                           ) ss.
County of _____          )

The foregoing instrument was acknowledged before me this ____ day of _____, 2007 by
_____, as _____ of ECALV I LLC.


_____
Notary Public
My Commission Expires: